The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YOLANY PADILLA, *et al.*, <br>                    Plaintiffs-Petitioners, <br>    v. <br><br> U.S. IMMIGRATION AND CUSTOMS <br> ENFORCEMENT, *et al.*, <br><br>                    Defendants-Respondents. | Case No. 2:18-cv-00928-MJP <br><br> **MOTION FOR PRELIMINARY <br> INJUNCTION** <br><br> NOTE ON MOTION CALENDAR: <br> October 12, 2018 <br><br> ORAL ARGUMENT <br> REQUESTED |

# Table of Contents

I.   INTRODUCTION ..................................................................................................................1

II.  BACKGROUND ..................................................................................................................2

   A.  Defendants' Anti-Asylum Seeker Policy Changes .........................................................2

   B.  Defendants' Current Bond Hearing Policy .....................................................................3

III. ARGUMENT .......................................................................................................................6

   A.  Plaintiffs Are Likely to Prevail on Their Claims ...........................................................7

      1.   Likelihood of Success on Due Process Claims ........................................................7

         a.   *Plaintiffs Have a Substantive Liberty Interest in Freedom from Imprisonment* .......7

         b.   *Defendants Have Violated Plaintiffs' Procedural Due Process Rights*....................7

            i.   Plaintiffs' Private Interest .................................................................................8

            ii.  Risk of Erroneous Deprivation and Value of Additional Safeguards....................8

            iii. Government Interest...........................................................................................15

      2.   Likelihood of Success on Administrative Procedure Act Claims .............................16

         a.   *Defendants' Actions Are Unreasonably Delayed* ..................................................16

         b.   *Defendants' Actions Were Not in Accordance with Law and Contrary to Constitutional Right*...............................................................................................19

   B.  Plaintiffs Have Suffered, and Will Continue to Suffer, Irreparable Harm Absent This Court's Intervention.......................................................................................................20

   C.  The Public Interest and Balance of Equities Weigh Heavily in Favor of Granting Injunctive Relief............................................................................................................23

IV. CONCLUSION....................................................................................................................24

PLS.' MOT. PRELIM. INJ.

- i -

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

## I.   **INTRODUCTION**

Asylum seekers in the United States face an increasingly hostile landscape, as Defendants seek to deter them from entering the country. This motivation is most crudely laid bare by the family separation practice that formed part of Defendants' recent "Zero-Tolerance Policy," yet is also demonstrated in their routine practice of imprisoning asylum seekers and prolonging their imprisonment after they demonstrate a credible basis for asylum. These anti-asylum tactics conflict with the fair process to which asylum seekers are entitled—a process that includes bond hearings. While the family separation policy has now been rejected as unconstitutional, Defendants continue to utilize protracted civil detention to deter and obstruct asylum seekers, depriving them of a fair process to seek release during their lengthy immigration proceedings.

Plaintiffs Blanca Orantes and Baltazar Vasquez, and the Proposed Bond Hearing Class[1] they seek to represent (hereinafter, Plaintiffs), are asylum seekers who already have been determined by Defendant U.S. Citizenship and Immigration Services (USCIS) to have a credible fear of persecution in their countries of origin. They all are eligible for bond hearings before an immigration judge (IJ). Defendants nonetheless prolong their detention by delaying access to bond hearings in which an IJ would determine whether release pending adjudication of their asylum applications is warranted. Furthermore, the bond hearings Defendant Executive Office for Immigration Review and Defendant Sessions (the EOIR Defendants) eventually provide do not comport with due process, because 1) they are not recorded or transcribed, 2) the burden of proof is erroneously placed on the asylum seeker, and 3) the IJ does not make contemporaneous, particularized written findings when issuing a decision.

Absent action by this Court, Plaintiffs face irreparable harm: violation of their constitutional rights, extended detention without access to a fair hearing, and, as a consequence,

---

[1]     To the extent the Court deems it necessary, Plaintiffs meet the standards for provisional class certification. The relevant portions of Plaintiffs' amended motion for class certification, Dkt. 37, are incorporated herein.

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

interference with their ability to pursue their asylum claims. Plaintiffs therefore ask this Court to issue a preliminary injunction requiring timely bond hearings that comport with due process. Specifically, they ask this Court to order the EOIR Defendants to 1) conduct bond hearings within seven days of a hearing request, 2) place the burden of proof on Defendant Department of Homeland Security (DHS) in those bond hearings, 3) produce a recording or verbatim transcript, and 4) produce a contemporaneous written decision with particularized determinations.

## II.    BACKGROUND

### A.    Defendants' Anti-Asylum Seeker Policy Changes

This case involves individuals seeking asylum in the United States who face systemic resistance in pursuing their individual immigration cases, even after receiving positive determinations from DHS Defendants regarding the credibility of their claims. Starting several years ago, Defendants created policies that make it increasingly difficult for these asylum seekers to pursue their claims and seek release from detention. The "Zero-Tolerance Policy" announced by Defendant Sessions in April 2018 greatly exacerbated the existing hurdles.

Through the Zero-Tolerance Policy, Defendants sought to deter noncitizens from entering the country and exercising their right to apply for asylum by forcibly separating them from their children, criminally prosecuting them, and keeping them incarcerated. Defendant Sessions warned individuals crossing the southern border, including asylum seekers, that they would "not be rewarded" and would "be met with the full prosecutorial powers of the Department of Justice." Press Release, U.S. Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://tinyurl.com/y96nsut6; *see also* Jefferson B. Sessions, Att'y Gen., U.S. Dep't of Justice, Remarks to the Largest Class of Immigration Judges in History for the Executive Office for Immigration Review (EOIR) (Sep. 10, 2018), https://tinyurl.com/y7jrxl2v (describing the "deterrent effect" of the Zero Tolerance Policy

against asylum seekers who "abuse[]" the immigration system "to the detriment of the rule of law, sound public policy, and public safety").

Subsequently, after sustained outcry against the ensuing separation of thousands of parents and children, President Trump issued an Executive Order directing an end to the practice. *See* Exec. Order No. 13841, 83 Fed. Reg. 29435, Affording Congress an Opportunity to Address Family Separation (Jun. 20, 2018). However, the Executive Order re-committed to keep asylum seekers detained while they present their claims to immigration courts. *Id.* § 3(a) (directing DHS to "maintain custody of [noncitizen] families during the pendency of any . . . immigration proceedings involving their members"); *see also* Jefferson B. Sessions, *Remarks, supra* (decrying the practice of releasing asylum seekers as part of "[p]owerful incentives" that led to a "surge[]" of "illegal entrants").

