The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

Yolany PADILLA, *et al.*,

        Plaintiffs,

    v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

        Defendants.

No. 18-cv-0928 MJP

**DECLARATION OF HOLLY S.
COOPER**

I, HOLLY S. COOPER, hereby declare:

1.    I am a resident of the State of California.  I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.    I have knowledge of the conditions in many immigration detention centers within the State of California, Arizona and Texas.  I have been a lawyer for almost 20 years and for the majority of my career, I have provided free legal representation and consultations to individuals in immigration detention centers. I am currently the Co-Director of the U.C. Davis School of Law Immigration Law Clinic where I seek to serve men, women, and children detained by the federal government.  Over the course of my career, I have interviewed thousands of men and women in the custody of Immigration and Customs Enforcement (ICE) and unaccompanied children in the custody of the Office of Refugee

COOPER DEC. - 1
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

Resettlement.  I have also been permitted special access to certain detention centers to inspect detention centers in my capacity as the Co-director of the University of California, Davis School of Law's Immigration Law Clinic, counsel for the *Flores v. Reno* Settlement Agreement (Case No. CV85 4544 (C.D.Cal. 1996), and in my capacity as a former member and advisor of the American Bar Association's Immigration Commission. I have received the following awards:

    a.  Congressional Woman of the Year Award 2018
    b.  International Educator Hall of Fame Award 2018
    c.  California State Assembly Woman of the Year Award 2018
    d.  Mexican American Concilio Community Award 2017
    e.  Legal Services for Children's Community Partner Award 2017
    f.  Yolo County District Attorney's Multi-Cultural Community Council Award 2017
    g.  UC Davis Immigration Law Clinic Recognition State Senate 2017
    h.  UC Davis Immigration Law Clinic Recognition State Assembly 2016
    i.  National Lawyers Guild – Carol Weiss King Award 2011
    j.  King Hall Legal Foundation – Outstanding Alumni Award 2011
    k.  UC Davis Immigration Clinic Alumni Council – Public Interest Award 2007

3.    For almost 18 years, I have documented, witnessed, and listened to detainees recount their experiences enduring systemic, sub-human conditions in immigration custody in public and private immigration detention centers and in the custody of the Office of Refugee Resettlement.  I visit immigration detention centers in California almost every week and interview at least 30 individuals in immigration custody every month.  The following are my observations and experiences from my visits and investigations of detention centers throughout my career:

- Spoken to detainees on the telephone who are contemplating suicide while they are describing feces smeared on their segregated cell;

COOPER DEC. - 2
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

- Speak almost weekly (sometimes daily) to children in the custody of the Office of Refugee Resettlement contemplating suicide due to their despair in detention and have frequently noted self-mutilation wounds on their wrists and arms during my interviews with them;

- Inspected a rape phone hotline in a children's detention center only to realize the phone was not even connected to a phone line;

- Had a child show me visible bullets still lodged in their bodies that had gone untreated;

- Had children repeatedly tell me how the federal government coerces statements from them after arrest;

- Witnessed almost universally inadequate law libraries;

- Witnessed retaliation against clients for demanding humane medical treatment;

- Witnessed many detention centers with attorney-client visit rooms that are not sound proof, where clients are afraid to speak for fear of being overheard;

- Felt many attorney-client visit rooms were kept so cold that I have had to wear a ski jacket to maintain a comfortable body temperature during meetings;

- Heard detainees recount life threatening medical issues that are not being treated;

- Some detainees have told me they have been raped while in detention;

- Some children detainees have witnessed guards performing oral sex on other guards;

- Witnessed clients (both adults and children) suffer from inadequate food sources in detention centers—one said her food supply was so insufficient she was losing her hair;

COOPER DEC. - 3
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

- Clients and detainees have complained about being transported in shackles—which can be extraordinarily painful for elderly detainees and detainees with disabilities; and

- Children have also been shackled during asylum interviews and suffered injuries from shackles being too tight around the wrists.

The issues are systemic, pervasive, and have not abated throughout the 18 years I have been working with adults and children in immigration detention centers.

4.   Unsanitary and unsafe conditions continue to exist in detention facilities in California.  For instance, during a visit to RCCC in January 2014, I observed that the facility was old, loud, and dirty.  As we walked down the halls, the concrete was wet and dirty—like a thin sludge on the ground.  Men were detained with other county inmates who were in criminal custody.  Some pods were open with bunks out in the open, and other pods were double-tiered with locked down cells.  Last year around March 2017, detainees at RCCC were evacuated due to high levels of lead and copper in the drinking water was discovered by local government inspection officials.

