The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| Yolany PADILLA, *et al.*,<br><br>    Plaintiffs,<br>    v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>    Defendants. | No. 18-cv-0928 MJP<br><br>**DECLARATION OF TALIA INLENDER** |

I, Talia Inlender, hereby declare:

1. I am an attorney at Public Counsel in Los Angeles, California. My business address is: 610 S. Ardmore Ave., Los Angeles, California 90005. I am admitted to practice

1

law in the State of California, the United State Central District of California, the U.S. Court of Appeals for the Ninth Circuit, and the United States Supreme Court.

2. I received by my J.D. from Yale Law School in 2007. During my time in law school, I served as a co-director of the Immigration Legal Services Clinic, where I represented immigrants before the Executive Office for Immigration Review as well as before U.S. Citizenship and Immigration Services. I also authored two published papers on immigration law: "The Imperfect Legacy of Gomez v. I.N.S.: Using Social Perceptions to Adjudicate Social Group Claims," 20 Geo. Immigr. L. J. 681 (Summer 2006) and "Status Quo or Sixth Ground?: Adjudicating Gender Asylum Claims," in Migrations and Mobilities: Gender, Citizenship, and Borders (Seyla Benhabib & Judith Resnik eds., 2009).

3. From 2007-2008, I clerked for the Hon. Stephen R. Reinhardt on the U.S. Court of Appeals for the Ninth Circuit. Following my clerkship in 2008, I was awarded a two-year Equal Justice Works Fellowship at Public Counsel, where I developed a project to provide and expand access to legal services for detained immigrants in the Los Angeles area. I transitioned to a staff attorney position at Public Counsel's Immigrants' Rights Project in October 2010. In 2016, I was named a Senior Staff Attorney at Public Counsel. In 2018, I became a Supervising Senior Staff Attorney.

4. In my time as an attorney at Public Counsel, I have provided direct representation to more than 35 people in proceedings before the Executive Office for Immigration Review, U.S. Department of Homeland Security (DHS) , U.S. Citizenship and Immigration Services, and the U.S. Court of Appeals for the Ninth Circuit. I have

facilitated the representation of hundreds of people by pro bono attorneys, whom I mentor and train. I have taught thousands of immigration detainees in my weekly Legal Orientation Program over the years, and have provided pro se help to hundreds of immigration detainees representing themselves in their proceedings.

5. In addition to direct service work, I litigate complex class action lawsuits in federal court on behalf of immigrants. For the past eight years, I have served as co-counsel in *Franco-Gonzalez v. Holder*, No. CV 10-2211 (C.D. Cal.), a groundbreaking class action lawsuit that established a right to counsel for detained immigrants with serious mental disabilities. I also represented the lead plaintiff, Mr. Franco-Gonzalez, in his underlying immigration proceedings. I am co-counsel in *F.L.B. (formerly J.E.F.M.) v. Sessions*, No. 2:14-cv-01026 (W.D. Wash.), a class action lawsuit seeking to vindicate children's right to counsel in removal proceedings, as well as *J.P. v. Sessions*, No. 2:18-cv-06081 (C.D. Cal.), seeking trauma-informed care for families separated by Trump's zero-tolerance policy. My work has been recognized by the American Immigration Lawyers' Association with the Jack Wasserman Memorial Award in 2014 for excellence in litigation in the field of immigration law.

6. In addition to my direct service and impact work, I supervise other attorneys within Public Counsel's Immigrants' Rights Project. I am currently responsible for supervising five attorneys with their direct representation and pro bono immigration caseloads. For eight years, I also supervised law students in the UCLA School of Law on an asylum case each spring semester.

7. I have a particular expertise in immigration law. My experience is in representing detained clients in immigration cases as well as in federal court litigation. A federal court has recognized my "specialized skills and distinctive knowledge" in this area by awarding me enhanced fees under the Equal Access to Justice Act (EAJA) in a case I litigated on behalf of an Afghan family detained following Trump's travel ban. See *International Refugee Assistance Project v. Kelly*, No. 2:17-cv-01761, Dkt. 88 at 16-17 (C.D. Cal. July 27, 2017).

8. I and my team of attorneys primarily work with non-citizens detained at three facilities in the Southern California area: James A. Musick Facility, Theo Lacy Facility, and Adelanto Detention Facility. Until March 2017, we also served non-citizens detained at the Santa Ana City Jail, until its contract with DHS ended. At Santa Ana, we ran a weekly legal orientation program for approximately nine years. At Musick, we have run a monthly legal orientation program for the past seven years, and continue to do so. At Adelanto and Theo Lacy, we meet with individual non-citizens who request our services.

9. Through these programs, I have met with a large number of asylum seekers. These individuals have expressed a fear of return to their home countries at a port of entry or immediately upon apprehension by immigration authorities. They are typically given credible fear interviews (CFIs) before an asylum officer.  In my experience, individuals generally wait several weeks after having requested asylum or expressing a fear of return to receive a CFI. For example, last week, I received a referral for an asylum seeker who waited nearly a month to receive a decision on her

CFI: she arrived in the United States to seek asylum on June 23, 2018, arrived at Adelanto Detention Facility on July 13, 2018, and received her CFI results on July 18, 2018. In some cases, waits may be exacerbated due to lack of availability of interpreters, particularly for indigenous languages. Delays are also common in situations where individuals have been transferred from other facilities.

