The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YOLANY PADILLA, *et al.*,

Plaintiffs-Petitioners

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

Defendants-Respondents.

Case No. 2:18-cv-00928-MJP

**PLAINTIFFS' REPLY IN SUPPORT OF AMENDED MOTION FOR CLASS CERTIFICATION**

NOTE ON MOTION CALENDAR:
September 28, 2018

ORAL ARGUMENT REQUESTED

CLASS CERT REPLY
Case No. 2:18-cv-00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## I.      INTRODUCTION

Defendants do not challenge numerosity or adequacy of Class Counsel. They challenge the commonality of the claims and the adequacy of Plaintiffs as class representatives of the proposed Credible Fear Interview (CFI) and Bond Hearing (BH) Classes by attempting to distract the Court from the fact that the policies being challenged apply equally to Plaintiffs and proposed class members. Defendants also point to subsequent developments in Plaintiffs' individual cases, ignoring that the inherently transitory nature of their claims requires this Court to look to Plaintiffs' standing at the time the claims were filed. Plaintiffs have satisfied the requirements under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

## II.      ARGUMENT

### A.      This Court Has Jurisdiction to Certify the Proposed Classes.

Defendants' effort to challenge certification based on jurisdictional claims is duplicative of the arguments set forth in their motion to dismiss, Dkt. 36 at 6-8, 23-24. For the reasons set forth in Plaintiffs' opposition to that motion, Dkt. 69 at 2-7, 23-24, which Plaintiffs incorporate herein by reference, none of Defendants' arguments have merit.

### B.      The Proposed Classes Have Common Claims Capable of Uniform Resolution.
#### 1.      Plaintiffs' APA Delay Claims

Defendants suggest that class certification is not available for unreasonable delay claims assessed under the factors set forth in *Telecommunications Research Action Center v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*). However, courts, including in this district, have applied the *TRAC* factors to class-wide delay claims in the immigration context. *See Rosario v. USCIS*, No. C15-0813JLR, *9-12 (W.D. Wash. Jul. 26, 2018) (finding delay unreasonable and granting class-wide injunctive relief even though the court accepted that the fourth *TRAC* factor, regarding competing priorities favored the government); *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1083-84 (N.D. Cal. 2005) (finding APA violation after class-wide application of *TRAC* factors to individuals challenging application delays); *cf. Roshandel v. Chertoff*, No. C07-

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1739MJP, 2008 U.S. Dist. LEXIS 90899, *20 n.6 (W.D. Wash. May 5, 2008) ("[C]ourts have analyzed whether agency delay is reasonable under the APA even in the absence of a statutory timetable for agency action."). In fact, courts have found that unreasonable delay claims meet the commonality requirement even while acknowledging that factual variations among class members' claims may later become relevant. *See, e.g.*, *Garcia v. Johnson*, No. 14-cv-01775-YGR, 2014 U.S. Dist. LEXIS 164454, *41-42, *46 (N.D. Cal. Nov. 21, 2014) (certifying class with unreasonable delay claim and suggesting that evaluation of *TRAC* factors is generally appropriate on summary judgment); *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1203-04 (W.D. Wash. 2008); *Santillan v. Ashcroft*, No. C 04-2686 MHP, 2004 U.S. Dist. LEXIS 20824, *35-36 (N.D. Cal. Oct. 12, 2004).

Here, Plaintiffs present common questions: whether Defendants' practices of conducting credible fear interviews (CFIs) more than 10 days after a request for asylum, absent the noncitizen's request for a delayed interview, and of conducting bond hearings more than 7 days after a request necessarily amount to unreasonably delayed action under the APA. These questions affect *all* proposed class members, because a uniform time limit is necessary to ensure that detention is not needlessly protracted, regardless of the variables for delay that Defendants allege in certain courts.[1] Indeed, Defendants set forth reasons for delays that are wholly irrelevant to this case, since Plaintiffs' credible fear delay claims challenge delays of more than 10 days absent a request for more time from a detained asylum seeker. *See, e.g.*, Dkt. 64 ¶8 (describing, inter alia, delays based on requests by asylum seekers or their attorneys, due to asylum seekers' need for medical attention, and in non-detained cases). That Defendants' staffing and detention decisions placed more asylum seekers in facilities unfit to meet their needs

---

[1] Defendants also suggest reasons for delays in bond hearings are "unique to the immigration court" where the hearing takes place but provide two declarations identifying nearly identical considerations at the Tacoma and Adelanto courts. *Compare* Dkt. 66 ¶¶13-14 *with* Dkt. 67 ¶13-14 (providing the same information, aside from hours per week devoted to bond hearings).

AM. CLASS CERT. MOT.
Case No. 2:18-CV-00928-MJP - 2

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

does not relieve Defendants of their obligation to act expeditiously. *See, e.g.*, *Yong Tang v. Chertoff*, 493 F. Supp. 2d 148, 158 (D. Mass. 2007) (declining to find delay reasonable where "delays in adjudication are due to a high volume of applications and scarce resources"); *cf. Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required.").

### 2.    Constitutional Claims

Defendants claim that each proposed class member requires an individualized due process and harmless error analysis. *See* Dkt. 68 at 14-15. However, courts regularly resolve procedural due process claims on a class-wide basis when addressing the constitutionality of immigration agencies' policies and practices. *See, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 993-94 (9th Cir. 2017); *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998); *Mendez Rojas v. Johnson*, 305 F. Supp. 3d 1176, 1183-87 (W.D. Wash. 2018); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1194-1200 (N.D. Cal. 2017). Defendants allege an array of reasons for delays in CFIs and bond hearings, but none affect Plaintiffs' claims: Defendants' practices of delaying CFIs more than 10 days after Plaintiffs express fear, and bond hearings more than 7 days after the bond hearing is requested, unnecessarily deprive Plaintiffs of their liberty in violation of their due process rights. *See infra* § II.C.2.b; *see also* Dkt. 45 at 20-23 (describing harm to Plaintiffs and class members due to these constitutional violations).