Defendants combined these detention-focused policies with directives to make it more difficult for asylum seekers to prove the merits of their claims. For example, Defendants Sessions and USCIS have directed IJs and USCIS officers to broadly reject categories of asylum claims related to, for example, domestic violence and gang violence. As part of that directive, Defendants emphasized the discretionary nature of asylum and urged consideration of whether asylum seekers who have entered without inspection and/or did not pursue refugee status in their countries of origin when determining whether to exercise such discretion, even in credible fear interviews. *Matter of A-B-*, 27 I&N Dec. 316, 345 & n.12 (A.G. 2018); USCIS, PM-602-0162, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-* (Jul. 11, 2018).

**B.    Defendants' Current Bond Hearing Policy**

Under the Immigration and Nationality Act (INA), detained asylum seekers who entered the county without inspection, who were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), and who USCIS determines to have a credible fear of persecution, are

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

eligible to seek release from incarceration while they pursue their claims. *See Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005).[2] DHS initially determines whether asylum seekers are to remain in detention or be released, *see* 8 C.F.R. § 236.1(c)(8), and they can seek review of DHS' custody determination before an IJ during a bond hearing, *see* 8 U.S.C. § 1226(a); 8 C.F.R. § 1003.19(a).

The EOIR Defendants' own guidance directs them to hold bond hearings quickly. Precedential decisions by the Board of Immigration Appeals (BIA), the appellate body reviewing IJ decisions, mandate that bond hearings take place as expeditiously as possible. *See Matter of Chirinos*, 16 I&N Dec. 276, 277 (BIA 1977) ("Our primary consideration in a bail determination is that the parties be able to place the facts *as promptly as possible* before an impartial arbiter."); *Matter of Valles-Perez*, 21 I&N Dec. 769, 772 (BIA 1997) ("When an [individual] is detained, the district directors, the Immigration Courts, and this Board give a high priority to resolving the case as expeditiously as possible."). This urgency is expressly echoed in relevant regulations and guidance. *See, e.g.*, 8 C.F.R. § 1003.47(k) (noting the "expedited nature" of initial custody redetermination hearings); Aliens and Nationality; Rules of Procedure Before Immigration Judges, 52 Fed. Reg. 2931, 2932 (Jan. 29, 1987) (noting that the structure of the then-bond regulation was intended to "maximize the prompt availability of Immigration Judges for respondents applying for custody/bond determinations"); Imm. Court Practice Manual § 9.3(d) (2016) ("In general, after receiving a request for a bond hearing, the Immigration Court schedules the hearing for the earliest possible date . . . ."). Recognizing the significance of the deprivation of liberty, the regulations provide for bond hearings to take place as soon as DHS takes an individual into custody, even before the agency files immigration charges. 8 C.F.R. § 1003.14(a). Yet, the EOIR Defendants nonetheless have a practice of

---

[2]     Defendant Sessions recently indicated an intention to reconsider the Board's precedent decision in *Matter of X-K-*. *See Matter of M-G-G-*, 27 I&N Dec. 469 (A.G. 2018) (inviting briefing on the continued validity of *Matter of X-K-* in light of *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)). Proposed class members are eligible for bond hearings unless and until the decision is vacated, and even then, this Court need not defer to any such vacatur.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

delaying Plaintiffs' bond hearings weeks, if not months, after a hearing request. *See* Dkt. 37 at 14; Levy Dec. ¶6; Valencia Dec. ¶4; Love Dec. ¶¶4-5; Byers Dec. ¶5; Lunn Dec. ¶5; Beckett Dec. ¶5; Mercado Dec. ¶10; Jong Dec. ¶¶3-4; Inlender Dec. ¶¶12-13; Koh Dec. ¶14; Antonini Dec. ¶5; Yang Dec. ¶¶5-6; Shulruff Dec. ¶4; *see also* Orantes Dec. ¶13.

At the bond hearing, an IJ determines whether to release the asylum seeker on bond, recognizance, or other conditions pending resolution of her immigration case. *See* 8 C.F.R. §§ 1236.1(d)(1), 1003.19. In doing so, the IJ evaluates whether she poses a danger to the community and the likelihood that she will appear at future proceedings. *See Matter of Adeniji*, 22 I&N Dec. 1102, 1112 (BIA 1999). Unlike in other civil detention contexts, EOIR places the burden of proving eligibility for release on the detained asylum seekers, not the government. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006).

An asylum seeker has the right to appeal an IJ's denial of bond to the BIA, 8 C.F.R. § 1003.19(f), or to seek another bond hearing before an IJ if she can establish a material change in circumstances since the prior bond decision. 8 C.F.R. § 1003.19(e). When determining whether to appeal a bond decision (or seek a new bond hearing), asylum seekers do not have access to a record of the initial bond proceedings. Immigration courts do not record bond proceedings or provide transcriptions of the oral decisions issued in the hearings, nor do they issue written decisions unless the individual has filed an administrative appeal of the bond decision. *See, e.g.*, Imm. Court Practice Manual § 9.3(e)(iii), (e)(vii); BIA Practice Manual §§ 4.2(f)(ii), 7.3(b)(ii).

If an asylum seeker is denied bond or is unable to pay the amount set by the IJ, she will remain detained throughout the entirety of removal proceedings before the IJ and the BIA. These detained individuals face serious obstacles, including a decreased likelihood of finding a lawyer and of prevailing in their claims for protection. *See, e.g.*, Ingrid Eagly & Stephen Shafter, Am. Imm. Council, *Access to Counsel in Immigration Court* (2016), https://tinyurl.com/y7hbl2rm; Lunn Dec. ¶7; Cooper Dec. ¶¶9-10. They also frequently face substandard conditions, inadequate

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

medical and mental health care, and insufficient resources to adequately pursue their cases. *Id.* ¶¶3-8, 11-14, 17-20 (outlining "systemic, sub-human conditions" in immigration detention centers, including insufficient medical and mental health care, access to legal materials, ability to communicate, and access to safe food and water); *see also infra* Section III.B. Especially for individuals like Plaintiffs who already have established credible persecution claims, detention during removal proceedings can have devastating consequences.