**Inadequate Mental Health Care**

5.   Suicidal ideation is a major issue for persons and children in prolonged detention. Children have called me from detention during the Christmas holidays crying in total despair that they just want to be with their mothers. I and other child advocates receive so many calls from detained children voicing suicidal ideation from the affects of detention that we have started group therapy sessions to learn how to cope with suicidal children and to support one another. Most detained children are hundreds of miles from family and often are only able to speak with parents less than an hour per week. Mothers and fathers who

COOPER DEC. - 4
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1    are detained have particularly profound trauma at being separated from their

2    children. Detainees are not permitted to touch their children throughout their

3    detention, and walking through the family visitation rooms I often see children

4    and parents crying, placing their hands over the plexiglass dividers trying to

5    touch. One very unique aspect of immigration detention is that many individuals

6    are applying for immigration defenses that require them to provide detailed

7    narratives about their past traumas. Many asylum seekers, abused children, and

8    crime victims must provide sworn testimony regarding their past rapes, past

9    torture, past child abuse, and past traumas. Detailing past traumatic experiences

10   in a public court takes a tremendous psychological toll on immigration

11   detainees. This trauma is compounded by the fact that most do not have their

12   traditional support networks to sustain them because they are detained. For

13   example, a woman may be required to provide specific, graphic detail of all past

14   rapes for her asylum hearing, and then must return alone to her cell at the

15   detention center. Detainees have shown me where they self-mutilate due to the

16   despair of prolonged detention and tell me of their suicidal thoughts.  It is so

17   frequent to have to counsel individuals who are having suicidal ideations that I

18   now include trainings on how to cope with suicidal clients in my law student

19   Immigration Law Clinic Orientation. Many children who have psychological

20   issues in detention cannot speak confidentially to a therapist—the medical files

21   are shared with immigration authorities and can be used to the child's detriment

22   in their asylum cases and in their detention reviews. One detainee told me how

23   he witnessed one detainee cut his wrists and watched the blood spill out from the

24   bathroom stall.  He cried to me as he recounted how people were in complete

25

26

COOPER DEC. - 5
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1   despair and not getting adequate psychological care. Another child attempted to

2   hang himself in detention and then was repeatedly, forcibly sedated.

3   **Inadequate Medical Care**

4   6.    Medical indifference to immigration detainees is pervasive and unabated.

5   Detainees with medical or psychological issues rarely receive adequate medical

6   care.  Throughout my 18 years visiting immigration detention centers I have

7   observed that detention centers: (1) fail to meet health care needs of individuals

8   in a timely manner; (2) often fail to refer individuals to higher-level medical

9   care providers when necessary (and in some cases this failure has resulted in

10  death); (3) fail to provide adequate staff and medical personnel; (4) fail to

11  communicate critically important information about individuals' medical

12  conditions between staff and especially during transfers; and (5) fail to

13  adequately screen individuals for illnesses.

14  7.    Almost every time I visit an immigration detention center, detainees complain of

15  medical neglect.  On a recent visit a man told me that he had severe pain in his

16  mouth and believed his tooth was infected.  He told me was going to pull out the

17  tooth himself because he was not receiving medical attention and feared the

18  infection would spread.

19  8.    Another child told me his arm had been so badly disfigured and bludgeoned by

20  persecutors in his home country that it was causing him pain on a level of 10 out

21  of 10 and he could not sleep. His arm was visibly disfigured and malformed. He

22  said he had repeatedly complained to ORR officials but no one had treated him.

23  **Language Barriers**

24  9.    The overwhelming majority of immigration detainees do not speak, write, or

25  read English.  Spanish is the predominant language of most detainees. Other

26

COOPER DEC. - 6
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1    languages spoken by detainees are Tagalog, Vietnamese, Mandarin, Punjabi,

2    French, Wolof, Somali, Haitian Creole, Hindi, Urdu, Farsi, and indigenous

3    languages from Guatemala and Mexico. Language barriers create enormous

4    obstacles for non-English speakers. Although detainees have simultaneous

5    translations during their removal hearings, they are not afforded a translator to

6    prepare the legal forms required by the court.  Immigration detainees also do not

7    have the right to appointed counsel unless they have a serious mental disorder

8    pursuant to *Franco-Gonzalez v. Holder,* No. CV 10-102211 DG (C.D. Cal). The

9    vast majority of immigration detainees (most of whom do not speak, read, or

10   write English) represent themselves without the assistance of a lawyer. In some

11   California detention centers, only around 15% of the detainees have the

12   assistance of a lawyer.