10. During this period before a CFI, asylum seekers are detained in jail facilities without any recourse for release and extremely limited means of communication with the outside world. And, for the majority of these individuals who are pro se, they have little to no understanding of what is happening with their asylum request and how long the process will take. These waits cause a tremendous amount of stress and fear for already traumatized individuals fleeing their home countries.

11. I have personally represented as well as facilitated pro bono representation to detained asylum seekers who initially have been found by an asylum officer to have a credible fear of return to their country of origin, as well as at least one detained asylum seeker who was found by an immigration judge to have a credible fear of return to their country of origin after a negative credible fear determination by an asylum officer. I have also assisted many detained, pro se asylum seekers who initially have been found by an asylum officer to have a credible fear of return to their country of origin. To the best of my recollection, I have never met a detained, pro se asylum seeker who has been found by an immigration judge to have a credible fear of return to their country of origin after a negative credible fear determination by an asylum officer. This is not surprising as without legal

assistance, it is extremely difficult to overcome a negative credible fear determination.

12. In my early years of practice, the vast majority of asylum seekers I encountered were charged as "arriving aliens." These individuals are generally not eligible for bond before an immigration judge; their only release option is parole, a determination made by DHS following a positive CFI. More recently, I have observed a growing number of asylum seekers through our legal orientation and representation programs who initially entered the country without inspection, and who are charged as such, making them eligible to seek a bond hearing before an immigration judge once they are placed in removal proceedings. In the past three months, I have supervised four cases in this posture, and have met with several pro se individuals through our legal orientation program at the Musick Facility in the same position. To my knowledge, none of these individuals were scheduled for bond hearings within seven days of their positive CFI decisions. It regularly takes longer than that to secure an initial court date for a bond or removal hearing.

13. In my experience, the lack of prompt bond hearings can be extremely difficult for detained asylum seekers. Because of the delays in both CFIs and bond hearings, many asylum seekers charged as entering without inspection have been in custody for approximately one to two months before a bond hearing is scheduled. The majority of these individuals have never previously been incarcerated. Most have suffered severe trauma and endured difficult journeys to seek safety. Many speak languages other than English or Spanish, and are unable to communicate with

detention facility staff, fellow detainees, and even legal service providers. Many lack funds to place phone calls to family and friends on the outside. As a result, I have met people who decide that if they are not able to secure release through parole or bond, they would prefer to stop fighting their cases and be removed. Others remain out of desperation, but their mental health suffers severely. For example, we have a current asylum seeking client who, after being denied parole and enduring the prolonged stress of detention, had a mental breakdown. She reported experiencing panic attacks, loss of consciousness, loss of appetite, and severe nightmares.

14. Being scheduled for a bond hearing is only the first step in the arduous process of trying to secure release for an asylum seeker who passes a CFI and is charged as entering without inspection. At the bond hearing itself, the asylum seeker—who is most often pro se—bears the burden of proving the she is not a flight risk or a danger to the community. In order to make this showing, judges regularly require asylum seekers to show proof of identity as well as a strong tie to a U.S. citizen or lawful permanent resident who is willing to house and support them for the duration of their removal proceedings. Many asylum seekers lack identity documents, while others face significant barriers in obtaining copies of their documents, which DHS typically confiscates upon apprehension. Judges also often require a notarized letter, proof of address, and financial documents from the proposed "sponsor." In a recent case that I supervised, the immigration judge denied bond to an asylum seeker *despite* having these documents as well as support letters from grassroots

community organizations, because the judge did not believe that she had a sufficiently strong tie to the proposed sponsor. The burden of proof is often an insurmountable burden for a detained asylum seeker who has little to no access to the outside world.

15. Once a negative determination is made at an initial bond hearing, it is extremely difficult to overcome. In initial bond hearings, no transcript is produced. The decision is generally provided on a one-page form, where the judge checks a box to indicate his or her ruling. No individual findings are generally included in an initial denial. A short cursory opinion is produced only if and when an appeal has been filed; this is often weeks after the hearing itself and is not based on a transcript, since none exists. Without individual findings, it is difficult for both represented and unrepresented detainees to evaluate whether or not to file an appeal. Once an appeal is filed, the lack of a transcript means that there is no verifiable way to relay what happened before the immigration judge and, in some cases, to articulate specific errors requiring reversal. For example, there is no way to show the judge or government attorney's line of questioning was improper, that the IJ did not act as a neutral decision-maker, or that the judge wrongly drew an adverse credibility inference against the asylum seeker that infected the bond determination. In my experience, and in light of these circumstances, bond appeals are rarely successful.

16. Securing a subsequent bond hearing after an initial denial is similarly very difficult. While the regulations provide that a non-citizen may request a subsequent hearing if "circumstances have changed materially since the prior bond redetermination," 8

C.F.R. § 1003.19(e), that request must be made in writing. For the vast majority of detained asylum seekers who are pro se and for whom English is not a first language, filing such a request in writing—not to mention making it sufficiently compelling to show a material change in circumstances—is simply not possible. Even for individuals who have legal representation, it is very difficult to obtain a subsequent bond hearing based on a material change of circumstances. For example, in a recent case in our office, securing counsel, a new sponsor, and additional proof of community support, was not deemed a material change of circumstances.

In some cases, DHS opposes such requests. Moreover, if a subsequent bond hearing is granted, the burden of proof remains on the asylum seeker.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 18th day of September 2018 in Los Angeles, California.

By: _____
Talia Inlender