That some class members have not yet had bond hearings also fails to defeat commonality. While Defendants discuss the possibility that individual class members will be released from detention, Dkt. 68 at 15, Plaintiffs' bond claims relate to Defendants' *policies*: placing the burden of proof on noncitizens, failing to require recording or transcription, and failing to require contemporaneous written decisions with particularized findings.[2] There is no

---

[2]        Even those proposed class members to whom IJs grant release face harm based on the lack of procedural protections—IJs may set higher bond amounts based on how well they met the burden of proof, leaving class

dispute that Defendants apply these policies to each and every proposed class member. Because Plaintiffs' claims relate to the constitutionality of these *policies*, not their application in any particular case, they can be resolved in a "single stroke," *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014), and Plaintiffs satisfy the commonality requirement. *See Rivera v. Holder*, 307 F.R.D. 539, 550 (W.D. Wash. 2015) (finding commonality requirement met where "[c]lass members share common questions of law and fact []concerning whether they received or will receive a bond hearing that does not comply with the law").

Plaintiffs can demonstrate commonality even where some proposed class members may have received one of the protections at issue. *See, e.g.*, *Mendez Rojas v. Johnson*, No. C16-1024RSM, 2017 U.S. Dist. LEXIS 73262, *16-17 (W.D. Wash. Jan. 10, 2017) (finding commonality in case seeking recognition of asylum seekers' right to receive notice of a filing deadline where some asylum seekers had received some form of notice). Defendants point out that the bond hearings of Plaintiffs Orantes and Vasquez were recorded and claim, without evidence, that "many" class members may be in the same position. Dkt. 68 at 15. Notably, they do not allege that the courts which conducted those hearings—or any immigration courts—have a policy of mandating that IJs record bond hearings. The record in fact suggests that, for the named Plaintiffs in this case, Defendants only recorded the bond hearings that took place *after* the filing of the First Amended Complaint adding claims related to delayed bond hearings. *Compare* Dkt. 66 ¶20 (bond hearing on July 16 recorded); Dkt. 67 ¶18 (bond hearing on August 20 recorded) *with* Dkt. 66 ¶¶18-19 (not mentioning recording of bond hearings); *cf. Walters*, 145 F.3d at 1046 (declining to allow an "agency to avoid nationwide litigation that challenges the constitutionality of its general practices simply by pointing to minor variations in procedure . . . , particularly because the variations were designed to avoid the precise constitutional

members to decide whether to appeal and seek a lower bond amount without the benefit of a particularized written decision or recording.

AM. CLASS CERT. MOT.
Case No. 2:18-CV-00928-MJP - 4

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1

inadequacies" at issue in the case).

2

### 3.    Asylum Claim

3

For the reasons discussed above, Plaintiffs also establish commonality as to their claims

4

under asylum law. Contrary to Defendants' contention, Dkt. 68 at 15-16, Plaintiffs' motion

5

alleges that Defendants policies violate Congress's intent to "create a 'uniform procedure' for

6

consideration of asylum claims." Dkt. 37 at 11 (citing *Orantes-Hernandez, v. Thornburgh*, 919

7

F.2d 549, 552 (9th Cir. 1990) (citation omitted)); *see also* Dkt. 37 at 17, 19. Thus, this Court can

8

resolve Plaintiffs' asylum claims on a class-wide basis.

9

## C.    Plaintiffs Are Adequate Representatives with Claims Typical of Those of Members of the Proposed Classes.

10

### 1.    Adequacy

11

12

In challenging Plaintiffs' adequacy, Defendants fault them for failing to satisfy

13

requirements Defendants have manufactured. *See* Dkt. 68 at 17-18. Plaintiffs are not required to

14

submit declarations expressly affirming their interest, willingness, and capacity to serve as class

15

representatives. Courts, including in this district, routinely appoint plaintiffs as class

16

representatives without affidavits or declarations from them. *See, e.g.*, *Mendez Rojas*, 2017 WL

17

1397749, at *6; *Rivera*, 307 F.R.D. at 550; *Khoury v. Asher*, 3 F. Supp. 3d 877, 891 (W.D.

18

Wash. 2014), *aff'd*, 667 F. App'x 966 (9th Cir. 2016); *Gonzales v. U.S. Dep't of Homeland Sec.*,

19

239 F.R.D. 620, 628 (W.D. Wash. 2006), *vacated and remanded sub nom. Gonzales v. Dep't of*

20

*Homeland Sec.*, 508 F.3d 1227 (9th Cir. 2007).[3] Moreover, Defendants err in asserting that

21

Plaintiffs "have not submitted a single sworn statement from any proposed representatives." Dkt.

22

68 at 17. *But see* Dkt. 57 (Plaintiff Orantes Decl.); Dkt. 61 (Plaintiff Vasquez Decl.).

23

Here, Plaintiffs' vigorous advocacy on behalf of themselves and the proposed classes is

24

well documented. *See* Dkts. 8, 26, 37, 45. Plaintiffs' "involvement in the case shows that [they

25

26

[3]         Plaintiffs nevertheless submit additional declarations concurrently herewith for the Court's consideration.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

are] not merely a pawn of the class lawyers," *In re AEP ERISA Litig.*, No. C2-03-67, 2008 U.S. Dist. LEXIS 77165, at *6 (S.D. Ohio Sept. 8, 2008) (remarking also that "the threshold for establishing adequacy is quite low"), and easily distinguishes them from the negligent and disinterested plaintiffs in the cases Defendants cite, *see Spinelli v. Capital One Bank*, 265 F.R.D. 598, 613-14 (M.D. Fla. 2009) (plaintiff failed to appear for her deposition and had not made herself subsequently available); *In re AEP ERISA Litig.*, 2008 U.S. Dist. LEXIS 77165 at *11 (plaintiff had not, inter alia, had any contact or interest in the litigation in the three years preceding his deposition); *Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421, 427 (E.D. La. 1997) (plaintiff was unaware she had "any duties as a class representative or what those duties might entail" and class counsel's adequacy and candor to the court called into question).