## III.   ARGUMENT

The party moving for a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm absent injunctive relief, (3) that the balance of equities favors injunctive relief, and (4) an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). The Ninth Circuit uses a balancing, or "sliding scale," approach, clarifying that, where the balance of hardships tips strongly in the movant's favor, she need only show that her claims raise serious legal questions and that the other two elements are met. *See, e.g., Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

Plaintiffs request only that Defendants correctly apply the law and thus merit a prohibitory injunction. *See Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (noting that an injunction that "prevents future constitutional violations" is "a classic form of prohibitory injunction"). Plaintiffs can demonstrate not only serious questions going to the merits, but a likelihood of success on those merits, satisfying both the "sliding scale" and traditional inquiry.[3]

---

[3] However, even if the relief sought were deemed to be a mandatory injunction, Plaintiffs are able to show that "'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez*, 872 F.3d at 999 (citation omitted).

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

A.   **Plaintiffs Are Likely to Prevail on Their Claims**

1.   **Likelihood of Success on Due Process Claims**

a.   *Plaintiffs Have a Substantive Liberty Interest in Freedom from Imprisonment*

Every individual in immigration detention has a constitutional liberty interest in freedom from physical restraint. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." (citation omitted)). This fundamental right applies to noncitizens and citizens alike. *See, e.g.*, *Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *Harisiades v. Shaughnessy*, 342 U.S. 580, 586 & n.9 (1952) (stating that immigrants stand on "equal footing with citizens" in several respects, including the protection of personal liberty). This is true even for recent entrants. *See United States v. Raya-Vaca*, 771 F.3d 1195, 1203 (9th Cir. 2014) (reaffirming that the "Due Process Clause applies to all who have entered the United States—legally or not," even those who have only "run some fifty yards into the United States"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188 (D.D.C. 2015) (noting that individuals apprehended in the country, especially those who "may have legitimate claims to asylum, such that their presence here may become permanent . . . are entitled to the protection of the Due Process Clause, especially when it comes to deprivations of liberty").

b.   *Defendants Have Violated Plaintiffs' Procedural Due Process Rights*

"In the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Hernandez*, 872 F.3d at 990 (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)). Courts assess procedural due process claims under a balancing test, weighing:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally,

the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Under this test, Defendants must provide prompt bond hearings in which DHS bears the burden of proof, a recording or transcript is provided, and judges issue a contemporaneous written decision explaining their findings.

### i.     Plaintiffs' Private Interest

As the Ninth Circuit has recognized, it "is beyond dispute" that "the private interest at issue here is 'fundamental': freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'" *Hernandez*, 872 F.3d at 993 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). The Supreme Court also has repeatedly found that "civil commitment for *any* purpose constitutes a significant deprivation of liberty." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added). This liberty interest is implicated by each of Plaintiffs' due process claims: remaining detained without a prompt bond hearing; bearing the burden of proof in a bond hearing for civil detention despite having already established a credible asylum claim and having limited access to evidence; and being forced to consider whether to appeal a negative bond decision without any record of what took place at the hearing or even the individualized findings behind the bond decision.

### ii.     Risk of Erroneous Deprivation and Value of Additional Safeguards

*(a). Timely Bond Hearings*: Defendants' failure to provide prompt bond hearings not only risks, but guarantees, unnecessarily prolonging the detention of bona fide asylum seekers. Once individuals are given the opportunity to have a bond hearing, EOIR Defendants will grant bond in many of their cases. *See* Transactional Records Access Clearinghouse, Three-fold Difference in Immigration Bond Amounts by Court Location (Jul. 2, 2018), http://trac.syr.edu/immigration/reports/519/ (showing that more than 47% of IJ bond decisions in the first 8 months of FY2018 ordered release). Delays of weeks or months are not reasonable

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

given the liberty interests at stake, Defendants' own guidance on the need for prompt custody determinations, and the timing required for similar types of hearings.

While the agency has not set a precise timeline for expeditious bond hearings, EOIR Defendants are required, by Congress, to review credible fear determinations "as expeditiously as possible," which is defined to require review "to the maximum extent practicable within 24 hours, but in no case later than 7 days." 8 U.S.C. § 1225(b)(1)(B)(III)(iii); *see also* 8 C.F.R. § 1003.42(e). Similarly, DHS must undertake prompt custody redeterminations of noncitizens arrested without a warrant generally within 48 hours of arrest. *See* 8 C.F.R. § 287.3(d).

In the criminal context, the Fourth Amendment generally requires a "prompt" probable cause hearing within 48 hours of arrest. *See, e.g.*, *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).[4] Similarly, in the civil commitment context, courts long have required a hearing within days after the state takes custody. *See, e.g.*, *Doe v. Gallinot*, 657 F.2d 1017, 1025 (9th Cir. 1981) (recognizing that due process requires an expeditious hearing to justify an individual's continuing civil detention and requiring a hearing within 7 days). District courts similarly have required Defendants to conduct bond hearings within 7 to 10 days after determining entitlement to a bond hearing under § 1226(a). *See, e.g.*, *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1177, 1197 (N.D. Cal. 2017) (ordering bond hearings for minors re-arrested by DHS within 7 days of arrest and noting that the government had represented that bond hearings generally take place within 7 to 14 days of arrest); *Nguti v. Sessions*, 259 F. Supp. 3d 6, 14 (W.D.N.Y. 2017) (ordering a bond hearing within one week); *Rosciszewski v. Adducci*, 983 F. Supp. 2d 910, 917 (E.D. Mich. 2013) (ordering a bond hearing for individual within 10 days); *Castañeda v. Souza*, 952 F. Supp. 2d 307, 309-10 (D. Mass. 2013), *aff'd by equally divided court* 810 F.3d 15 (1st

---

[4] These hearings are required to allow for an initial probable cause determination, rather than bail proceedings. However, federal bail hearings generally also occur during an individual's first appearance before a judicial officer. *See, e.g.*, *United States v. Molinaro*, 876 F.2d 1432 (9th Cir. 1989).

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Cir. 2015) (ordering a bond hearing within 9 days); *Pujalt-Leon v. Holder*, 934 F. Supp. 2d 759, 761 (M.D. Pa. 2013), *abrogated on other grounds by Sylvain v. Att'y Gen.*, 714 F.3d 150 (3d Cir. 2013) (ordering a bond hearing within 10 days). Thus, while Congress has not provided a precise timetable for initial bond hearings, where liberty is at stake, due process requires an expeditious schedule of 7 days from a bond hearing request to avoid unreasonable delay.