13   10.    Most defenses in immigration court are enormously complicated and require

14          submitting lengthy legal forms to the court. The immigration legal forms are

15          akin to Internal Revenue Service tax forms—they are lengthy and

16          incomprehensible to most persons. For example, if an immigration detainee

17          asked an immigration judge for the opportunity to apply for political asylum,

18          she would be given the Form I-589, a 10-page form in English that asks

19          complex questions regarding persecution in her home country.  The Form I-589

20          is required of anyone wishing to seek political asylum. If, for example, the

21          detainee was a monolingual Mandarin speaker from China, she would need to

22          complete the Form I-589 in English. If the person cannot read or write in

23          English, they cannot complete the form. Most detainees who cannot afford a

24          lawyer have no choice but to ask other detainees to assist them with the forms.

25          This forces immigration detainees to disclose very personal details about their

26

COOPER DEC. - 7
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1    persecution, sexual orientation, or rape histories to other detainees.  Detainees

2    helping non-English speakers usually have no legal training—and even though

3    well-intended—often miss critical details or facts that can have a serious

4    prejudicial effect on the person's asylum application.  Even as a trained lawyer,

5    I can spend a minimum of 15 hours completing a Form I-589 with my clients—

6    if I need to use a translator that timeframe can easily be doubled. Moreover, if a

7    pro se detainee who cannot read or write in English must author a legal brief to

8    the court of appeals, the legal process becomes a farce. To properly write a legal

9    appellate brief, the detainee must be able to read lengthy transcripts in English,

10   research case law in English, read relevant court cases in English, and write

11   legal briefs in English analyzing the transcripts and case law applicable to their

12   case. Immigration detainees often stare at me in confusion, as I describe the

13   appellate process in the Board of Immigration Appeals and Ninth Circuit and

14   what will be required in their legal briefs. I can confidently say that a person

15   who does not read or write English cannot represent themselves in a court of

16   appeals without assistance. Many immigration detainees give up valid claims

17   for relief because the language barriers make it extremely difficult to represent

18   themselves in pro se.

19                              **Lack of Access to Telephones**

20   11.   Telephone access has historically been an enormous issue for detainees and

21         lawyers who are trying to reach their clients.  One near-common characteristic

22         of immigration detention is its remoteness from California's urban centers or

23         distance from free legal service providers.  Over the years, ICE has contracted

24         with detention centers located in El Centro, Marysville, Elk Grove, California

25         City, Bakersfield, and Adelanto, among other cities.  Most of these are distant

26

COOPER DEC. - 8
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

from free legal services and major cities.  Thus, phone access is critical to an individual's legal case as many lawyers and nonprofit lawyers cannot afford the time and expense to travel to remote detention centers. Persistent issues are: (1) inability to call numbers with automated attendants; (2) inability to call legal counsel on a confidential phone line; (3) inability of lawyers to reach clients on confidential phone lines; (4) inability to leave messages (most detention center phones disconnect the detainee call if no "live" person is there to receive the call); and (5) the high cost of phone calls. The lack of inadequate phone access impedes a person's ability to gather evidence in support of their claim, impacts a lawyer's ability to effectively represent their client, and impacts residents who must pay the high costs of the collect telephone calls from their family in friends in detention.

12.   Children frequently tell me that the federal government denies them calls to me as their lawyer.

**Inadequate Access to Legal Resources and Counsel**

13.   Immigration law is extraordinarily complex yet law libraries in immigration detention centers are universally inadequate.  Rarely are relevant forms available in immigration detention centers' law libraries.  Immigrants in removal proceedings often apply for relief from removal.  Typical forms used to apply for relief are: (1) applications for political asylum; (2) applications for U visas; (3) applications for cancellation of removal; (4) fee waivers; and (5) applications for adjustment of status.  It is common for law libraries not to have any of these forms.

14.   Immigrants also bear the burden of proof in applications for relief.  For example, for political asylum, an applicant must show an objectively reasonable fear or

COOPER DEC. - 9
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

credible fear of persecution in her home country.  This is typically demonstrated through human rights reports, newspaper articles, and State Department reports submitted by the applicant.  However, law libraries in detention centers rarely contain relevant human rights materials and applicants cannot meet their burden without assistance outside of the detention center.

15.     The bond process is equally confusing and inaccessible to detainees. Many detainees are illiterate and monolingual Spanish speakers and cannot make written requests to the Court or understand the documents that immigration has filed against them. Under the law, they are required to prove a negative—that they are not a danger or flight risk—to obtain a bond. For immigrants who recently arrived in the United States, who have no phone access, cannot write letters to request evidence, this burden is impossible to meet. Imagine being locked in a cell without phone access, without communication to your support networks, being brought to court, confronted with documents you could not read, having no representation, and being asked to prove to a judge why you were not a danger or a flight risk.  I have witnessed some detainees so fearful to enter the courtroom that will decide their freedom, that they have anxiety attacks in the waiting rooms. I have spoken to some detainees who could not meet the burden, are denied bond, and have emotional breakdowns back in their cells in the detention center. The stakes for freedom are incredibly high, and the playing field in a bond hearing is out of line with the fundamental liberty interest that is at stake.