Given their demonstrated commitment, there is no reason to seek "confirmation" of Plaintiffs' commitment to this litigation. Dkt. 68 at 18. Moreover, no developments in this case or in Plaintiffs' individual cases conflict with their commitment to vindicate the rights of similarly-situated asylum seekers—a commitment that satisfies adequacy requirements, for it is shared with putative class members. *See* Dkt. 37 at 19-20. Plaintiffs' ultimate release from detention does not undermine certification (or adequacy), *see* Dkt. 68 at 17, because the nature of immigration detention makes those claims "inherently transitory." *See* Dkt. 69 at 9, 21-22; *Rivera v. Holder*, 307 F.R.D. at 548. As their claims would otherwise "evade review," the certification analysis should "relate back" to the filing of the complaint. *Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975); *Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014); *Rivera*, 307 F.R.D. at 548. No plaintiff had received a credible fear interview or a bond hearing at the time they filed suit. *See* Dkt. 1 ¶¶71, 86, 103; Dkt. 8 ¶¶112, 126-127. Contrary to Defendants' arguments, Dkt. 68 at 17 n.1, the relation back doctrine is equally applicable to the bond procedures claims, for, when Plaintiffs Orantes and Vasquez initially brought this action, *see* Dkt. 8, they faced the

AM. CLASS CERT. MOT.
Case No. 2:18-CV-00928-MJP - 6

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

prospect of deficient bond hearings and now "similarly-situated class members would have the same complaint." *Rivera*, 307 F.R.D. at 548; *see also Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152-53 (10th Cir. 2013); *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005); *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004). Defendants do not dispute the policies challenged by Plaintiffs and proposed BH Class members with respect to the burden of proof, requiring recording or transcription, and contemporaneous decisions with particularized findings. Accordingly, "there is a constantly changing putative class that will become subject to these allegedly unconstitutional conditions." *Lyon v. U.S. Immigration and Customs Enforcement*, 300 F.R.D. 628, 639 (N.D. Cal. 2014), *modified sub nom. Lyon v. U.S. Immigration and Customs Enforcement*, 308 F.R.D. 203 (N.D. Cal. 2015) (citation omitted). Accordingly, this Court should reject Defendants' request to delay class certification by first allowing Defendants to interrogate Plaintiffs as to their "suitability" to serve as class representatives. Dkt. 68 at 18.

### 2.    Plaintiffs' claims are typical of proposed class members' claims

Plaintiffs' claims are typical of those of the class members they seek to represent. *See* Dkt. 37 at 17-19. While some features and background circumstances surrounding Plaintiffs' credible fear hearings and detention may vary, the actions at issue here form part of the *typical* CFI and bond hearing delays and baseline deficiencies in the bond hearings, as demonstrated by the considerable testimony of immigration practitioners confirming that Defendants' delays and bond-hearing due process violations are *not* "unique," Dkt. 68 at 19, to this time period. *See* Dkt. 39 ¶¶4-5; Dkt. 40 ¶¶3-5; Dkt. 41 ¶¶3-4; Dkt. 70-1 ¶¶4-6; Dkt. 43 ¶3-4; Dkt. 44 ¶¶3-5. Notably, Defendants do not refute or account for these declarations. The delay, deficient procedures, harm to Plaintiffs and their resulting legal claims are typical of those of the putative class members.

Defendants erroneously argue that Plaintiffs' claims are not typical of the CFI Class

AM. CLASS CERT. MOT.
Case No. 2:18-cv-00928-MJP - 7

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

because of individual factors that are irrelevant to the credible fear process. Despite Defendants'

allegations, Dkt. 68 at 19, whether Plaintiffs or proposed class members were "subject to

criminal prosecution" for entering without inspection does not render their claims atypical of

those who presented themselves at ports of entry. All individuals, regardless of manner of entry,

are entitled to a timely credible fear determination. But to be clear, just as Plaintiffs do not seek

to impose deadlines where delays are at the request of the applicant, they do not seek to require

CFIs prior to a district court's disposition of a pending criminal charge.[4] Thereafter, they all go

through the same credible fear process. Even for Plaintiffs subject to criminal prosecution, their

CFIs were weeks after the criminal prosecution was completed. Dkt. 26 ¶¶80, 100-03. Notably,

the regulation governing the timing of reasonable fear interviews does not contemplate a

different application for asylum seekers subject to criminal prosecution based on entry without

inspection. *See* 8 C.F.R. § 208.31(b). Nor do "processing and transfer times," ECF No. 68 at 19,

affect the analysis of the issues at stake. *See supra* § II.B.

Plaintiffs Orantes and Vasquez assert claims that are typical of the BH Class. They, like

all proposed class members, were not provided bond hearing within 7 days of requesting a

hearing. The delays that Plaintiffs Orantes and Vasquez experienced are not attributable to an

"influx" of detainees that caused ICE to house noncitizens at BOP facilities. Dkt. 68 at 19.

Rather, such delays are customary for noncitizens in ICE custody throughout the

country. *See* Dkt. 37 at 13-14 (citing practitioner declarations); Dkt. 45 at 5 (same). Both

Plaintiffs Orantes and Vasquez suffered injury resulting from the delay in receiving a bond

hearing—an injury that is typical of all proposed BH Class members.

Defendants also err in asserting that Plaintiffs Orantes and Vasquez are required to first

---

[4] Notably, Defendants did not bring criminal charges against all Plaintiffs. Moreover, that the federal government turns away noncitizens who attempt to seek asylum at ports of entry, *see generally Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-02366-BAS-KSC, 2018 U.S. Dist. LEXIS 141025 (S.D. Cal. Aug. 20, 2018), necessarily leading some to enter the country without inspection, makes the prosecution of these asylum seekers especially troubling.

file administrative appeals of their bond decisions in order to challenge procedural deficiencies on behalf of class members. The court in *Leonardo v. Crawford* dismissed an *individual* habeas claim for failure to exhaust administrative remedies because the petitioner did not "demonstrate[] grounds for excusing the exhaustion requirement." 646 F.3d 1157, 1161 (9th Cir. 2011). However, courts generally waive the exhaustion requirement when it "would be a futile attempt to challenge a fixed agency position." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995); *see also Rivera*, 307 F.R.D. at 551-52 (discussing factors warranting waiver of prudential exhaustion requirement). Here, it would be futile to require exhaustion because Defendants have fixed policies with respect to the relevant procedures challenged by proposed BH Class members. *See* Dkt. 37 at 16-17; Dkt. 45 at 4-5.