    *(b). Burden of Proof*: Similarly, Defendants' policy of placing the burden of proof on individuals with bona fide asylum claims risks error in the form of continued detention due to the inability to gather evidence and develop arguments while detained. But, "the Supreme Court has consistently adhered to the principle that the risk of erroneous deprivation of a fundamental right may not be placed on the individual. Rather, when a fundamental right, such as individual liberty, is at stake, the government must bear the lion's share of the burden." *Tijani v. Willis*, 430 F.3d 1241, 1245 (9th Cir. 2005) (Tashima, J., concurring). While the Ninth Circuit already requires the government to bear the burden in prolonged detention cases (involving individuals previously subject to mandatory detention), *see Singh*, 638 F.3d at 1203, it has not yet addressed the bearer of the burden in initial bond hearings, nor in bond hearing involving individuals who already have established a bona fide asylum claim. By definition, Plaintiffs have already made a showing that they have a bona fide basis for protection from removal—a key factor in assessing flight risk. *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987) (finding that "[a] respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear"); *see also* Koh Dec. ¶13. "In cases where a non-criminal [noncitizen's] liberty may be taken away, due process requires that the government prove that detention is necessary. This is especially true when individuals may be detained for extended periods of time." *Pensamiento v. McDonald*, 315 F. Supp. 3d 684, 692–93 (D. Mass. 2018) (citing *Foucha*, 504 U.S. at 81-82; *Addington*, 441 U.S. at 427.).

    As Defendants acknowledge, "the government previously applied a presumption that

non-criminal [noncitizens] detained under Section 1226(a) would be released on bond, unless the government could show by a preponderance of the evidence that he was a flight risk or danger." Dkt. 36 at 16; *see also Matter of Patel*, 15 I&N Dec. 666 (BIA 1976) (clarifying the noncitizen "generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security, or that he is a poor bail risk") (citation omitted); *Matter of Andrade*, 19 I&N Dec. 488, 489 (BIA 1987) (reaffirming *Patel*).

Congress only ever identified the bearer of the burden of proof with respect to *one* group: individuals with certain convictions. Initially, Congress mandated the detention of persons with aggravated felony convictions during immigration proceedings, only allowing for release of lawful permanent residents who were "not a threat to the community and [who were] likely to appear before any scheduled hearings." *See* Immigration Act of 1990, Pub. L. No. 101-649, § 504(a), 104 Stat. 4978, 5049-50 (amending former INA § 242(a)(2)); *see also Matter of De La Cruz*, 20 I&N Dec. 346, 349-50 (BIA 1991). In 1996, Congress expanded the types of convictions that trigger mandatory detention, *see* 8 U.S.C. § 1226(c)(1), allowing for release if the person is necessary to a criminal prosecution and "will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding," 8 U.S.C. § 1226(c)(2).

This is the *only* category—individuals otherwise subject to mandatory detention—where Congress has specified that the detained individual bears the burden of proving they should be released. Congress took no action to alter the identity of the burden bearer in other bond proceedings. It was the former Immigration and Naturalization Service (INS) that unilaterally removed the pre-existing presumption of release and altered the burden, amending its regulations in 1997 to require all noncitizens to affirmatively demonstrate to an INS official that they do not present a flight risk or a danger to the community. *See* 62 Fed. Reg. 10,312, 10,360 (Mar. 6, 1997) (interim rule); 8 C.F.R. § 236.1(c)(2) (1998).

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Regardless of whether the INS had authority to take this action in the absence of congressional intent, the regulation only dictates that noncitizens bear the burden with respect to DHS' initial custody determination, not an IJ determination. However, Defendant EOIR subsequently adopted this same standard for bond hearings. *See Matter of Adeniji*, 22 I&N Dec. 1102 (BIA 1999); *Matter of Guerra*, 24 I&N Dec. at 40. Most importantly, the BIA did not even address whether shifting the burden from the government to the detainee presented any constitutional concerns, despite the fact that, throughout the history of the Supreme Court's civil detention jurisprudence, the Court has required the government to bear the burden of proof, making clear that civil detention be treated as the "exception," not the norm. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."); *Addington*, 441 U.S. at 425 ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").

In rejecting a challenge to pretrial detention under the Bail Reform Act, the Court relied in part upon the procedural protections in the Act, including the fact that the government bore the burden of proving "by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." *Salerno*, 481 U.S. at 751. In contrast, in *Foucha*, the Court ruled that a Louisiana statute providing for continued confinement of the mentally ill after a finding of not guilty by reason of insanity violated the Due Process Clause, in part because "the statute places the burden on the detainee to prove that he is not dangerous." 504 U.S. at 81. Indeed, in *Addington*, the Court ruled that the preponderance of the evidence standard was insufficient to comport with due process because it was improper to ask "the individual . . . to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." 441 U.S. at 427; *see also Zadvydas*, 533 U.S. at 692 (rejecting regulation authorizing DHS to review a detainee's

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

continued custody and emphasizing the constitutional inadequacy of a procedure where the noncitizen "bears the burden of proving he is not dangerous").

In the instant case, by definition, Plaintiffs are not subject to the mandatory detention category designated by Congress. Moreover, they already have demonstrated to DHS officials that they have a bona fide claim to remain in this country. Defendants do not have legal authority to shift and impose the burden on the detained person to overcome protracted civil detention.