16.     The bond appeal process is not accessible to almost all detainees and the procedures for bond appeals are exceptionally unfair. First, detainees must be able to write in English and understand complex detention laws to file Notices

COOPER DEC. - 10
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1    of Appeal. This process itself of requiring literacy and English writing skills

2    divests almost all detainees of access to appeals. Second, even assuming a

3    detainee can write in English, the detainee does not have access to the written

4    substantive decision of the Immigration Judge until *after* he or she files and

5    appeal. The Executive Office for Immigration Review has a unique bond appeal

6    process where the judges do not write out written reasons for denying a bond

7    until *after* the appeal is filed. Judges are permitted to file post hoc decisions.

8    Oftentimes in the post hoc written decisions, judges change their reasoning from

9    the reason given orally in the bond hearing. Thus, detainees have no fair notice

10   of what is on appeal. Moreover, transcripts of the hearing are not provided to the

11   appellate court, and therefore, the judge's post hoc written decision may be the

12   only record of what allegedly transpired during the bond hearing. However,

13   because no evidence is allowed into the record on appeal, a detainee has no

14   ability to challenge the judge's summary of the facts on appeal. I successfully

15   challenged this practice in the Ninth Circuit for detainees in prolonged

16   detention; however, for arriving asylum seekers this is the process that prevails.

17   17.   Legal materials are generally out-of-date and inadequate.  Typically, the

18         situation is so dire, that I donate my old legal treatises and compilations of

19         current human rights reports to detention centers.  I have even asked publishers

20         to send me defective books (i.e. books with torn pages or spines) so that I can

21         donate them to the detainees. All immigration law source books are in English,

22         and are accessible to only persons who can read English.

23   18.   During my visit to Mesa Verde Detention Center in 2015, I noted that the law

24         library was inadequate. During the inspection, I had the opportunity to log in

25         and run a search on the legal database available to detainees, and had three

26

COOPER DEC. - 11
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1    concerns about the system.  First, given that I – a trained attorney with

2    considerable experience using different legal search engines – could not figure

3    out how to conduct a search without significant guidance from the librarian, I

4    doubted that most detainees could do the same.  I queried the system on a basic

5    deportation question and the system told me it could not find any cases that met

6    a basic criteria.  Detainees often do not have access to recent, critical

7    information pertaining to their cases.  Immigration law can change from week-

8    to-week and having up-to-date legal information is critical.  Moreover, there

9    were no immigration forms or relevant human rights reports available in the law

10   library.  A large number of immigration detainees apply for asylum, withholding

11   of removal, and relief under the Convention Against Torture, all of which

12   usually require immigrants to bear the burden of proof and present evidence

13   about conditions in their home countries.  Without access to current human

14   rights reports, immigrants cannot present such evidence and meet their burdens.

15   Further, we were told if a detainee wanted to print any documents, they had to

16   be mailed to the law librarian and she would print them.  This raised concerns

17   about the privacy of the data as many detainees are recounting private

18   information about torture and persecution that would have to be emailed to a

19   third party for printing.

20   19.   Around January 2014, I was given a "tour" of RCCC in Elk Grove.  The law

21        library was in a large cage in the middle of a larger room.  The library had no

22        relevant information for ICE detainees.  The library appeared catered to persons

23        in criminal custody.

24   20.   The ability to confer with counsel in immigration detention centers is also

25        limited.   For instance, Mesa Verde Detention Facility did not have sound-proof

26

COOPER DEC. - 12
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

1    rooms for attorneys.  The attorney-client visitation rooms at RCCC were of

2    varying sizes and were "first-come-first-serve."  The smaller visitation rooms

3    could not reasonably accommodate more than one person, thus, if the lawyer

4    needed a translator, he or she would have to wait for the larger room.  At the

5    Otay Mesa Detention Facility, I also had concerns of the adequacy of the law

6    library due to lack of relevant forms and legal resources, and concerns over

7    phone access.

8

9        I declare under penalty of perjury of the laws of the State of California and the United

10   States that the foregoing is true and correct to the best of my knowledge and belief.  Executed

11   this 19th day of September 2018 in Davis, California.

12

13                              By: _____

14                                      Holly S. Cooper

15

16

17

18

19

20

21

22

23

24

25

26

COOPER DEC. - 13
Case No. 2:18-cv-0928-MJP

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611