Defendants further assert that Plaintiffs Orantes and Vasquez's bond hearings were recorded, Dkt. 68 at 21, but as noted this occurred before the first amended complaint was filed. *See supra* § II.B.2. Defendants do not assert they have a policy or practice of recording bond hearings, and they did not advise Plaintiffs of the availability of recordings at the time of their bond hearings. Moreover, both were still denied a bond hearing in which the government bears the burden of proof and the IJ provides contemporaneous particularized findings. Both plaintiffs thus suffered a violation of their right to procedural due process—an injury that is typical of all proposed BH Class members. Defendants further err in asserting that Plaintiff Orantes suffered no prejudice because she was eventually released, Dkt. 68 at 20, but only as a result of the nationwide injunction issued in *Ms. L v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). Unlike the petitioner in *Prieto-Romero v. Clark*, 534 F.3d 1053 (9th Cir. 2008), Plaintiff Orantes was prejudiced by having to bear the burden of proof: the IJ found her to be a flight risk, denied bond, and caused her to be detained for 8 additional days, during which she also suffered significant emotional harm. Dkt. 57 ¶¶14-17. The bond amount and condition Plaintiff Vasquez

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1

stipulated to were impacted by these procedures. *See* Dkt. 69 at 23 n.6; *cf.* Dkt. 61 ¶¶10-11.

2

**D.      Nationwide Class Certification is Appropriate and Warranted.**

3

The proposed classes consist of asylum seekers who are subject to Defendants' unlawful

4

policies and practices of delaying CFIs and bond hearings without procedural safeguards. The

5

vast majority do not possess the resources or capacity to litigate these purely legal issues, even if

6

they could do so while attempting to prepare asylum applications and evidence from inside a

7

detention facility, often without the assistance of counsel. *See* Dkt. 49 ¶¶9-20; Dkt. 50 ¶¶10-15.

8

Many class members are traumatized from the persecution they fled and face mental and

9

physical health challenges, which also interfere with their ability to litigate. *See* Dkt. 45 at 21

10

(citing declarations); Dkt. 49 ¶¶3-8. Moreover, proposed class members are transferred across

11

the country as they pass through this process. *See, e.g.*, Dkt. 37 at 11; Dkt. 50 ¶9; Dkt. 57 ¶¶4, 6,

12

10, 16; Dkt. 61 ¶¶2-3, 6. Thus, nationwide certification is particularly appropriate in this case.

13

Defendants rely on *Califano v. Yamasaki*, 442 U.S. 682 (1979) to suggest that nationwide

14

certification is inappropriate, Dkt. 68 at 21, 22, but that decision supports Plaintiffs' motion.

15

Indeed, the Court explained that a nationwide class is not "inconsistent with principles of equity

16

jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation

17

established, not by the geographical extent of the plaintiff class," and expressly "decline[d] to

18

adopt the extreme position that such a class may never be certified." 442 U.S. at 702-03.

19

*Califano* affirmed in relevant part an order consolidating and affirming two district court

20

decisions, one of which, *Buffington v. Weinberger*, No. 734-73C2 (W.D. Wash. Oct. 22, 1974),

21

was a nationally certified class. *Id.* at 689. Here, irrespective of geographical location, the

22

proposed CF and BH class members face delayed credible fear interviews and bond hearings

23

without procedural protections, respectively, and all stand to benefit from the same relief this

24

Court can afford notwithstanding the differing factual circumstances that may affect the outcome

25

26

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

of those interviews and hearings.

Defendants' concerns about "intercircuit comity," "issues of local importance," and interference "with courts already assessing overlapping issues," Dkt. 68 at 21-22, ring hollow. *See Hamama v. Aducci*, No. 17-cv-11910, 2018 U.S. Dist. LEXIS 162410, *28-29 (E.D. Mich. Sept. 24, 2018) (rejecting as "too narrow" the government's contention "that certifying a nationwide class would violate principles of inter-circuit comity and strip other courts of jurisdiction over claims pending before them"). Plaintiffs are unaware of—and Defendants do not cite—*any* case involving proposed class members raising the legal claims presented in this case, let alone a case poised to resolve them.[5] Defendants' claim that "the constitutionality of placing the burden on the [noncitizen]," Dkt. 68 at 22, is play in *Rodriguez v. Jennings*, 887 F.3d 954, 956 (9th Cir. 2018), is inaccurate. That case may only implicate the burden with respect to prolonged detention, i.e., where persons have been detained at least six months.

Defendants also claim *Brevil v. Jones*, No. 1:17-cv-01529-LTS-GTW (S.D.N.Y.) is an example of competing litigation. *See* Dkt. 68 at 22. Although the case is sealed, it appears to involve a pro se habeas petition filed in February 2017 by a man who waited four months for a bond hearing after DHS placed him in removal proceedings (not through the credible fear process). *See Brevil v. Jones*, 283 F. Supp. 3d 205, 208-09, 211 (S.D.N.Y. 2018). After the government objected to the Magistrate Judge's recommendation of Mr. Brevil's release, the District Court Judge appointed counsel, and eventually ordered briefing on a burden of proof issue. *See Brevil*, No. 1:17-cv-01529-LTS-GTW, Dkt. 26 (Feb. 16, 2018), Dkt. 28 (Mar. 1, 2018), Dkt. 34 (Apr. 3, 2018), Dkt. 47 (Aug. 8, 2018). If anything, *Brevil* weighs in Plaintiffs' favor as it demonstrates that detained pro se noncitizens filing habeas petitions require the assistance of counsel and that habeas petitions may pend for years. It is also instructive that the

---

[5]     If any such case exists, the proposed class in this case could exclude individuals with pending cases that raise the same legal issues presented here, as in *Buffington*. *See Califano*, 442 U.S. at 689.