*(c). Recordings, Transcripts and Decisions*: Defendants' failure to provide a transcript or recording of bond hearings also interferes with the right to appeal bond decisions to the BIA. In FY2016, more than 3,000 individuals sought review of IJ bond decisions from the BIA. *See* Executive Office for Immigration Review, *FY2016 Statistics Yearbook*, at R2, Table 18 (Mar. 2017), https://tinyurl.com/y7n6ho9l. But those individuals pursued administrative appeals at a significant disadvantage. Unlike all other proceedings before an IJ, EOIR does not generally record bond hearings. As such, there is no recording or transcript available to refer to on appeals. *See Singh*, 638 F.3d at 1208 (private interest is "fundamentally affected by the BIA's refusal to provide transcripts or an adequate substitute" created contemporaneously with the hearing). Detained asylum seekers do not have access to the information they need to determine if the IJ made errors and then to substantiate those errors in an appeal. *Cf. Bergerco, U.S.A. v. Shipping Corp. of India*, 896 F.2d 1210, 1215 (9th Cir. 1990) ("[W]here a defendant makes allegations of error which, if true, would be prejudicial, the unavailability of a transcript may make it impossible for the appellate court to determine whether the defendant's substantive rights were affected."). The absence of this protection impedes their ability to appeal bond decisions and to provide sufficient arguments in support of appeal, undermining potential appeals and causing asylum seekers to unnecessarily remain detained while they pursue their asylum claims. *See, e.g.*, Inlender Dec. ¶15; Koh Dec. ¶19; Byers Dec. ¶10; Beckett Dec. ¶8; Shulruff Dec. ¶10. Once asylum seekers have lost—or forgone entirely—an appeal, they may not get a new opportunity to win release from detention given the difficulty in demonstrating circumstances have changed materially. *See* 8 C.F.R. § 1003.19(e); Inlender Dec. ¶16; Koh Dec. ¶20; Mercado Dec. ¶¶15-20.

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Finally, for many of these same reasons, the absence of a contemporaneous written decision containing individualized findings for the IJ's bond determination also presents a risk of the erroneous deprivation of liberty. Absent such a written determination, individuals or their counsel have insufficient information to assess whether an administrative appeal is appropriate and, if so, on what bases, especially given the lack of a recording to serve as reference. *See Agonafer v. Sessions*, 859 F.3d 1198, 1207 (9th Cir. 2017) (finding that EOIR may not fail to consider relevant issues "in a manner showing that it 'heard and thought and not merely reacted'") (quoting *Lopez v. Ashcroft*, 366 F.3d 799, 807 n.6 (9th Cir. 2004)); *De la Llana-Castellon v. INS*, 16 F.3d 1093, 1096, 1098 (10th Cir. 1994) (finding that due process requires EOIR to "actually consider the evidence and argument that a party presents" and issue a non-boilerplate decision). For individuals who appeared at bond hearings pro se and subsequently consult with an attorney, potential appellate counsel have no way of assessing whether an appeal is viable or the bases for arguments on appeal. *See, e.g.*, Byers Dec. ¶10; Koh Dec. ¶19; Levy Dec. ¶13. Defendants' practice of issuing a decision only once an individual has already filed an appeal of a bond decision is an insufficient alternative. *Singh*, 638 F.3d at 1208. As an initial matter, it comes too late to assist in determining whether an appeal is warranted and articulating the bases for appeal so as to avoid a dismissal. BIA regulations and case law mandate dismissal of appeals if the Notice of Appeal is not sufficiently detailed. *See, e.g.*, 8 C.F.R. § 1003.3(b) (requiring appeal notice to, inter alia, specifically identify challenged factual and/or legal findings and state whether the errors relate to statutory eligibility or discretionary grounds); *Matter of Keyte*, 20 I&N Dec. 158, 159 (BIA 1990) (summarily dismissing notice of appeal that "offered only a generalized statement of [the] reason for the appeal"). Furthermore, a post-hoc written decision, often composed weeks after the hearing, risks failing to include key facts and findings and is unlikely to be limited to the actual bases that the IJ had for the bond decision when it was issued. *See* Cooper Dec. ¶16; Jong Dec. ¶10; *Bergerco*, 896 F.2d at 1214 ("[O]nce

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

the court has entered judgment, it may become subject to the very natural weight of its conviction, tending to focus on that which supports its holding."). Under Defendants' current policies, Plaintiffs will not have a record of proceedings or even a contemporaneous written decision at the time they must provide these detailed explanations for their bond appeals.

### iii.     Government Interest

Ensuring that bond hearings are prompt and include procedural safeguards places a minimal burden on the government. Defendants' practice of imprisoning immigrants, even for a brief period, is extremely costly. *See Hernandez*, 872 F.3d at 996 ("The costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million."). Ensuring that asylum seekers who are eligible for bond have the opportunity to present their cases promptly will ensure that they are not needlessly detained for additional weeks or months. Similarly, with a shifted burden of proof, detained asylum seekers who were unable to gather sufficient evidence in support of their bond cases may be able to be released, rather than spending months—or even years—imprisoned while they pursue their cases before the IJ, BIA, and possibly the courts of appeals. *See, e.g.*, Inlender Dec. ¶14; Jong Dec. ¶¶7-9; Antonini Dec. ¶7; Love Dec. ¶7; Lunn Dec. ¶7; Levy Dec. ¶¶9, 12; Yang Dec. ¶8; Shulruff Dec. ¶7; Cooper Dec. ¶15; Mercado Dec. ¶10. Providing recordings of initial bond hearings also should place no burden on EOIR Defendants, since immigration courts already are equipped to record hearings and do so on a regular basis for other hearings. *See* 8 C.F.R. § 1240.9; *Singh*, 638 F.3d at 1209. Likewise, EOIR Defendants already are equipped to produce transcripts of IJ hearings and do so regularly. BIA Practice Manual § 4.2(f).

Even if providing a written decision with individualized findings or shifting the burden of proof places a small additional burden on the government, it is outweighed by the significant private interests at stake. None of the protections requested require bond hearings for individuals

who are not currently entitled to them, nor would it change that only those individuals who are neither a danger to their community nor a flight risk would be released.

Defendants may suggest—and certainly have behaved as though—they have an interest in avoiding the procedural protections and prompt bond hearings as a means to deter individuals from continuing to pursue their asylum claims, or to deter similarly situated asylum seekers from coming to the United States. However, deterrence is not a sufficient justification for imprisoning noncitizens in civil detention while they pursue their asylum claims and should not be a relevant consideration for procedural due process analysis. *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (cautioning against "civil commitment becom[ing] a mechanism for retribution or general deterrence—functions properly those of criminal law, not civil commitment") (quotations omitted); *R.I.L-R*, 80 F. Supp. 3d at 189 ("[A] general-deterrence rationale seems less applicable where . . . neither those being detained nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate claims to asylum in this country.").

### 2.    Likelihood of Success on Administrative Procedure Act Claims

Plaintiffs also are likely to prevail on their claims under the Administrative Procedure Act (APA). Under the APA, this Court can "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and set aside agency action that is "contrary to constitutional right" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), (B). Relief is appropriate in cases of "final agency action for which there is no other adequate remedy in a court" where an individual is "adversely affected or aggrieved by agency action." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986) (quoting 5 U.S.C. §§ 702, 704).