AM. CLASS CERT. MOT.
Case No. 2:18-cv-00928-MJP - 11

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

government points to only one district court case raising a tangentially related issue for a differently-situated individual. Indeed, *Brevil* undermines Defendants' assertion that class certification "may well impede [proposed BH class members'] access to speedier and/or particularized adjudication of their detention," Dkt. 68 at 24, as Mr. Bevil's pending habeas petition already has been pending for 18 months.

The government's "apparent preference for litigating a single issue in multiple circuits does not outweigh the factors here that favor certification of a nationwide class." *Clark v. Astrue*, 274 F.R.D. 462, 470-71 (S.D.N.Y. 2011) (certifying nationwide class despite contention that class "would foreclose litigation of the issue presented . . . in other circuits"). As Defendant Sessions explained, there is a "specific mechanism that the law provides for large numbers of similarly situated persons to pursue relief efficiently: the class action system." Memorandum from Jefferson B. Sessions, Att'y Gen., Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions at 5 (Aug. 28, 2018), https://tinyurl.com/y7lbf4hw (marshalling arguments against nationwide injunctions issued in *individual* cases and noting safeguards in class action rules). Here, these safeguards are both critical and necessary: most proposed class members do not have the resources to litigate these claims. Moreover, given the inherently transitory nature of the claims, the government will inevitably try to defeat adjudication of individual claims by arguing mootness, as they have done here. *See* Dkt. 36 at 13, 21.

Finally, certification of nationwide class actions is common in civil rights and immigration cases, in part because of Congress' interest in a uniform application of immigration law. *See* Dkt. 37 at 9-12. Plaintiffs have established commonality, *see id.* at 15-17; *supra* § II.B, and, as such, there are no barriers to nationwide resolution.

### III.    CONCLUSION

The Court should certify the proposed classes and enter the proposed certification order.

RESPECTFULLY SUBMITTED this 28th day of September, 2018.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

s/ Matt Adams
Matt Adams, WSBA No. 28287
Email:  matt@nwirp.org

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No. 46987
Email:  glenda@nwirp.org

s/ Leila Kang
Leila Kang, WSBA No. 48048
Email:  leila@nwirp.org

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

s/ Trina Realmuto
 Trina Realmuto*
 Email: trealmuto@immcouncil.org

s/ Kristin Macleod-Ball
 Kristin Macleod-Ball*
 Email: kmacleod-ball@immcouncil.org

AMERICAN IMMIGRATION COUNCIL
100 Summer Street, 23rd Floor
Boston, MA 02110
Telephone: (857) 305-3600

*Admitted pro hac vice

*Attorneys for Plaintiffs-Petitioners*

AM. CLASS CERT. MOT.
Case No. 2:18-CV-00928-MJP - 13

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2018, I filed the foregoing motion for class

certification as well as the accompanying supporting declarations with the Clerk of the Court

using the CM/ECF system, which will send notification of such filing to those attorneys of

record registered on the CM/ECF system. All other parties shall be served in accordance with the

Federal Rules of Civil Procedure.

DATED this 28th day of September, 2018.

*s/* Matt Adams
Matt Adams
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025
E-mail: matt@nwirp.org

AM. CLASS CERT. MOT.
Case No. 2:18-CV-00928-MJP - 14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILMAN GONZALEZ ROSARIO, et al., | CASE NO. C15-0813JLR |
| Plaintiffs, | ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court are (1) named Plaintiffs A.A., Antonio Machic Yac, and W.H. and class members' (collectively, "Plaintiffs") motion for summary judgment (Pls. MSJ (Dkt. # 118)); and (2) Defendants United States Citizenship and Immigration Services ("USCIS"), United States Department of Homeland Security ("DHS"), Director of USCIS L. Francis Cissna, and Secretary of DHS Kirstjen Nielsen's (collectively,

1  "Defendants") motion for summary judgment (Defs. MSJ (Dkt. # 119)).  Each party

2  opposes the other's motion.  (*See* Pls. Resp. (Dkt. # 123); Defs. Resp. (Dkt. # 122).)  The

3  court has considered the motions, the parties' submissions in support of and in opposition

4  to the motions, the administrative record, and the applicable law.  The court also heard

5  oral argument from parties on July 26, 2018.  (*See* Min. Order (Dkt. # 126).)  Being fully

6  advised, the court GRANTS Plaintiffs' motion and DENIES Defendants' motion.

## II.    BACKGROUND

8       Plaintiffs seek to compel USCIS to abide by regulatory deadlines for adjudicating

9  noncitizens' applications for employment authorization documents ("EADs").  (*See*

10 *generally* Am. Compl. (Dkt. # 58).)  The court reviews the regulatory structure governing

11 the EAD application process before turning to the factual and procedural background of

12 this case.[1]

### A.    Regulatory Structure

14      Asylum seekers can obtain an employment authorization prior to adjudication of

15 their asylum applications.  *See* 8 C.F.R. §§ 208.7(a)(1), 274a.12(c)(8), 274a.13(d); *see*

16 *also Carballo v. Meissner*, No. C00-2145, 2000 WL 1741948, at *2 (N.D. Cal. Nov. 17,

17 2000).  To do so, an individual must file Form I-765 with DHS and obtain an EAD,

18 which is evidence that the holder is authorized to work in the United States.  (Supp.