### a.    *Defendants' Actions Are Unreasonably Delayed*

Plaintiffs are likely to prevail under § 706(1) because EOIR Defendants "failed to take a discrete agency action that [they are] required to take"—namely, failing to timely conduct bond

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

hearings. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Pursuant to 8 U.S.C. § 1226(a), Plaintiffs have a right to a bond hearing to determine whether they should be released. *See, e.g.*, *Preap v. Johnson*, 303 F.R.D. 566, 583 (N.D. Cal. 2014), *aff'd* 831 F.3d 1193 (9th Cir. 2016), *cert. granted sub. nom. Nielsen v. Preap*, 138 S. Ct. 1279 (2018) (stating that noncitizens detained under § 1226(a) are "entitle[d] . . . to a bond hearing"); *Guerra v. Shanahan*, 831 F.3d 59, 61 (2d Cir. 2016) (affirming that, because noncitizen was detained under § 1226(a), "he was, therefore, entitled to a bond hearing"). Because noncitizens have a right to request such hearings, EOIR Defendants have a corresponding duty to adjudicate those requests. Where Congress has vested EOIR with jurisdiction over a particular type of motion, "the agency is not required—by statute or by this decision—to grant [such a motion]. But it is required—by both—to consider it." *Pruidze v. Holder*, 632 F.3d 234, 239 (6th Cir. 2011); *see also Union Pacific R.R. v. Brotherhood of Locomotive Engineers*, 558 U.S. 67, 71 (2009) (prohibiting agencies from declining to exercise jurisdiction conferred upon them).

Consideration of six factors determines whether a delay in agency action was reasonable:

(1) the time agencies take to make decisions must be governed by a rule of reason, (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, (5) the court should also take into account the nature and extent of the interests prejudiced by the delay, and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecommunications Research Action Center v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (citations and quotations omitted); *Brower v. Evans*, 257 F.3d 1058, 1068-69 (9th Cir. 2001) (applying the *TRAC* factors). Applying those factors, Defendants' failure to take the required action—conducting a bond hearing—within seven days is unreasonable.

Under the first factor, EOIR Defendants' own directive to conduct prompt bond hearings,

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

as well as Defendants' and courts' interpretation of promptness in analogous situations, indicate that allowing more than 7 days for initial bond hearings is not reasonable. As discussed, BIA decisions and regulations indicate that EOIR Defendants must conduct bond hearings as expeditiously as possible. *See supra* Section II.B. Furthermore, examples from elsewhere in the immigration statute and relevant regulations, as well as federal court decisions related to probable cause hearings in criminal cases and initial hearings for civil commitment indicate that reasonableness requires a bond hearing within 7 days of request. *See supra* Section III.A.1.b.ii; *cf. Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1083-84 (N.D. Cal. 2005) (assessing reasonableness based on implicit directive for expeditious action in statute).

The third and fifth factors also weigh in favor of finding Defendants' delay unreasonable. Plaintiffs' health and welfare are impacted by being forced to remain in detention without a chance to seek bond—due to loss of liberty, separation from their families, unsafe conditions in detention centers, and impact on their ability to pursue their cases. *See infra* Section III.B. Similarly, the nature of the rights at stake—the liberty interests of bona fide asylum seekers—are in Plaintiffs' favor, as every day of delay is another day that they spend incarcerated.

Nor does the fourth factor weigh against Plaintiffs. This is not a situation where one litigant would be moved ahead in a queue, forcing others similarly situated to face further delays as a result. Instead, ending Defendants' unreasonable delays would require prompt action in cases they themselves have prioritized. *See, e.g.*, *Matter of Valles-Perez*, 21 I&N Dec. at 772 ("When an [individual] is detained, . . . the Immigration Courts[] and this Board give a high priority to resolving the case as expeditiously as possible."); EOIR, Case Priorities and Immigration Court Performance Measures at 2 (Jan. 17, 2018), https://tinyurl.com/y92qc5c9 ("All cases involving individuals in detention or custody, regardless of the custodian, are

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

priorities for completion.").[5] Thus, delaying bond hearings more than 7 days is unreasonable.

Furthermore, Plaintiffs are adversely affected by this unreasonable delay. *See infra* Section III.B (describing harm to Plaintiffs). Finally, Plaintiffs have no other adequate remedy available to them to address the harm they suffer due to their pre-bond hearing detention. *See, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (recognizing that APA review is not available only where "Congress has provided special and adequate review procedures") (quotation omitted). Because Plaintiffs seek to remedy "the period of unlawful detention members of the class suffer before receiving [IJ bond hearings]," their eventual IJ bond hearings cannot provide an adequate alternate review procedure for the injuries at issue in this case. *R.I.L-R*, 80 F. Supp. 3d at 185; *see also Roshandel v. Chertoff*, No. C07-1739-MJP, 2008 U.S. Dist. LEXIS 90899, *14-15 (W.D. Wash. May 5, 2008) (distinguishing between remedies for "institutional delays in the system" and those for delay in a particular case).

b.      *Defendants' Actions Were Not in Accordance with Law and Contrary to Constitutional Right*

Plaintiffs also are likely to prevail on their claim that Defendants' failure to provide procedural protections in bond hearings—specifically, appropriately placing the burden of proof on DHS and requiring a recording or verbatim transcript and contemporaneous particularized written decision for the hearing—are contrary to law and in violation of their constitutional rights. *See supra* Section III.A.1. The APA provides a remedy because EOIR Defendants' policy and practice of not providing the relevant procedural protections is a final agency action which adversely affects Plaintiffs and for which they have no adequate alternate remedy.