19 Admin. Rec. ("SAR") (Dkt. ## 103-1, 103-2, 103-3, 103-4, 103-5) at 2-3.)  Generally, an

20 //

---

21      [1] The court has previously detailed at length the background of this case.  (*See* 2/10/16
   Order (Dkt. # 55); 10/5/16 Order (Dkt. # 80); 7/18/17 Order (Dkt. # 95); 4/17/18 Order (Dkt.
22 # 113).)  Thus, here, the court recounts only the information pertinent to the instant motions.

1  individual must wait 150 days after filing an asylum application to file an initial EAD

2  application. 8 C.F.R. § 208.7(a)(1). Upon receiving the initial EAD application, the

3  regulation states that USCIS:

> shall have 30 days from the date of filing of the request [for] employment
> authorization to grant or deny that application, except that no employment
> authorization shall be issued to an asylum applicant prior to the expiration of
> the 180-day period following the filing of the asylum application filed on or
> after April 1, 1997.

7  *Id.* § 208.7(a)(1); *see also* 8 U.S.C. § 1158(d)(2).

8  **B.    Factual Background**

9        A.A., Mr. Machic Yac, and W.H. are initial asylum EAD applicants who allege

10  that Defendants failed to adjudicate their EAD applications within the required 30-day

11  period. (Am. Compl. ¶¶ 21, 23, 28, 57, 62, 81; *see also* Machic Yac AR (Dkt. # 67-6) at

12  3 (EAD application received on December 31, 2015, and adjudicated March 31, 2016);

13  A.A. AR (Dkt. # 67) at 3 (EAD application submitted around January 12, 2016, and

14  adjudicated March 16, 2016); W.H. AR (Dkt. # 38) at 42-50 (EAD application received

15  on December 15, 2014, and adjudicated June 16, 2015).) There is no dispute that USCIS

16  failed to meet its 30-day deadline, both for the named Plaintiffs and more broadly for

17  class members. (*See* Defs. MSJ at 7 ("USCIS was not able to adjudicate 100 percent of

18  initial asylum EADs within 30 days.").) Defendants' data reveals that from 2010 to

19  2017, USCIS met its 30-day deadline in only 22% of cases—that is, out of 698,096 total

20  applications, USCIS resolved only 154,629 applications on time. (*See* SAR at 89-90.) In

21  2017, USCIS timely resolved only 28% of applications. (*See id.* at 90.)

22  //

1        USCIS made some changes in response to the need to more quickly adjudicate

2 EAD applications. First, USCIS increased the validity period of an initial asylum EAD

3 from one year to two years. *USCIS Increases Validity of Work Permits to Two Years for*

4 *Asylum Applicants*, U.S. Citizenship and Immigration Services (Oct. 6, 2016),

5 https://www.uscis.gov/news/alerts/uscis-increases-validity-work-permits-two-years-

6 asylum-applicants. Second, USCIS provided checklists on its websites to assist

7 applicants who are submitting applications. *Form M-1162, Optional Checklist for Form*

8 *I-765(c)(8) Filings Asylum Applications (With a Pending Asylum Application) Who Filed*

9 *for Asylum on or after January 4, 1995*, U.S. Citizenship and Immigration Services (July

10 17, 2017), https://www.uscis.gov/system/files_force/files/form/m01162.pdf.

11 **C.**    **Procedural Background**

12        Plaintiffs brought a putative class action on May 22, 2015. (*See* Compl. (Dkt.

13 # 1).) On August 10, 2015, Defendants moved to dismiss the suit and argued that the

14 "30-day regulatory deadline is discretionary." (2/10/16 Order at 21; *see* MTD (Dkt. # 34)

15 at 10-13.) The court disagreed and held that not only did the "plain language of the

16 regulation favor[] a mandatory interpretation," but "[r]eading the 30-day timeline as

17 mandatory also comports with the regulation's overall goals and related regulations."

18 (2/10/16 Order at 24; *see also id.* at 24-26.)

19        On July 18, 2017, the court granted Plaintiffs' motion for class certification and

20 certified the following class:

21          Noncitizens who have filed or will file applications for employment
         authorization that were not or will not be adjudicated within . . . 30 days . . .

22          and who have not or will not be granted interim employment authorization.

[This class] consists of only those applicants for whom 30 days has accrued or will accrue under the applicable regulations, 8 C.F.R. §§ 103.2(b)(10)(i), 208.7(a)(2), (a)(4).

(7/18/17 Order at 26-27.)  The court additionally reiterated that the regulatory 30-day deadline is "mandatory" and found "no reason to differentiate those mandatory regulatory deadlines from the mandatory statutory deadlines in [Ninth Circuit precedent]." (*Id.* at 21.)  The court explicitly rejected Defendants' argument that the regulations only created a mandatory duty to act and not a mandatory timeline to follow, stating that it will not entertain "Defendants' effort to relitigate whether the 30-day deadline is directory or mandatory." (*Id.* at 21 n.10.)

Subsequently, both parties sought to supplement the administrative record. (Defs. Mot. to Supp. (Dkt. # 103); Pls. Mot. to Supp. (Dkt. # 104).)  The court granted in part and denied in part both motions (4/17/18 Order at 13-14), and parties accordingly filed a supplemental administrative record (*see* Not. of SAR (Dkt. # 116)).

Both parties then moved for summary judgment. (*See* Pls. MSJ; Defs. MSJ.)  The court now addresses both motions.

### III.   ANALYSIS

The parties agree that USCIS has a duty to adjudicate initial EAD applications within 30 days. (*See* Pls. Reply (Dkt. # 124) at 1; Defs. MSJ at 9 (acknowledging that the court "has previously held that Defendants have a mandatory duty to adjudicate initial EAD applications within 30 days").)  The parties further agree that USCIS violates this duty. (*See* Pls. Reply at 1-2; Defs. MSJ at 9 (acknowledging that "they are unable to meet that [30-day] requirement for every application").)  Thus, the sole remaining

question is what remedy is proper.  (*See* Pls. Resp. at 2; Defs. MSJ at 9 (stating "a

question for this [c]ourt remains:  what remedy is appropriate?").)

Plaintiffs request (1) a declaration that USCIS has violated the mandatory

deadline, and (2) an injunction compelling Defendants to comply with the regulation.