Defendants' policies with regard to the bond hearing procedures are uniformly established through agency decisions and determine the rights of Plaintiffs in their bond

---

[5]      Because Plaintiffs do not argue that impropriety played a quantifiable role in the delays, the sixth *TRAC* factor is not relevant in this case.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

hearings. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (requiring the challenged action to be the "consummation of the agency's decision-making process" and "one by which rights or obligations have been determined or from which legal consequences will flow") (quotations omitted). EOIR Defendants have a uniform policy of placing the burden of proof on Plaintiffs in their initial bond hearings, failing to issue contemporaneous and particularized written decisions, and failing to require recordings or verbatim transcripts of bond hearings. *See Matter of Guerra*, 24 I&N Dec. at 40 ("The burden is on the [noncitizen] to show to the satisfaction of the [IJ] that he or she merits release on bond."); *Matter of Chirinos*, 16 I&N Dec. at 277 ("There is no right to a transcript of a bond redetermination hearing."). Defendants acknowledge these policies in their motion to dismiss. *See* Dkt. 36 at 14-18. The experiences of Plaintiffs and practitioners representing asylum seekers confirm the existence of an agency policy subject to challenge as a final agency action. *See* Dkt. 37 at 16-17; Inlender Dec. ¶¶14-15; Koh Dec. ¶¶17, 19; Levy Dec. ¶¶9-11; Cooper Dec. ¶¶15-16; Shulruff Dec. ¶¶7-9; *see also R.I.L-R*, 80 F. Supp. 3d at 184 (holding that the relevant action "need not be in writing to be final and judicially reviewable").

Defendants' failure to provide procedural protections is contrary to law and in violation of Plaintiffs' due process rights, *see supra* Section III.A.1, and adversely affects Plaintiffs, *see infra* Section III.B. Finally, there is no other adequate remedy available—the INA does not provide for petitions for review of bond denials. *See* 8 U.S.C. § 1226(e); *see also Darby v. Cisneros*, 509 U.S. 137, 146 (1993) ("Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions.").

**B.      Plaintiffs Have Suffered, and Will Continue to Suffer, Irreparable Harm Absent This Court's Intervention**

Plaintiffs can demonstrate they have already suffered irreparable harm and will continue to suffer immediate, concrete, irreparable harm absent this Court's intervention. *See Hernandez*, 872 F.3d at 995 (holding that irreparable harm exists where "plaintiff class will likely be

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

deprived of their physical liberty unconstitutionally" absent an injunction); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (stating that "the deprivation of constitutional rights unquestionably constitutes irreparable injury") (quotation omitted); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (noting that "separation from family members" is an important irreparable harm factor) (citation omitted); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) ("[T]he harm from detention pursuant to an unlawful departure from agency procedure cannot be remediated after the fact.").

Plaintiffs are subject to Defendants' punitive anti-asylum policies that seek to extend their incarceration. *See supra* Section II.A. Consequently, they have faced harm in the form of violation of their constitutional rights and deprivation of physical liberty. As a result of this protracted detention, asylum seekers, often already facing serious trauma due to persecution in their countries of origin, face further trauma, depression, and other medical and mental health problems. *See, e.g.*, Orantes Dec. ¶17 (Plaintiff felt "hopeless, lost, and overwhelmed); Inlender Dec. ¶13 (client suffered "panic attacks, loss of consciousness, loss of appetite, and severe nightmares"); Koh Dec. ¶18 (detained noncitizens experience anxiety and psychological and emotional harm); Levy Dec. ¶7 (clients suffer depression and hopelessness); Yang Dec. ¶7 (detained individuals who previously were tortured, wrongfully imprisoned, or sexually assaulted experience exacerbation of prior trauma); Antonini Dec. ¶6 (clients experience memory problems); Shulruff Dec. ¶6 (detained noncitizens faced breakdowns, depression and severe anxiety requiring treatment in mental health facilities). Others lose faith in the system that will ultimately assess their asylum claims. *See, e.g.*, Beckett Dec. ¶¶5-6; Love Dec. ¶6; Antonini Dec. ¶6; *see also* Orantes ¶17. Regardless, delayed bond hearings keep asylum seekers with credible claims detained unnecessarily without even an opportunity for a judge to determine whether they should be released. *See supra* Section II.B (discussing length of delays before bond hearings); *see also* Love Dec. ¶6 (delays prevent noncitizens from promptly finding attorneys to represent

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

them in asylum cases, since they do not know where their case will be heard).

Furthermore, this protracted detention, combined with the lack of procedural protections, harms asylum seekers. Specifically, detained asylum seekers who bear the burden of proof despite having already demonstrated viable fear-based claims face serious obstacles in demonstrating eligibility for release at a bond hearing, including impediments to gathering evidence, communicating with potential witnesses or attorneys through extremely expensive or non-functional telephone systems and lack of internet access, or accessing documents that immigration officials have confiscated. *See, e.g.*, Inlender Dec. ¶14 ("The burden of proof is often an insurmountable burden for a detained asylum seeker who has little to no access to the outside world."); Koh Dec. ¶17; Valencia Dec. ¶6; Jong Dec. ¶9; Love Dec. ¶7; Byers Dec. ¶7; Antonini Dec. ¶5; Beckett Dec. ¶10. Thus, Plaintiffs who present neither a flight risk nor any danger to the community are more likely to remain incarcerated unnecessarily for the entirety of their removal proceedings. This is especially true where DHS and EOIR continue to receive guidance condoning the detention and prosecution of asylum seekers. *See supra* Section II.A.

Furthermore, the absence of recordings, a recording or transcript, and individualized findings when issuing decisions compound the harm faced by Plaintiffs. Without these procedural protections, Plaintiffs struggle to understand the basis for decisions denying release, let alone mount a viable appeal to the decision. *See, e.g.*, Inlender Dec. ¶15 ("Once an appeal is filed, the lack of a transcript means that there is no verifiable way to relay what happened before the immigration judge and, in some cases, to articulate specific errors requiring reversal."); Jong Dec. ¶10 ("When I asked Judge Marks Lane for her reasoning for [denying bond], she responded that she would provide the reasoning in a written decision if the decision was appealed."); *id.* ¶11 ("This practice makes advising clients on whether to appeal extremely difficult. It is near impossible to advise a client on his or her chances of appeal if I have little to no idea of what the [IJ]'s reasoning was for denying bond in the first place.").

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

As a result of needlessly protracted or continued detention, these asylum seekers remain separated from their families, and some face serious difficulties even communicating with family members. *See, e.g.*, Orantes Dec. ¶6; Byers Dec. ¶6; Mercado Dec. ¶¶17-19. They may be subjected to substandard conditions in immigration detention centers, including inadequate medical and mental health care and inadequate food and water supplies. *See supra* Section II.B; *see also* Lunn Dec. ¶5 (client faced irreversible physical harm while detained pending bond hearing); Jong Dec. ¶6 (clients denied access to sanitary products and blankets and were detained in locations that used tear gas against noncompliant detainees); Love Dec. ¶6 (clients vulnerable to "medical crisis" and "horrible food and living conditions"); Orantes Dec. ¶¶4, 10 (Plaintiff faced unsanitary detention conditions and poor treatment from immigration officers); *cf.* Antonini Dec. ¶4 (if released, client class members could receive needed counseling).