(Pls. MSJ at 11.)  Defendants do not dispute the declaratory relief Plaintiffs request.[2]

(*See* Defs. MSJ; Defs. Resp.)  Instead, Defendants focus their arguments on the

impropriety of injunctive relief.  (*See* Defs. MSJ at 9-15.)  The court disagrees and finds

that an injunction compelling agency action is appropriate here.

The Administrative Procedure Act ("APA") provides that a court may compel

"agency action unlawfully withheld or unreasonably delayed."[3]  5 U.S.C. § 706(1).  A

court may compel agency action when "an injunction is necessary to effectuate the

congressional purpose behind the statute."  *Badgley*, 309 F.3d at 1177 (citing *TVA v. Hill*,

437 U.S. 153, 194 (1978)).  In *Badgley*, the Ninth Circuit considered whether an

injunction should issue for an agency's failure to comply with a deadline laid out in the

//

---

[2] In reply, Defendants argue for the first time that a declaratory judgment "is not appropriate in this case."  (Defs. Reply (Dkt. # 125) at 1 (bolding removed).)  As a preliminary matter, the court "need not consider arguments raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  But even if the court considered Defendants' argument, Defendants merely purport that a declaratory judgment "alone would not be sufficient" but provide no support that this alleged insufficiency should prevent a declaratory judgment from issuing.  (*See* Defs. Reply at 2.)  Indeed, the court finds that the parties are "immersed in a substantial controversy regarding the proper interpretation of" the regulations at issue and thus, the court has the authority to issue a declaratory judgment regarding the rights of Plaintiffs.  *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1172-73 (9th Cir. 2002).

[3] Both parties recognize that an injunction pursuant to the APA is identical to mandamus relief under 28 U.S.C. § 1361.  (*See* Pls. MSJ at 6-7; Defs. MSJ at 8.)

Endangered Species Act (the "ESA"). *See id.* at 1176-78. Because the clear purpose of the ESA was to assure adequate protection for endangered species, and violation of the ESA deadlines impeded that purpose, the court held that the ESA "removed the traditional discretion of courts in balancing the equities before awarding injunctive relief." *Id.* at 1177. In other words, because the statute was "abundantly clear that the balance [of equities] has been struck in favor of affording endangered species the highest of priorities," it removed the usual discretion a court exercises in determining whether an injunction should issue and compelled the court to grant injunctive relief. *Id.* at 1177-78 (internal quotation marks omitted) (quoting *TVA*, 437 U.S. at 194).

As the court has previously found (*see* 2/10/16 Order at 24), one of the "chief purposes" of the 30-day deadline, as part of the larger regulatory amendments issued in January 1995, was "to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible," 62 Fed. Reg. at 10,318 (1997). The focus on expediency is reinforced by how the agency described the proposed rule: "The INS will adjudicate these applications for work authorization within 30 days of receipt, regardless of the merits of the underlying asylum claim." 50 Fed. Reg. at 14,780 (1994). This elevation of the 30-day deadline above the merits of the underlying asylum claim reflects, as in *Badgley*, that the balance of equities has been struck in favor of adhering to the deadline so that applicants can obtain employment authorization. *See* 309 F.3d at 1177.

The goal of timely employment authorization is further evidenced by the reason why the 30-day deadline was implemented. The January 1995 amendments imposed a 150-day waiting period before an asylum seeker may submit an initial EAD application.

1    50 Fed. Reg. at 14,780.  But even though the agency imposed a waiting period, it made

2    clear that "[i]deally . . . few applicants would ever reach the 150-day point."  *Id.*  Indeed,

3    the INS selected 150 days because it was a period "beyond which it would not be

4    appropriate to deny work authorization to a person whose claim has not been

5    adjudicated."  *Id.*  Thus, the purpose of promulgating the 30-day deadline on top of that

6    150-day waiting period was to cabin what was already—in the agency's view—an

7    extraordinary amount of time to wait for work authorization.  *See id.*  This context further

8    elucidates that the 30-day deadline was instituted to promote timeliness.

9         In light of the plain language and clear objectives behind the regulation at issue,

10   the court concludes that, as in *Badgley*, it is "abundantly clear that the balance [of

11   equities] has been struck in favor" of expedient adjudication of initial EAD applications

12   so that asylum seekers may obtain work authorization when waiting—often for years—to

13   have their asylum applications resolved.  *See* 309 F.3d at 1177; (*see* SAR at 93-95

14   (showing that asylum applicants wait at least two years, and sometimes, up to four years,

15   for an asylum interview).)  Thus, much like *Badgley*, the court is compelled to issue

16   injunctive relief.  *See* 309 F.3d at 1177.

17        Defendants attempt to distinguish *Badgley* on the basis that *Badgley* involved a

18   deadline set by a congressional statute rather than an agency regulation.  (Defs. MSJ at

19   11-12.)  But it is settled law that "properly enacted regulations have the force of law and

20   are binding on the government until properly repealed."  *Flores v. Bowen*, 790 F.2d 740,

21   742 (9th Cir. 1986).  And nothing in *Badgley* expressly limits its reasoning to statutes

22   enacted by Congress.  *See* 309 F.3d at 1176-78.  Moreover, Defendants provide no

1    authority interpreting *Badgley* in the way they propose, either in their briefing or at oral

2    argument.  (*See* Defs. MSJ at 11-12.)  Indeed, Congress, in its statutory directive, defers

3    to the agency regulations to govern the process of granting work authorization.  *See* 8

4    U.S.C. § 1158(d)(2) ("[S]uch authorization may be provided under regulation.").  Thus,

5    the court discerns no reason to differentiate the mandatory regulatory deadlines at issue

6    here from the mandatory statutory deadlines in *Badgley*.