In combination, facing unnecessary incarceration and an increasingly difficult road to proving their asylum claims, some proposed class members—all of whom have viable claims to protection in the United States—give up their cases and accept deportation to countries where they fear persecution and torture. *See, e.g.*, Koh Dec. ¶¶18, 21; Inlender Dec. ¶13; Jong ¶¶6, 8, 13; Lunn Dec. ¶6; Antonini Dec. ¶¶4, 6-7; Levy Dec. ¶¶7-8; Yang Dec. ¶7; Beckett Dec. ¶¶6-7; Valencia Dec. ¶5; Shulruff Dec. ¶6; *cf.* Orantes ¶13, 15 (Plaintiff considered giving up her case due to prolonged detention and separation from her son). Absent action by this Court, proposed class members will continue to face these irreparable harms.

## C. The Public Interest and Balance of Equities Weigh Heavily in Favor of Granting Injunctive Relief

The public interest and balance of equities factors "merge" when, as in this case, the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Regardless, both factors strongly favor Plaintiffs. If the Court does not provide immediate injunctive relief, the Proposed Bond Hearing Class will continue to suffer irreparable harm,

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

including the ongoing violation of their statutory and constitutional rights, separation from their families, obstacles to pursuing their meritorious asylum claims, and punitive treatment under this administration's anti-asylum policies. *See supra* Section II.A.

Rather than expeditiously determining whether asylum seekers must remain incarcerated during their often-lengthy cases at bond hearings conducted with fair procedures, Defendants have violated Plaintiffs' and class members' constitutional rights. They have delayed access to bond hearings and applied unlawful procedures that further the Defendants' stated goal of maintaining custody of asylum seekers throughout their removal proceedings. The Ninth Circuit "agree[s] . . . that it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quotation omitted); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) ("[T]he public interest favors applying federal law correctly."); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). This is true specifically in the case of unlawful bond practices which lead to increased immigration detention and the attendant costs to the public. *See Hernandez*, 872 F.3d at 996 (holding that an injunction "serves the interests of the general public by ensuring that the government's initial bond determination procedures comply with the Constitution" and that the "general public's interest in the efficient allocation of the government's fiscal resources favors granting the injunction" against improper bond procedures).

The balance of equities and public interest thus tip sharply in Plaintiffs' favor.

## IV.   CONCLUSION

Plaintiffs Orantes and Vasquez and members of the Proposed Bond Hearing Class have demonstrated that they satisfy the required criteria for injunctive relief. Accordingly, this Court should grant this motion and issue the accompanying proposed order.

RESPECTFULLY SUBMITTED this 20th day of September, 2018.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

s/ Matt Adams
Matt Adams, WSBA No. 28287
Email: matt@nwirp.org

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No.
46987
Email: glenda@nwirp.org

s/ Leila Kang
Leila Kang, WSBA No. 48048
Email: leila@nwirp.org

Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

s/ Trina Realmuto
Trina Realmuto*
Email: trealmuto@immcouncil.org

s/ Kristin Macleod-Ball
Kristin Macleod-Ball*
Email: kmacleod-ball@immcouncil.org
AMERICAN IMMIGRATION
COUNCIL
100 Summer Street, 23rd Floor
Boston, MA 02110
(857) 305-3600

*Admitted *pro hac vice*

*Attorneys for Plaintiffs-Petitioners*

PLS.' MOT. PRELIM. INJ.

- 25 -

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2018, I electronically filed the foregoing, along with the supporting declarations and exhibits, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system. All other parties shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 20th day of September, 2018.

Sydney Maltese, paralegal to Matt Adams
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
(206) 587-4025 (fax)

PLS.' MOT. PRELIM. INJ.

- 26

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

The Honorable Marsha J. Pechman

1

2

3

4

5

6

7

8

9

10            UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
11                    AT SEATTLE

12

13   YOLANY PADILLA, *et al.*,           Case No. 2:18-cv-00928-MJP
                    Plaintiffs-Petitioners,
14
            v.
15                                        **[PROPOSED] ORDER GRANTING
                                          PLAINTIFFS' MOTION FOR
16   U.S. IMMIGRATION AND CUSTOMS         PRELIMINARY INJUNCTION**
     ENFORCEMENT, *et al.*,
17
                    Defendants-Respondents.
18

19        This matter having come before the Court on Plaintiffs' Motion for Preliminary

20   Injunction, and having considered the pleadings submitted in support and opposition to the

21   motion, as well as oral argument of the Parties, this Court finds that Plaintiffs have satisfied the

22   requirements for preliminary injunctive relief. Therefore, Plaintiffs' motion is GRANTED.

23

24        Accordingly, with regard to the Bond Hearing Class, it is HEREBY ORDERED that

25   EOIR Defendants must, within 30 days of this Order:

26

27        1.  Conduct bond hearings within seven days of a bond hearing request by a class member;

28

[PROPOSED] ORDER GRANTING                          NORTHWEST IMMIGRANT RIGHTS PROJECT
PLS.' MOT. FOR PRELIM. INJ.                              615 Second Avenue, Suite 400
Case No. 2:18-cv-928-MJP       -1                             Seattle, WA 98104
                                                            Tel. (206) 957-8611

2.  Place the burden of proof on Defendant Department of Homeland Security (DHS) in that bond hearing to demonstrate why the class member should not be released on bond, parole, or other conditions;

3.  Record the bond hearing and produce the recording or verbatim transcript of the bond hearing upon appeal; and

4.  Produce a written decision with particularized determinations of individualized findings at the conclusion of the bond hearing.

It is so ORDERED.

DATED this _____ day of _____, 2018.

_____
HONORABLE MARSHA J. PECHMAN
U.S. DISTRICT JUDGE

Presented this 20th day of September, 2018, by:

NORTHWEST IMMIGRANT RIGHTS PROJECT

*s/ Matt Adams*_____
Matt Adams, WSBA No. 28287
615 Second Avenue, Suite 400
Seattle, WA  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025
matt@nwirp.org

[PROPOSED] ORDER GRANTING
PLS.' MOT. FOR PRELIM. INJ.
Case No. 2:18-cv-928-MJP      - 2

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611