7        *Badgley* also forecloses Defendant's argument that the court should apply the

8    six-factor reasonableness analysis from *Telecommunications Research & Action Center*

9    *v. F.C.C.* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984).  (*See* Defs. MSJ at 12-13 (urging

10   the court to apply the *TRAC* factors).)  As the court previously concluded (*see* 7/18/17

11   Order at 20-21), *Badgley* rejected the *TRAC* analysis when the law "specifically

12   provide[s] a deadline for performance," *see* 309 F.3d at 1177 n.11; *see also Garcia v.*

13   *Johnson*, No. 14-cv-01775-YGR, 2014 WL 6657591, at *12 (N.D. Cal. Nov. 21, 2014).

14   Here, there is undisputedly a deadline established by regulation.  *See* 8 C.F.R.

15   § 208.7(a)(1).  Thus, the court rejects the Defendants' contention that the *TRAC* factors

16   should be applied.

17       But even if Defendants are correct that the *TRAC* factors apply, they weigh in

18   favor of granting injunctive relief.  The *TRAC* factors measure whether the agency has

19   unreasonably delayed action, as is required to issue injunctive relief under the APA.  750

20   F.2d at 79-80; *see* 5 U.S.C. § 706(1); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190

21   (D.C. Cir. 2016) (applying *TRAC* factors in the mandamus context to determine whether

22   mandamus should issue).  The factors include:

(1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake, (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, (5) the court should also take into account the nature and extent of the interests prejudiced by the delay, and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*TRAC*, 750 F.2d at 80 (internal citations omitted).  Defendants discuss only their current efforts to meet the 30-day timeline and the reasons why they cannot achieve 100% compliance, both of which fall within the fourth *TRAC* factor.[4]  (*See* Defs. MSJ at 13-15.) Specifically, Defendants cite "resource and logistical constraints in the face of an astronomical increase in both asylum applications and subsequent [EAD] applications" and the two changes they have made in an effort to comply:  (1) extending the validity of initial asylum EADs; and (2) preparing a checklist for initial EAD applicants so that applications are properly filled out.[5]  (*Id.* at 13-14.)

Even accepting Defendants' assertions on their face and assuming that the fourth *TRAC* factor weighs against an injunction, that factor is outweighed by the remaining

---

[4] Although the Defendants urge the court to apply the *TRAC* factors, their briefing does not explicitly make arguments under each factor; instead, they raise general practical concerns involving their resources.  (*See* Defs. MSJ at 12-15.)  At oral argument, Defendants identified the fourth *TRAC* factor as the one most likely to encompass resource concerns, and in its own review of the factors, the court agrees that these practical concerns best fit into the fourth *TRAC* factor.

[5] Defendants also indicate that they are in the process of amending the regulations to eliminate the 30-day deadline.  (Defs. MSJ at 8; Defs. Resp. at 3.)  But the current regulation remains binding until it is properly repealed.  *See Flores*, 790 F.2d at 742.  Moreover, the status of the amendment is unclear, and its outcome is equally unclear.  Thus, the court declines to rely on a potential amendment in its consideration of the instant motions.

factors. Most importantly, the overlapping third and fifth *TRAC* factors, both of which

assess the impact of the agency's delay on the public welfare, strongly weigh in favor of

an injunction. *See TRAC*, 750 F.2d at 80. As *TRAC* recognizes, delays are "less tolerable

when human health and welfare are at stake." *Id.* And that is exactly what is at stake

here: Asylum seekers are unable to obtain work when their EAD applications are

delayed and consequently, are unable to financially support themselves or their loved

ones. (*See* SAR at 3 (noting that asylum seekers "are not authorized to work unless they

are specifically granted [EADs]").) This negative impact on human welfare is further

compounded by the length of the USCIS's delay. For example, in 2017, 10,103

applications took over 121 days to adjudicate, on top of the 150 days those applicants

already had to wait, unable to work, after filing their asylum application. (SAR at 90.)

The first and second *TRAC* factors additionally suggest that Defendants' delay is

unreasonable. Although Congress has not included a timetable specific to EAD

applications, it has stated that the final adjudication of the asylum application "shall be

completed within 180 days after the date an application is filed." 8 U.S.C.

§ 1158(d)(5)(A)(iii). This timetable syncs up with the regulatory requirements—that

after the asylum application has been pending for 150 days, the EAD application should

be resolved in 30 days. *See* 8 C.F.R. § 208.7(a)(1). Yet, the agency is taking far longer

than 30 days. (*See* Machic Yac AR at 3 (91 days); A.A. AR at 3 (about 64 days); W.H.

AR at 42-50 (183 days).)

Considered in combination with the third and fifth factors, the court concludes that

the totality of the *TRAC* factors indicates that Defendants' delay in resolving EAD

applications is unreasonable in these circumstances.[6]  Accordingly, the court grants an injunction compelling Defendants to adhere to the 30-day deadline as laid out in 8 C.F.R. § 208.7(a)(1).

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' motion for summary judgment (Dkt. # 118) and DENIES Defendants' motion for summary judgment (Dkt. # 119).  The court FINDS that Defendants are in violation of 8 C.F.R. § 208.7(a)(1) and ENJOINS Defendants from further failing to adhere to the 30-day deadline for adjudicating EAD applications, as set forth in 8 C.F.R. § 208.7(a)(1).  The court ORDERS Defendants to submit status reports every six (6) months regarding the rate of compliance with the 30-day timeline.

The court DIRECTS the Clerk to provisionally file this order under seal and ORDERS the parties to meet and confer regarding the need for redaction.  The court further ORDERS the parties to jointly file a statement within ten (10) days of the date of this order to indicate any need for redaction.

Dated this 26th day of July, 2018.

_____
JAMES L. ROBART
United States District Judge

---

[6] To the extent Defendants rely on resource constraints as a standalone argument, that argument is unavailing.  The Supreme Court recently rejected a similar argument from an agency citing "a number of practical concerns."  *Pereira v. Sessions*, --- U.S. ---, 138 S. Ct. 2105, 2118 (2018).  The Court found these "meritless" considerations "do not justify departing from the [law's] clear text."  *Id.*  The court concludes the same here.