1          UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

                                    )
4    YOLANY PADILLA, et al.,         ) C18-00928-MJP
                                    )
5                 Plaintiffs,        ) SEATTLE, WASHINGTON
                                    )
6    v.                              ) March 26, 2019
                                    )
7    U.S. IMMIGRATION AND CUSTOMS    ) Oral Argument on
     ENFORCEMENT, et al.,            ) Request for
8                                    ) Preliminary
                  Defendants.        ) Injunction
9                                    )
    _____

10

            VERBATIM REPORT OF PROCEEDINGS
11      BEFORE THE HONORABLE MARSHA J. PECHMAN
            UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15   For the Plaintiffs:    Matt Adams
                            Leila Kang
16                          Aaron Korthuis
                            Northwest Immigrant Rights Project
17                          615 Second Avenue
                            Suite 400
18                          Seattle, WA  98104

19

20   For the Defendants:    Lauren C. Bingham
                            U.S. Department ofJustice
21                          P.O. Box 868
                            Ben Franklin Station
22                          Washington, D.C.  20044

23

24

25

1           THE COURT:  Please be seated.

2           THE CLERK:  This is the matter of Yolany Padilla versus

3    the U.S. Immigration and Customs Enforcement, Cause No. C18-928.

4       Counsel, please make your appearance for the record.

5           MR. ADAMS:  Matt Adams with the plaintiffs.

6           MS. KANG:  Leila Kang with the plaintiffs.

7           MR. KORTHUIS:  And Aaron Korthuis with the plaintiffs.

8           MS. BINGHAM:  Good afternoon, Your Honor.  Lauren

9    Bingham on behalf of defendants, and with me is Brianna Evans

10   from EOIR.

11          THE COURT:  Well, welcome all.

12      Counsel, we're here this afternoon to have oral argument on

13   the request for the preliminary injunction.  I have had an

14   opportunity to review the preliminary injunction, the response,

15   and the reply.  And you should have received a series of

16   questions from me that I ask that at some point during your

17   argument that you answer the questions.  You don't have to go

18   through each of the questions in lockstep, but at some point

19   during your argument I would like answers to each of them.

20      So who is it that will argue for the plaintiffs?

21          MR. ADAMS:  Matt Adams, myself.  Thank you.

22          THE COURT:  Okay.  Mr. Adams, you may begin.

23          MR. ADAMS:  May it please the Court, I will seek to

24   reserve five minutes for rebuttal.

25      Just last October, after we filed our motion for preliminary

1   injunctive relief, the Ninth Circuit, in *Saravia v. Sessions,*

2   affirmed a district court order in which the district court

3   granted preliminary injunction challenging the government's

4   failure to provide timely immigration bond hearings.  And prior

5   to that, in *Hernandez v. Sessions*, the Court of Appeals

6   reaffirmed that, quote, "In the context of immigration detention,

7   it is well settled that due process requires adequate procedural

8   protections," end quote.

9       The bond-hearing class in this case are not just asylum

10  applicants, but they are asylum seekers who have already been

11  screened and interviewed by Department of Homeland Security

12  officers and have been determined to have a credible fear, that

13  is, a bona fide claim for protection, for relief under the

14  Immigration and Nationality Act.  And because of that, all of

15  them were passed out of the expedited removal process to the

16  immigration court for full immigration proceedings.  And because

17  every one of the class members had already entered the country,

18  they're all entitled to a bond hearing.  Nonetheless, defendants

19  needlessly delay these hearings by denying access to the bond

20  hearings on a timely basis and prolonging detention by depriving

21  them of the procedural protections that they are entitled to in

22  those bond hearings.

23      Plaintiffs ask this Court to issue a preliminary injunction

24  in order to ensure that class members do not continue to suffer

25  irreparable harm based upon the deprivation of liberty without

1       due process of law.

2           In *Zadvydas v. Davis*, a Supreme Court case addressing another

3       immigration detention challenge, the Supreme Court made clear, in

4       no uncertain terms, that the fundamental principle of freedom

5       from imprisonment, from immigration detention, lies at the core

6       of the liberty interests that the due process clause seeks to

7       protect.  And repeated decisions from the Ninth Circuit have made

8       clear that the violation of the constitutional right impinging on

9       liberty is a per se example of irreparable harm.

10          So I want to turn to the first protection that plaintiffs are

11      seeking, and that is a timely bond hearing.  Plaintiffs seek a

12      concrete timeline upon which defendants must provide a custody

13      hearing.  And we provided substantial evidence, declarations from

14      advocates across the country, making clear that asylum-seeker

15      class members are subjected to delays, at times up to six weeks,

16      waiting for these bond hearings.  In *Saravia v. Sessions*, again,

17      the Ninth Circuit reaffirmed that due process requires, quote,

18      "the opportunity to be heard at a meaningful time," end quote.

19          Now, defendants cannot dispute that class members are

20      entitled to a prompt bond hearing, as their own guidance and

21      precedents require that they be provided hearings as

22      expeditiously as possible.  Yet, defendants refuse to place any

23      parameters, any concrete timelines, upon which these hearings

24      must be provided and instead argue that they should have

25      unfettered discretion.

1     The Court has asked plaintiffs:  What is the basis for

2  proposing a seven-day timeline?  And I would like to address that

3  now.

4     In the credible fear context, Congress laid out a definition

5  for "as expeditiously as possible," and that was in the context

6  of individuals who have the right to have that credible fear

7  determination reviewed by an immigration judge.  The statute

8  requires that they be provided that review, quote, "as

9  expeditiously as possible," end quote, and then it goes on to

10  define that.  And it defines it as, quote, "to the maximum extent

11  practicable, within 24 hours, but in no case later than seven

12  days," end quote.  And that's at 8 U.S.C.

13  1225(b)(1)(B)(III)(iii).

14     It's also instructive that the regulations require DHS to

15  provide a custody determination within 48 hours of arresting an

16  individual, and that's at 8 C.F.R. 287.3(d).  However, the

17  regulations have no parallel timeline upon which the Court will

18  provide the custody hearing.  But the regulations do say that

19  jurisdiction vests with the Court for that custody determination

20  even before DHS files the charging documents with the immigration

21  court.  That is to say, an individual who's arrested by DHS can

22  get a hearing with the Court even before those one to two days

23  have elapsed, before DHS has provided the Court with those

24  charging papers.  And that's at 8 C.F.R. 1003.14(a).  And this,

25  again, reinforces this concept that they're entitled to this

1    expeditious hearing.  But perhaps most instructive is the Ninth

2    Circuit's recent decision in *Saravia v. Sessions.*  Because,

3    there, the Ninth Circuit, in October, upheld the district court

4    order that in that case a class of youth, that was provisionally

5    certified, be entitled to a bond hearing within seven days of

6    being arrested.  Similar to this case, in that case the

7    government had alleged that in most cases the youth received

8    hearings within seven to fourteen days.  Well, the Court found

9    that that was insufficient and ordered that they be provided

10   hearings within seven days.  And the Ninth Circuit upheld that

11   based upon its citation to *Mathews,* the due process clause

12   requires "the opportunity to be heard 'at a meaningful time.'"

13       Now, in addition to that case, we have cited to other case

14   law from the Ninth Circuit in the civil commitment context,

15   particularly *Doe v. Gallinot*, where the Court said that if the

16   state is going to take custody of an individual, that the state

17   must provide a hearing, and I will quote again, "in no event

18   should the hearing occur later than the seventh day of

19   confinement."  Of course, in the criminal context, the Fourth

20   Amendment, which is not at issue here, but the Fourth Amendment

21   requires a probable cause hearing even sooner, within 48 hours.

22       All of this supports a conclusion that is consistent with how

23   Congress defined "as expeditious as possible" in the statute,

24   within seven days, and is consistent with how the Ninth Circuit

25   created the timeline in *Doe v. Gallinot*, "in no case later than

1    seven days."  And we believe the hearing should be within

2    48 hours.  And sometimes our clients do get those hearings within

3    48 hours, but sometimes our clients wait four to six weeks, and

4    that's what is unacceptable.

5         There must be a concrete timeline, and the agency should

6    comply with a mandate that requires a meaningful opportunity to

7    be heard within a meaningful time.

8         I think it's important to note that under the current

9    process, for those who do receive their bond hearing, according

10   to the stats that we cited in our motion that the government

11   released in 2018, for the first eight months of the fiscal year,

12   almost 50 percent -- that is, over 47 percent of those who had

13   their bond hearing -- received an order that they be released on

14   bond amount or on parole.  So these individuals are being

15   released -- almost half of them have this opportunity -- but it's

16   being needlessly delayed, delayed at times for days and at times

17   for weeks, and that is irreparable harm.

18        And, you know, it's interesting to note, in *Hernandez v.*

19   *Sessions*, the Court pointed to the expense of the government,

20   that the government is paying to the tune of $159 a day per

21   detainee.  And if almost half of our class members are going to

22   get bond amounts but should have been released earlier, it's

23   talking about a huge amount of resources that the government is

24   squandering by detaining individuals by not providing them their

25   prompt bond hearings.

1        But, unfortunately, the bond hearings themselves are not

2   enough, and we see this from our Plaintiffs Blanca Orantes and

3   Ibis Guzman, both of whom were denied bond when they appeared,

4   after the Court placed the burden on them, even though the

5   government had taken away their children and held their children

6   in separate facilities.  And we see this not just in the example

7   of our named plaintiffs, but we see that, again, pointed out in

8   the declarations, the supporting declarations that we submitted

9   from advocates across the country.  Detained asylum seekers who

10  bear the burden of proof, despite having already demonstrated a

11  bona fide claim for relief under the act, face serious and often

12  insurmountable obstacles to ever having an opportunity to be

13  released, regardless of whether they present a flight risk or

14  danger to the community.  And why is that?  They are locked up,

15  they are separated from family, they have no opportunity to

16  gather the documents that the court is requiring them to gather

17  to show they're not a flight risk, documents about their identity

18  or about family members or documents about individuals who would

19  support them if they were released.  Just as important, they are

20  denied the opportunity to look for counsel, so they don't have

21  legal representation to present their claim and to satisfy the

22  framework that the government has imposed on them.

23      In addition --

24          THE COURT:  Counsel, can I stop you there for a moment?

25          MR. ADAMS:  Yes, please.

1       THE COURT:  I certainly am familiar with doing lots of

2   bond hearings over lots of years, and I know in the criminal

3   context how that process is run.

4       Is there anyone who does an interview with the detainee to

5   gather information, you know, name, relatives, you know, what

6   kind of papers do you have, where are you going, what's your

7   plan?  Does anyone do that for anyone, whether it be the

8   government or the detainee?

9       MR. ADAMS:  No.  In some cases, if the detained

10  individual is fortunate enough to have counsel, the counsel

11  prepares a bond packet for them.  But almost 90 percent of these

12  individuals are not represented, so they don't have anyone to

13  prepare that packet.

14      Now, the government files the record of deportable alien,

15  which lists the demographic information of the individual that

16  they have arrested and detained, but they don't provide any

17  information about family that might support them, they don't

18  provide any of the information on behalf of the detained

19  individual demonstrating why they are not a flight risk.  And, in

20  fact, the government is in the better position to get this

21  information.  Oftentimes they have confiscated the identity

22  documents of the individuals.  They have access to the criminal

23  databases, both domestic and international, that would provide

24  any record, and yet they flip the burden on these individuals to

25  demonstrate why they should be released.  And as Judge Tashima

 1    said in the case in *Tijani*, the Supreme Court has consistently

 2    adhered to the principle that the risk of erroneous deprivation

 3    of a fundamental right may not be placed on the individual.  And

 4    so in *Tijani,* and then later in *Singh*, the Ninth Circuit made

 5    clear that the burden must be placed on the government.

 6        Now, the defendants respond, well, the Ninth Circuit got it

 7    wrong in *Tijani* and *Singh*, and they point to the recent case in

 8    *Jennings*, but what they fail to acknowledge is that the

 9    discussion in *Singh* about the burden of proof was exclusively

10    focused on the due process rights of the individual and relied

11    exclusively on Supreme Court case law dealing with due process.

12    There was no statutory interpretation of the burden of proof in

13    *Singh*.

14            THE COURT:  Let me go back to the hearing itself.

15            MR. ADAMS:  Okay.

16            THE COURT:  The way it works now is that the detainee

17    has the burden of going forward.  If the government has whatever,

18    a passport or identification, that they have confiscated, and the

19    detainee basically says, you know, I don't have my documents, are

20    you telling me that the government wins by remaining silent?

21            MR. ADAMS:  Yes, I am.

22        We have declarations, supporting declarations, where

23    advocates talk about having to submit FOIA, Freedom of

24    Information Act, requests just to get copies of those documents

25    to demonstrate the identity of their clients and talking about

1   how they have to communicate with ICE and sometimes

2   unsuccessfully get ICE to hunt down where those documents now

3   are.

4        For example, our clients here had their documents confiscated

5   at the border and then are transferred up to the detention center

6   in Tacoma, and even local ICE often doesn't know where those

7   documents are.

8            THE COURT:  Okay.  Thank you.

9            MR. ADAMS:  Now, again, I would like to emphasize that,

10  in *Jennings*, the Supreme Court explicitly refrained from

11  addressing the constitutional issue and said only that the

12  statute is silent as to the burden, and that is certainly so.

13  The statute does not say the burden is on the government, but

14  contrary to defendant's response, the statute does not indicate

15  that the burden is on the detained individual.  To the contrary,

16  going back to the '70s, the agency accepted the responsibility of

17  demonstrating, with the preponderance of the evidence, that the

18  detained individual was either a flight risk or a danger to

19  society.  And that's in Board precedent, starting with *Matter of*

20  *Patel*, but then being affirmed in other cases like *Matter of*

21  *Andrade*, and that's how it's remained, and Congress has never

22  done anything to indicate that it should be otherwise, with the

23  exception of one group, and that's currently those who are

24  subject to mandatory detention.

25        Starting in 1990 and then evolving until 1996, Congress

 1   selected a group of individuals who have criminal convictions

 2   that at first they placed the burden of proof on them to

 3   demonstrate that they should be released and then ultimately made

 4   it the default that they are not even entitled to a bond hearing.

 5   That's currently at 8 U.S.C. 1226(c).

 6       Now, there is an exception to those who are subject to

 7   mandatory detention at 1226(c)(2), and it carves out a group who

 8   are under the government protection witness program and says that

 9   if that group of individuals demonstrate by clear and convincing

10   evidence that they're not a flight risk or a danger, they may be

11   released.  But it's only that small group of individuals who are

12   otherwise subject to mandatory detention that even have the

13   burden placed on them.  Otherwise, Congress has been silent as to

14   who should bear the burden in these proceedings.

15       But the Supreme Court has not.  And that's what Judge

16   Tashima's dissent, I think, most eloquently explains in his --

17   not dissent -- his concurrence in *Tijani,* and then the Court also

18   goes with in *Singh* and is also relied upon in *Hernandez*, when

19   they cite back to Judge Tashima's concurrence.  Although I don't

20   mean to imply that in *Hernandez* they address the burden of proof,

21   because they do not.  But what they addressed there is that the

22   Supreme Court said that the government must bear the burden.  And

23   they looked at cases like *Salerno*, which was a pretrial detention

24   challenge to the Bail Reform Act, and there the Court rejected

25   the challenge based upon the procedural protections that are in

1    the Bail Reform Act and relied heavily on the fact that the

2    burden was placed on the government to demonstrate with clear and

3    convincing evidence.

4         Now, in contrast to that, in *Foucha v. Louisiana*, the Court

5    struck down a Louisiana statute because it placed the burden of

6    proof on the individual to demonstrate why they should be

7    released.  One other thing that I note with respect to the burden

8    of proof:  Given that, by definition, our class members all have

9    been found to have a credible fear, and, thus, a bona fide claim

10   for protection, they are even in a better position.  Pursuant to

11   the Board's decision in *Matter of Andrade*, eligibility, bona fide

12   relief, is a key factor in assessing a flight risk.  The fact

13   that they demonstrate -- that they actually qualify for relief

14   demonstrates that they have every motivation in the world to

15   appear to their hearings, to then make their claims for asylum,

16   to obtain the stability and the protection that they're seeking

17   in the first place.

18        Now, I want to move on briefly to two other things that we've

19   requested for our class members, and one is a record of a

20   hearing.  Unlike every other hearing before the immigration

21   court, EOIR does not require immigration judges to record bond

22   hearings and does not provide transcripts of those hearings for

23   appellants, people who challenge the denial or the amount of the

24   bond, even though they're equipped in every hearing to do so.

25   And, in fact, in their declaration, the government has said they

 1   even recorded two of our plaintiffs' bond hearings after we filed

 2   these claims.  Yet, the Ninth Circuit has made clear that the

 3   liberty interest is, quote, "fundamentally affected by the BIA's

 4   refusal to provide transcripts or an adequate substitute created

 5   contemporaneously with the hearing," end quote.  And that's from

 6   the *Singh* case again.  And that follows up from the Ninth

 7   Circuit's decision in *Bergerco* where it says, "Where a defendant

 8   makes allegations of error which, if true, would be prejudicial,

 9   the unavailability of a transcript may make it impossible for

10   the appellate court to determine whether the defendant's

11   substantive rights were affected," end quote.

12       And, again, we provided supporting declarations from

13   advocates discussing how difficult and often impossible it is to

14   demonstrate a basis for the appeal without a transcript on which

15   to point out the errors that the judge has made either in factual

16   findings or in relying on inappropriate case law.

17       One thing that I would note is the defendant's own arguments

18   support us in this regard.  Now, defendants will argue that our

19   plaintiffs should be required to exhaust their appeals to the

20   BIA, and the reason they argue that, and I'm going to quote from

21   defendant's brief, is that, "Indeed, without a record on the

22   claim, it is not possible for this (or any) court to assess

23   whether the alien has demonstrated harm," end quote.  Now,

24   they're arguing for exhaustion, and I will address exhaustion in

25   a second.  But that is true as to our plaintiffs.  That is why

1   they need a record, so that they can go before the Board and show

2   the harm they suffered in the underlying hearing before the

3   immigration judge.  Without that transcript, they have no way to

4   show the judge that -- or rather to show the Board that the judge

5   inappropriately disregarded evidence of the relative because the

6   relative didn't make more than some arbitrary amount of the

7   poverty level.  And we have declarations talking about examples

8   where the judge did just that.  Or like Blanca, our main

9   plaintiff, Blanca Orantes, where the judge completely refused to

10  address the fact that she had been separated by the government

11  from her child and that her child was in another detention

12  center.  The judge refused to address that.  And yet without a

13  transcript, we have no opportunity to present those facts to the

14  Board of Immigration Appeals.

15      Now, I'm going to digress a little bit to the Court's

16  question regarding exhaustion.  So the government argues that

17  exhaustion should be required, yet this is precisely along the

18  lines of *Hernandez v. Sessions* where the Court made clear that

19  exhaustion was not required because -- and they laid out the *Puga*

20  factors -- we're dealing with a pure legal matter, one that's

21  already been clearly established by the agency, and so it won't

22  help to develop any more factual record or administrative record;

23  and, two, it's likely that it's going to be futile for these

24  individuals to appeal, given that the agency has already

25  established their position in precedential decisions, and it's

1    not going to encourage other individuals to bypass the

2    administrative appeal process because, once it's resolved, it

3    will be resolved for all class members.  And in addition, as this

4    Court has noted, the harms that are alleged, are those going to

5    the appellate process themselves, and since it's challenging the

6    failures of the appellate process, that's yet another reason why

7    prudential exhaustion should not be required in this case.

8         And then turning to the last point, and that is the failure

9    of the agency to require the judges to issue contemporaneous

10   individualized findings.  Instead what happens is an individual

11   has a bond hearing.  At the end of the hearing, they're provided

12   basically a rubber-plate sheet saying you are denied bond or you

13   are granted bond in this amount.  And then if they appeal that,

14   after they file their notice of appeal to the Board of

15   Immigration Appeals, the BIA then notifies the immigration judge

16   that an appeal has been filed, and then, and only then, the

17   immigration judge issues what they call a bond memorandum, a

18   summary account of why they denied bond or issued it at that

19   amount.  And this happens weeks after the actual hearing, after

20   the judges have, in the interim, heard hundreds of other cases at

21   times.  And all of this is -- and I have to -- I just want to

22   cite one example that we have submitted in Docket 51, the

23   declaration of Mr. Jong, an attorney with the Southern Poverty

24   Law Center, who talks about one case where he said, "When I asked

25   Judge Marks Lane for her reasoning for denying bond, she

1    responded that she would provide the reasoning in a written

2    decision if the decision was appealed," end quote.  Even with an

3    attorney, they're representing -- places that attorney in an

4    impossible position to then file the notice of appeal because the

5    notice of appeal requires that he specify the factual findings or

6    the legal findings that he thinks are in error.  And I'm

7    referring to 8 C.F.R. 1003.3(b).  And, indeed, both the Board and

8    the Ninth Circuit have sustained denials of appeals based on the

9    failure to file an adequate notice of appeal.  We cited to the

10   *Matter of Keyte*, 20 I&N Dec. 158 from the BIA.  But even more

11   recently, in the Ninth Circuit, *Rojas-Garcia v. Ashcroft*, which

12   was 339 F.3d 814.  And it's not just on the notice of appeal.

13   Then the individual also -- so when you file a notice of appeal,

14   you have a box at the bottom that says either you want an

15   opportunity to subsequently file a brief or you are not

16   submitting anything beyond what you are submitting with that

17   packet.  So oftentimes with our clients we submit our brief with

18   the notice of appeal in order to try to expedite that appeal,

19   since our client is sitting there detained waiting for the Board

20   to decide it.  The government responds, well, they can wait, they

21   can ask for a delay in the briefing schedule, or they can wait

22   for the Board to eventually remand the case months later, saying

23   the judge didn't get it right and they need to have a more

24   fleshed-out decision for the Board to review.  But that is no

25   remedy.  That's asking our clients to continue to suffer an

1    unlawful deprivation of liberty waiting for the government to

2    create the record, the basic procedural protection that's

3    necessary, in order to know whether they should appeal the case

4    or not.

5        And the last point I would make about that -- you know, I

6    cited the example of an attorney who was flabbergasted by the

7    judge's response, about how much more difficult it is for us when

8    we're dealing with our pro se class members who appear in court

9    with an interpreter, often have no clue what's going on, and then

10   afterwards, if they're seeking legal representation in order to

11   try to understand whether they can appeal it, they have no way to

12   communicate the basis on which they were denied a bond.  And so

13   there's absolutely no basis for the counsel then to lay out the

14   reasons in a notice of appeal, if they were to agree to make that

15   case.  These are basic procedural protections.

16       And the government has not even argued, and can't argue, that

17   it creates any expense with respect to the burden of proof.  They

18   haven't argued that it would be an expense with respect to the

19   record or the transcript, in large part because they already have

20   it set up for recording every hearing that's before the Court.

21   Now, it could create a cost -- we don't deny -- to require that

22   the hearing be within seven days.  They're going to have to

23   perhaps provide additional resources.  But as the Ninth Circuit

24   made clear in *Hernandez v. Sessions*, they're also going to save

25   millions of dollars by having people bond out of detention days

1   and weeks before, when the government is paying $159 per person

2   per day for their detention.  And, ultimately, as the Court said

3   in *Hernandez v. Sessions*, whatever minimal expenses there are,

4   they can't be justified at the expense of what's at stake for

5   class members, and that is their liberty.  And in *Saravia v.*

6   *Sessions*, the Court made the same determination, that it was

7   insufficient.  Whatever expense it may be to transport those

8   youth across the country to the bond hearings, which was one of

9   the things they required, it still was not enough to overcome

10  what was at stake for the youth, which was, again, their liberty

11  in those bond hearings.

12          THE COURT:  Counsel, are you asking specifically -- I'm

13  thinking about the logistics of this.  And one is, is that, are

14  you asking that there be written findings of fact and conclusions

15  of law, or would it be acceptable to have spoken findings of fact

16  and conclusions of law that go on the tape?

17          MR. ADAMS:  We are asking that there be written findings

18  of fact, so that there is a piece of paper that that pro se

19  person can then provide to an individual to say, this is why the

20  judge denied me.

21          THE COURT:  Okay.  But you would be satisfied with them

22  being handed a flash drive or something that had the oral

23  presentation of the evidence?

24          MR. ADAMS:  That would work if they have counsel.  But

25  for the 90 percent who don't have counsel, what are they going to

1   do with that flash drive?  You know, they're in the detention

2   center.  Unless they have access to obtain the information on

3   that flash drive, it probably is not going to do them any good.

4       So what we're asking is that those bond memoranda, instead of

5   waiting four to six weeks afterwards, they be issued the day of

6   the hearing.

7           THE COURT:  Well, what I'm looking at is, is that the

8   reality is that you can get a transcript instantaneously.  In

9   other words, I can read every word that you just spoke right

10  here, and I can hit a button and it prints out.  So I could hand

11  you the transcript today.

12      If I were to make spoken findings of fact and conclusions of

13  law on the record, hit the button, and you would have them in

14  writing, would that satisfy you?

15          MR. ADAMS:  That would.  As long as our class members

16  have access to some -- you know, whether the judge produced them

17  handwritten or it's a transcript of the oral findings and they

18  have records access to that, that were transcribed, that would

19  absolutely satisfy what we believe is required as a minimal

20  protection under the due process clause.

21          THE COURT:  So, in fact, you're not asking for anything.

22  You have already got a recording.  What you are really asking for

23  is realtime and the ability to copy?

24          MR. ADAMS:  Yes.  Although I would add a caveat, already

25  there's the potential for recording.  They're not recording all

1   of these bond hearings.  In fact, it was noteworthy that in their

2   declarations the government said, well, they recorded two of the

3   plaintiffs.  They didn't assert that they recorded the other two.

4       And the other thing that I would note, like referring back to

5   Mr. Jong's declaration, is that some judges are not providing the

6   reasons for their decision there in the hearing.  And so they

7   must be instructed, if it's going to be on the record, then they

8   need to go ahead and explain why they are denying bond.

9           THE COURT:  Okay.  But it's as simple as purchasing,

10  like, Dragon software?

11          MR. ADAMS:  It is, yes.

12          THE COURT:  All right.  Thank you.

13          MR. ADAMS:  Thank you.

14      So I'm out of time, but there's a couple of points that I

15  have not addressed from the Court's questions that I would like

16  to get to.  And one is, should our plaintiffs' claims be

17  dismissed -- or not dismissed, because we have the class

18  certified, but is preliminary injunctive relief appropriate

19  because our named plaintiffs have already been released?  And,

20  again, this case is on square with a myriad of other cases

21  addressing detained individuals.  And there are both cases

22  certified here in this district court, like *Rivera*, like *Martinez*

23  *Baños*, but also cases from the Ninth Circuit, like *Hernandez v.*

24  *Sessions*, where it shows that individuals who are subsequently

25  released are nonetheless able to pursue preliminary injunctive

1    relief -- I mean, plaintiffs, that is, who are released are able

2    to pursue preliminary injunctive relief on behalf of the class

3    because it is a transitory class.  And, in fact, just -- what,

4    two weeks ago? -- in *Preap v. Nielsen*, Justice Alito's decision,

5    again, said that it matters not that these individuals have been

6    released, because this is an inherently transitory class.  They

7    received relief prior to whatever injunction was provided, but

8    that is no bar to the Court providing that form of relief.  So I

9    don't think there can be any serious dispute that this Court has

10   authority to provide preliminary injunctive relief,

11   notwithstanding the fact that Ms. Orantes and Mr. Baltazar

12   Vasquez have already been released.

13       And so if there's no further questions, I'll save myself some

14   time.

15           THE COURT:  One more question.  Can you give me some

16   idea of volume?  In other words, in a year's time, how many

17   hearings are you potentially facing?

18           MR. ADAMS:  Well, we have not been provided the quantity

19   of class members because discovery has not yet commenced in this

20   case, but we believe there are a few thousand class members.  And

21   that might be overstating it.  In the bond-hearing class, there

22   could be maybe a third of what's in the credible-fear class.  We

23   don't know because it fluctuates drastically over time.  But it

24   could be anywhere from close to a thousand to a few thousand

25   individuals who are given these bond hearings.

1          THE COURT:  Nationwide?

2          MR. ADAMS:  Nationwide, that's correct.

3      And then depending on how many of those appeal it -- you

4  know, who don't just post bond immediately, instead appeal it --

5  then it goes into that process.

6      But one of the things that I think is important is the

7  declarations provided by the government in Exhibit 66 and 67 from

8  the court administrators.  Again, they state that they're

9  providing most of these hearings -- the language they use is,

10  quote, "in most instances."  They say, "In most instances, we're

11  providing hearings within seven to fourteen days," or "most

12  instances, within ten days."  And if that is the case, then it

13  should not be a tremendous burden for them to comply with a more

14  concrete timeline.  And certainly as they move forward, they're

15  in a position to adjust their calendars to do so.

16      Thank you.

17          THE COURT:  Thank you.

18          MS. BINGHAM:  Good afternoon, Your Honor.

19      Plaintiffs' motion for preliminary injunction should be

20  denied because they cannot show that they are entitled to

21  preliminary relief requiring defendants to provide bond hearings

22  within seven days as a matter of constitutional law in all cases.

23  Nor can they show that they are entitled to overturn

24  long-standing bond procedures via preliminary injunction.

25      To start, I would like to address the likelihood of success

1    on the merits.  There are two distinct issues before the Court:

2    Plaintiffs' bond timing challenge and plaintiffs' --

3              THE COURT:  Counsel, if you want a record of this, you

4    are going to have to slow down.

5              MR. ADAMS:  Oh, I'm sorry.

6              THE COURT:  I cannot get a record.  I have got smoke

7    coming out of the court reporter's ears.  And, remember, I can

8    read what you are saying.  So, please, slow down, or you are not

9    going to be able to have a record when you want to appeal me.

10             MS. BINGHAM:  I will do my best, Your Honor.  Thank you

11   for the reminder.

12     I would like to start first by talking about their bond

13   timing challenge, then I will move on to their bond procedures

14   challenge, and I would also like to address the irreparable harm

15   and the balance of equities.

16     Plaintiffs can't show that they are entitled to a bond

17   hearing within seven days of request in all instances as a matter

18   of constitutional law.  Their detention is governed under

19   8 U.S.C. 1225(b)(1)(B)(ii), which provides that they should be

20   detained for further consideration of their application for

21   asylum.

22     In 2018, in *Jennings*, the Supreme Court explained that

23   aliens, like plaintiffs, are not entitled to bond hearings at any

24   point of their proceedings under the statutory text.  Now,

25   though, plaintiffs claim entitlement to that bond hearing in

1    seven days on constitutional grounds.  Their argument asserts

2    that they're entitled to protection of the due process clause by

3    virtue of their brief presence in the United States, and because

4    they are entitled to the protection of the due process clause,

5    they're ipso facto entitled to their bond hearings within their

6    preferred time frame.  But their analysis is incomplete because

7    determining what process they're entitled to is a two-step

8    analysis.  Even if the due process clause applies to them, this

9    Court must determine what process that they're entitled to.  And

10   in making that determination, this Court has to consider their

11   status as aliens who were unadmitted to the country and who enter

12   the country unlawfully and were apprehended within a very short

13   period of time.  They may lack any ties to this country

14   whatsoever.

15       When the Supreme Court has examined the due process rights of

16   aliens like plaintiffs, it has concluded that they're entitled to

17   only the process which Congress has given them.  That is

18   explicitly laid out in *Mezei*.  A quote is, "As aliens on the

19   threshold of initial entry, their rights are limited to only the

20   procedures provided by Congress."  And that's at *Mezei* at

21   page 212.  Here, the process provided by Congress has resulted in

22   them having been found to have a credible fear, and that has

23   provided them the opportunity to present their claims to an

24   immigration judge and has provided them with the opportunity to

25   have a bond hearing, a bond hearing that's already scheduled as

 1   expeditiously as possible under the circumstances, under those

 2   unique circumstances of whatever immigration court that they may

 3   be before.

 4       So I would like to take this opportunity to address your

 5   question about *Zadvydas*, which was that once an alien enters the

 6   country the legal circumstances change, for the due process

 7   clause applies to all persons within the United States, including

 8   aliens, whether their presence here is lawful, unlawful,

 9   temporary, or permanent.

10       The due process clause does apply, but as I stated earlier,

11   what the Supreme Court has found, going back decades, is that the

12   process that they are entitled to is the process that Congress

13   has given them.  That process here has -- the plaintiffs have

14   already received it.

15       Even if they have some additional due process rights by

16   virtue of their brief entry, it would be on the lowest ebb of the

17   sliding scale of due process.  And even *Zadvydas* itself talks

18   about that the nature of due process protection varies, depending

19   on the status and circumstances, and notes specifically that

20   aliens who had not gained initial entry into the country would

21   present a, quote, "very different question" than the one that was

22   raised in *Zadvydas*.

23           THE COURT:  Well, *Zadvydas* was different.  This class of

24   people have credible fear and are entitled to a bond hearing,

25   correct?

1          MS. BINGHAM:  That's right, under current law.

2          THE COURT:  All right.  So let's move on from there.

3     Just what kind of a bond hearing are they entitled to?

4          MS. BINGHAM:  The bond hearing that they're entitled to

5     under current law is consistent with the bond procedures that are

6     laid out at 8 U.S.C. 1226(a), and that's the bond process and

7     procedures that they're getting.  And when we're talking about

8     due process claims, like the ones that plaintiffs have put

9     forward, this Court has to look at the guidance that's been

10    provided by the Supreme Court in these due process questions.  So

11    we're talking about *Matthews v. Eldridge* and *Landon v. Plasencia*.

12    And it has to consider all of the relevant factors.

13         Plaintiffs' requested injunction --

14         THE COURT:  Counsel, you want a record, you have to slow

15    down, okay?  The court reporter can't understand you, and I can't

16    process it either when you speak that quickly.  So if you want to

17    persuade me, you are going to have to slow down, please.

18         MS. BINGHAM:  I'm sorry, Your Honor.  I'm trying.  I

19    will try harder.

20         We have to look at the guidance that the Supreme Court has

21    put forth in *Landon v. Plasencia*, which has laid out a balancing

22    test for these due process claims.  Plaintiffs' requested relief

23    does not take into account all of the relevant factors that are

24    laid out in this balancing test.  It does not account for the

25    government's weighty interests in the efficient administration of

 1   immigration law and it does not take into account the efficient

 2   allocation of government sources, which are specifically laid out

 3   as important and weighty factors in *Plasencia*.

 4        THE COURT:  Well, let's talk about costs.

 5        MS. BINGHAM:  Yes.

 6        THE COURT:  All right.  Costs have never been one of the

 7   considerations when you're talking about constitutional rights.

 8   For example, in criminal cases, it doesn't matter if you don't

 9   have enough courtrooms; it doesn't matter if you don't have

10   enough judges.  What you do is you process those cases and you

11   get them done in a timely fashion.

12      Why is cost something to be considered here?

13        MS. BINGHAM:  Your Honor, the test that the Supreme

14   Court has put forward for due process claims like this is laid

15   out in *Matthews v. Eldridge* and in *Landon v. Plasencia*.  And in

16   those cases, the Supreme Court has explicitly stated that one of

17   the factors in the balancing test is the government's interest in

18   using the current procedures.  And one of the government's

19   interests is efficient administration of the immigration

20   enforcement law -- excuse me, efficient administration of the

21   immigration laws, which is a specific -- *Plasencia* notes

22   specifically.  And so it's not that this Court can ignore cost;

23   it's that this Court has to take into account the government's

24   weighty interests, and that is specifically laid out in

25   *Plasencia*.

1          THE COURT:  Well, couldn't I be able to do that by

2    saying 47 percent of these are getting out on bond, and if you

3    did it faster, there would be a savings of $159 a day, which

4    would save the government a lot of money?

5          MS. BINGHAM:  Your Honor, I don't think that's accurate.

6    One of the things that I think is important to note here is that,

7    for example, in *Rodriguez* -- and the injunction is still in place

8    in the Central District of California -- defendants are actually

9    enjoined from conducting those prolonged detention hearings

10   before seven days have gone by, after notice, because that court

11   found that that was necessary to provide notice for counsel, for

12   the alien, you know, to get interpreters, for all of these things

13   to be prepared.  So if these hearings are happening more quickly,

14   I think that it's completely speculative that there would be any

15   savings at all.  It's possible that counsel and the alien, him or

16   herself, would not be prepared, and, thus, we could have a

17   different outcome than the outcome that we're currently having.

18       I think also the important point to remember, when we're

19   talking about plaintiffs' assertion that 40 percent -- excuse me,

20   47 percent of their class gets out on bond, is that the burden

21   that they are complaining about here is obviously not

22   insurmountable and is not causing irreparable harm.

23          THE COURT:  Where can I find how much the government is

24   spending on these hearings by not giving them within seven days?

25   I mean, are you telling me the $159 a day is wrong?

1          MS. BINGHAM:  I don't know the exact amount that it

2     would cost to detain someone, Your Honor.  I think that varies

3     across the nation, how much it costs to detain a person.

4        I think the point that we're making here is that the

5     immigration courts right now have the flexibility to ensure

6     coverage of the most compelling needs.  This, I think, is very

7     different than the criminal context, where state and federal

8     courts do have the ability to prioritize things on their dockets,

9     you know, according to what needs the most resources at that

10    moment.  I think that that's different in the immigration court

11    context because all of the hearings are immigration court

12    hearings.  And if there are bond hearings happening within this

13    time frame, that necessarily means that other hearings are going

14    to be postponed or canceled.  And that's what we have laid out in

15    declarations that we have attached at ECF 66 and 67.

16          THE COURT:  Counsel, let's get back to my question.

17    Opposing counsel said this is the cost and told me that

18    47 percent of the class members get released on bond.  Where can

19    I find a counter to that in your materials?

20          MS. BINGHAM:  We haven't submitted anything that talks

21    about the cost of detaining individuals.  I think the point is

22    that Congress has directed that these individuals be detained,

23    and so --

24          THE COURT:  So you don't have anything in your materials

25    that talks about the costs of detention?

1      MS. BINGHAM:  That talks about the cost of detention,

2  no.

3      THE COURT:  Okay.  Thank you.  Go ahead.

4      MS. BINGHAM:  I think that -- I think that the other

5  point that I wanted to make, since we started talking about Your

6  Honor's question about what is different between criminal courts

7  and what's different been immigration courts, is not only the

8  fact that there's an explicit balancing test that's laid out in

9  *Plasencia* and how to balance these claims in the immigration

10  context and it talks about the government's weighty interests in

11  this immigration context, but I think that there are just a

12  number of practical differences between criminal court and

13  immigration court.  I think that there's different constitutional

14  and statutory rights that are in place that are just not the

15  same.

16      THE COURT:  Well, let's get practical.  In the sense

17  that there's a bond hearing, I'm assuming it does not last days.

18      MS. BINGHAM:  No.

19      THE COURT:  It lasts moments.

20      MS. BINGHAM:  Yes.

21      THE COURT:  You have got, counsel says, 3,000 across the

22  nation.  Seattle Municipal Court does 3,000 bond hearings in a

23  month.  Every court in this nation that has any kind of detention

24  does those bond hearings, and they do them efficiently with far

25  fewer numbers.  So I'm not understanding with these ...  This is

 1   a very small group of people.

 2          MS. BINGHAM:  I don't think that's accurate, Your Honor.

 3   We don't have anything in the record at this point.  And as

 4   counsel pointed out, discovery hasn't started.  But I don't think

 5   it's accurate to say that this is a very small class.

 6          THE COURT:  Well, then give me some idea of what you

 7   think it is.

 8          MS. BINGHAM:  So I am aware of statistics, and I'm

 9   referencing -- this is an 83 Federal Register 55, just for the

10   Court's knowledge, that, for example, in fiscal year 2018,

11   immigration judges completed over 34,000 total cases that

12   originated with a credible-fear referral.  So those are -- that's

13   going to be over-inclusive, because that's going to include folks

14   who are members of the credible-fear class but not in the

15   bond-hearing class.  But I think that that goes to show that it's

16   not just in the low thousands.

17          THE COURT:  But how many bond hearings did they do?

18          MS. BINGHAM:  Even assuming that this is half, that

19   would be 15,000.

20          THE COURT:  That's still a pretty small number, counsel,

21   when you talk about how many people get processed.  Again, I'm

22   going to tell you that, just down the street, bond hearings are

23   happening at extraordinary rates because they are routine, they

24   are short.

25          I still want you to address the issue of why this is so

```
 1   difficult.

 2           MS. BINGHAM:  Well, I think that the declarations really

 3   provide the evidence of why this is difficult, which is to say

 4   that the immigration courts, as we know, already operate at max

 5   capacity, and their dockets -- these were in declarations that

 6   were submitted in September -- but their dockets were already

 7   scheduled into November and December at that time, and that's

 8   with leaving certain blocks of time open to conduct these bond

 9   hearings.  Sometimes leaving those certain blocks of time open to

10   conduct those bond hearings, there's still going to be more bond

11   hearings than that.  It's something that obviously fluctuates,

12   depending on the number of people who are entering the country

13   and DHS's enforcement practices at the time.  And so I think that

14   we're talking about practical effects here.  And particularly

15   with respect to the declarations that we submitted here, some of

16   these immigration courts deal with an entirely detained docket.

17   So that means, if we are prioritizing these bond hearings over

18   other hearings that are happening, those are also for individuals

19   who are detained, and so that could be anything from a

20   credible-fear review or a reasonable-fear review to a bond

21   hearing for someone who is recently arrested pursuant to 1226(a).

22   It could also be a final merits hearing for someone --

23           THE COURT:  Counsel, this is the third time.

24           MS. BINGHAM:  I apologize.

25           THE COURT:  Okay.  If you can't slow down, I can't get a
```

 1  record.  You are going to have to do it because otherwise --

 2          MS. BINGHAM:  I'm very sorry, Your Honor.

 3          THE COURT:  -- you will be without a record.  I don't

 4  want that to happen.

 5          MS. BINGHAM:  I don't want that to happen either.  I am

 6  trying my best, and I will continue to try.

 7      As I was saying, all of the other hearings for some of these

 8  courts involve individuals who are detained, and it may even be

 9  their final merits hearing that is going to be pushed back.  And

10  some of these merit hearings, as I'm sure Your Honor knows, can

11  be quite complicated, like evidentiary hearings, requiring the

12  coordination of not only the alien and counsel for the

13  government, but their counsel, witnesses, interpreters, maybe

14  even experts, this sort of thing.  So as the declarations set

15  forth, there could be a ripple effect and cause further backlogs.

16      Also, I wanted to make a couple other practical points, since

17  Your Honor wants to talk about them.  The bond hearing is really

18  akin to a second appearance, because DHS already makes an initial

19  custody determination.  And as my colleague on the other side

20  pointed out, that initial custody hearing takes place very

21  quickly.  So that's really more akin to the probable cause

22  hearing in the criminal court context, if we want to go there.

23  So it's really a custody review.

24      The other thing is, the triggering event at this time is the

25  alien's request.  The alien's request is simply a check box on a

1   form that says "I want a bond hearing."  So as soon as the

2   immigration court receives that form, that's when the obligation

3   to schedule that hearing is going to kick in.  And so that may be

4   before they even have counsel, that may be before their master

5   calendar hearing at which bond hearings and things like this are

6   discussed.  So I think that there's some practical issues here

7   that are not being considered in plaintiffs' briefing.

8        So if that concludes Your Honor's questions on the bond-

9   timing challenge, I would like to move on to the bond-procedures

10  challenge.

11       So plaintiffs -- one of the questions that Your Honor raised

12  was about exhaustion.  And the reason I want to talk about

13  exhaustion here is because these plaintiffs -- first of all, the

14  procedures were never applied to them.  The two named plaintiffs

15  for the bond-hearing class have recorded hearings, so the

16  procedures that they complain about were not even applied to

17  them.  Plaintiff Vasquez stipulated to an amount, and so no

18  procedures whatsoever were applied to him.  Plaintiff Orantes

19  had a recorded hearing.  She did not receive a bond.  She

20  reserved appeal, but then was later released, but she did not

21  perfect that appeal process.

22       And so while plaintiffs argue that exhaustion is not

23  required, exhaustion here has -- the BIA has the opportunity and

24  the responsibility to fix any problems that arise during that

25  appellate process.

1    Your Honor asked, is it necessary for them to have completed

2    an appeal of an adverse bond hearing when the injuries claimed

3    are alleged to have negatively impacted the appeals process

4    itself?  The answer to that is yes, because the BIA has the

5    opportunity and the responsibility to fix any errors, including

6    any errors that arose during that appellate process.

7    I also just want to make one thing procedurally clear, which

8    is that plaintiffs complain about the availability of a written

9    bond memorandum.  And that written bond memorandum is not going

10   to prejudice any class members on appeal because, when that

11   appeal is filed, that triggers the immigration judge's

12   responsibility to compose that written bond memorandum.  And

13   briefing deadlines are not set by the BIA until that bond

14   memorandum is completed.  So they're never going to have a

15   situation where they are having to compose a brief without the

16   benefit of those written findings.

17         THE COURT:  Well, now, wait a second.  Aren't they still

18   sitting in custody while that process takes place?

19         MS. BINGHAM:  Yes.  That's right, Your Honor.

20         THE COURT:  So it does slow it down?

21         MS. BINGHAM:  Any appeal slows it down.

22         THE COURT:  All right.  And aren't you processing a lot

23   of requests for appeals that may not be necessary if you actually

24   gave people reasons in the first instance?  In other words, if

25   there are reasons laid out, they could consult counsel, and some

 1    of those counsel might say, "There's no point in appealing here."

 2         MS. BINGHAM:  Well, I think that the immigration judges

 3    typically rule orally, so they're going to be in possession of

 4    those reasons even if the written findings are not composed until

 5    later.

 6         THE COURT:  So why not just print them out and hand them

 7    over?

 8         MS. BINGHAM:  Well, I think there's a practical problem

 9    with that, which is that the immigration courts use a third-party

10    service to transcribe their hearings.  So it's not as efficient

11    or fancy as what Your Honor has before you.

12         THE COURT:  Well, sometimes I use third-party services

13    too.  They're contract services.

14         MS. BINGHAM:  Uh-huh.

15         THE COURT:  Okay.  So they're same thing.

16         MS. BINGHAM:  So they don't have the ability to do it

17    immediately.

18         THE COURT:  Why not?

19         MS. BINGHAM:  They are not set up for that with their

20    technology.

21         THE COURT:  But it seems that it would be so easy to get

22    that done, to simply have the transcript printed out.  I mean,

23    for Pete's sake, you can get an app that does this, you know.

24    You know, if you want to send out a Tweet.

25         MS. BINGHAM:  Your Honor, I think that the immigration

1  courts -- and this is something we have been talking about

2  through this hearing -- the immigration courts are in a position

3  to efficiently balance all of their needs, and that includes

4  budgetary.  And so that's one of the choices that they have, is

5  they have their existing software, which requires --

6        THE COURT:  So the real answer, they're not willing to

7  spend the money in order to provide this ability to have a

8  transcript?

9        MS. BINGHAM:  I don't think that's the real answer, Your

10  Honor.  I think what we're talking about here is not what

11  plaintiffs or Your Honor thinks is the ideal process, but rather

12  what's the minimum amount of due process that's required.  And

13  what we have to do to determine that is look at *Landon v.*

14  *Plasencia*, where the Supreme Court has laid out that balancing

15  test.

16        THE COURT:  But the Supreme Court hasn't touched any of

17  the practical applications of these things.  In other words, I

18  see huge amounts of inefficiency in having people file appeals

19  and then going back and getting a record.  You know, you are

20  going to have people filing appeals that are never going to have

21  any chance of going forward.  You're also going to detain people

22  longer while you put together an appeal.  So why shouldn't I look

23  at the practicalities and say, you know, there's a faster,

24  cheaper, better way to do this?

25        MS. BINGHAM:  I think that there may be a faster, better

1    way, cheaper way to do this, but that doesn't mean that it's what

2    is required by the due process clause.  And that's what

3    plaintiffs are asking for, is what they believe is required by

4    the due process clause.  And I think that we have shown in our

5    briefing that this is not required by the due process clause.

6         And I want to read a quote from *Plasencia*, which I will

7    attempt to read as slowly as possible, which says that "The role

8    of the judiciary is limited to determining whether the procedures

9    meet the essential standard of fairness under the due process

10   clause and does not extend to imposing procedures that merely

11   display Congressional choices of policy."

12        And so here we have a situation where we're not imposing --

13   where the Court is not responsible for imposing what it thinks is

14   the best, most efficient way to do this.  The Court is

15   responsible for determining whether the procedures meet the

16   essential standard of fairness, and the test that is laid out for

17   that essential standard of fairness is in *Landon v. Plasencia.*

18   And in *Landon v. Plasencia*, one of those factors, Factor No. 3,

19   is the government's interests in maintaining the current

20   procedures.  And so that has to be accounted for in this Court's

21   analysis.

22        Your Honor, I see that I'm very close to being out of time.

23   I would like to address briefly irreparable harm and balance of

24   equities, and I think Your Honor also had a couple other

25   questions, which I will attempt to address quickly, since I don't

1    want to take too much time.

2        I think that you asked a question about how the claims of

3    this class are different than the class -- than those in

4    *Hernandez v. Sessions* and in *Ms. L.*  I think the difference here

5    is that the parties in those cases, the complained-of harms

6    actually happened to them, even if they weren't happening at that

7    time.  Here, that is not the case.  The harms that plaintiffs are

8    complaining about, which is the lack of a recording, they

9    received a recording.  They complained about not getting a bond

10   memo, but neither one of them ended up pursuing an appeal.  They

11   complain about not having a transcript, but, again, there's no

12   appeal, they were both released.  So I think that that is a

13   critical difference that this Court has to consider.

14       Your Honor also asked a question about the timing here, and

15   why seven days, why not 14, why not 21.  I think that that's a

16   really great question, and I think that that goes to show that

17   there's really no case law out here that supports the imposition

18   of a seven-day time frame, or really any of these time frames,

19   because what we have is this balancing test, and the immigration

20   courts are already scheduling these hearings as quickly as

21   possible, under the circumstances, which is consistent with the

22   requirements of the due process clause.

23       On irreparable harm, I want to make a couple quick points,

24   which is that they're receiving bond hearings.  There's no

25   allegation that they're not receiving any hearings.  It's just

1   not as quickly as they desire them.  They have not identified a

2   single class member that's languishing in detention without a

3   hearing.  And if there ever was that sort of instance, they, of

4   course, could always file a habeas asserting prolonged detention.

5   There's also --

6            THE COURT:  Counsel, they filed lots of affidavits from

7   counsel across the country that talked about long periods of time

8   in detention, and if you have a constitutional right to have due

9   process, isn't even a day, or a moment longer than necessary,

10  harm?

11           MS. BINGHAM:  I think that that can be harm, but it's

12  not irreparable because they have the option of a habeas.  So I

13  think that that's what we have to look at when we're looking at

14  the preliminary injunction standard.

15           THE COURT:  Counsel, habeas is a long, drawn-out

16  process.  So if you have one day that you are not supposed to be

17  in detention, how do you ever get that day back?

18           MS. BINGHAM:  That is simply what's provided for in the

19  habeas laws.  That's the process, when you think you are being

20  unlawfully detained ever, and that's the remedy that Congress has

21  provided in these circumstances.

22           THE COURT:  Well, you are talking about unlawfully

23  detained.  I'm talking about being detained when the default

24  should be liberty, if that's what the Constitution requires.  In

25  other words, you don't get those days back.  They are gone.

```
 1    Isn't that harm, if there's a constitutional violation?

 2              MS. BINGHAM:  I think that that is harm, but I don't

 3    think that that's the question on the preliminary injunction

 4    standard.  The preliminary injunction standard is irreparable

 5    harm.

 6              THE COURT:  And loss of liberty is not irreparable harm?

 7              MS. BINGHAM:  Not when there's another way to repair

 8    that harm, which is via a habeas.

 9         And when it comes to their bond procedures challenge, again,

10    they have not presented any evidence that the bond procedures are

11    causing irreparable harm such as the Court must intervene

12    immediately.  These bond procedures have been in place, no party

13    disputes, for years.

14              THE COURT:  Well, we're talking about two different

15    things here.  You are talking about a legal remedy, and I'm

16    talking about the harm of being in custody longer than the

17    Constitution requires.  And it's my understanding that there's

18    case law out there that as soon as you've got a constitutional

19    harm, assuming that I find one, then you've got irreparable harm,

20    because you have been detained; your liberty is valuable, and it

21    is gone.

22              MS. BINGHAM:  I think that this question bleeds back

23    into the question on the merits, which is whether they have a

24    constitutional right to this rigorous seven-day deadline that

25    they want.  And we have cited case law that say aliens in this
```

1  circumstance are entitled to the process which Congress has given

2  them, and there is no requirement from Congress that they be

3  given a bond hearing before they hit eight days.  So I think that

4  there isn't a question of irreparable harm here if they're not

5  entitled to this.

6      On the balance of the equities, the government's interests

7  are the public interests.  In this case, the government has a

8  weighty interest in the sufficient administration of its

9  immigration laws -- and that's as the Supreme Court stated in

10 *Plasencia* -- as well as the sufficient allocation of resources.

11 This case requires prioritization of the immigration courts'

12 limited resources to ensure the greatest coverage of the most

13 compelling needs.  Defendants already schedule bond hearings as

14 expeditiously as possible.  That same consideration guides the

15 agency's decision that generally immigration judges should rule

16 orally and not expend unnecessary attention on composing written

17 bond decisions unless they are needed for an appeal.  If this

18 Court grants plaintiffs' requested injunction, it would undermine

19 the agency's attempt to allocate resources while taking into

20 consideration the agency's competing demands.

21      If Your Honor has no further questions, I'm out of time.

22      THE COURT:  Thank you.

23      MS. BINGHAM:  Thank you very much, Your Honor.

24      MR. ADAMS:  Thank you.

25 Defendants assert that no harm occurred to our named

1    plaintiffs.  Ms. Orantes was denied a bond.  She remained another

2    ten days detained.  Because of the Court's order in *Ms. L*, she

3    was finally released to be reunited with her child.  From when

4    she passed her credible-fear interview, she was almost a month

5    detained.  She certainly suffered harm and there's certainly no

6    room for the government to say a month's detention is not

7    irreparable harm.  As this Court has already noted, in *Melendres*

8    *v. Arpaio* and countless other cases, violation of a

9    constitutional right does constitute irreparable harm, and the

10   reason preliminary relief is needed is because thousands of

11   individuals continue to suffer this harm.

12       Now, they point to the fact that a recording was made in

13   Ms. Orantes' case.  We didn't learn of that until defendants

14   advised us, after we filed this action.  There was no notice that

15   she had a right to seek a transcript or ask the government for a

16   recording because, generally, they don't make recordings.  The

17   fact that they did it after we filed this case was of no value to

18   her.

19       The government also disputes the savings, saying that it's

20   speculative because counsel or the class member may not be ready

21   for that hearing.  But, again, what we have requested is a bond

22   hearing within seven days of their request, so, presumably,

23   they're ready for the hearing because they're asking for that

24   hearing.  It's a little different than the preliminary injunction

25   that was granted in *Saravia*, where it was just within seven days

1    of the arrest.  So there are individuals who are gathering

2    documents and may not immediately request.  In fact, most times

3    clients don't request -- our clients don't request hearings until

4    they get counsel, and then we call up the court or send in the

5    written notice.

6        Now, plaintiffs simply try -- defendants are trying to turn

7    case law on its head by saying our plaintiffs are not entitled to

8    any due process other than what Congress has provided.  They're

9    citing the law that deals with the legal entry fiction, and the

10   Court has already found that in its order in the motion to

11   dismiss.  And, in fact, they cite to *Mezei*, which undermines it,

12   where *Mezei* explicitly distinguishes those who already entered

13   the country as being on separate footing.  You know, they've made

14   that same argument in *Zadvydas*.  They said that person already

15   has a final order of removal.  They made that same argument in

16   *Saravia*, against the class of youth, who had these alleged public

17   safety concerns.  They make it against every group, and in every

18   turn the Court has rejected that.  Once someone has entered the

19   country, case claw is clear, they are entitled to what due

20   process provides.  And as the Ninth Circuit just said, due

21   process provides an opportunity to be heard at a meaningful time.

22       And we agree that -- and, actually, I want to address one

23   other point.  They tried to paint the determination by the DHS

24   officer as the probable cause hearing.  The DHS officer is the

25   arresting official.  The arresting official then decides whether

1    to cut loose the person he or she has arrested.  That is not akin

2    to a probable cause hearing before a neutral magistrate.  Their

3    only shot at a neutral magistrate is that bond hearing.

4        They try to backpedal from the case law, talking about due

5    process in a criminal context.  Yet, those arguments were

6    rejected in *Hernandez v. Sessions*.  And I would just point to

7    page 993 of that *Hernandez* decision, where the Court forcefully

8    rejected that, saying "The government claims cases involving

9    criminal detention are irrelevant to immigration detention.  On

10   the contrary, the Supreme Court has recognized that criminal

11   detention cases provide useful guidance in determining what

12   process is due noncitizens in immigration detention."

13       And lastly, with respect to *Jennings*, they've, on the one

14   hand, admitted that our clients are entitled to a bond hearing.

15   The *Matter of X-K* makes that clear, and that's binding agency

16   precedent.  *Jennings* addressed its interpretation of the statute

17   with respect to a certified class, and that certified class

18   included only individuals who fell under the legal fiction entry,

19   that is, people who are detained at the port of entry.  And so

20   even plaintiffs conceded they were subject to mandatory

21   detention.  That case is not instructive.  It doesn't inform us

22   as to the process that's required under 1226(a).  And, indeed,

23   defendants later asserted that our class members are entitled to

24   no more than what's available under 1226(a).

25       We agree that at the bottom line it is the essential standard

1   of fairness, and an essential standard of fairness requires a

2   concrete timeline when they know they're going to have their day

3   in court to explain why they should not be locked up.  Moreover,

4   liberty is what's expected in our society.  And there's case law

5   that I cite, just one quick quote in *Salerno*, where it says, "In

6   our society, liberty is the norm, and detention prior to trial or

7   without trial is a carefully limited exception."  The burden

8   falls on the government because liberty is the norm.  These are

9   individuals that have already been screened and found to have a

10  bona fide claim for relief.

11      And it is certainly an essential element of fairness that

12  they be provided the reasons why they're being denied bond, that

13  they be provided a transcript or a recording of their hearing so

14  that they have a meaningful opportunity to assert why the

15  immigration judge erred in denying them bond.

16      And for these reasons, we respectfully request that the Court

17  grant our class members preliminary injunctive relief so they

18  don't continue to face irreparable harm.

19          THE COURT:  Thank you, counsel, for your arguments.  You

20  will see an order within 14 days of today.  You should also be

21  seeing shortly the Court's order setting schedule, after I've

22  reviewed your joint status reports.

23      The other thing I want point out is General Sessions is no

24  longer with us.  Do we need to have a substitute of caption in

25  the case?  If that's the case, would you please send in that

1   correction so that we can do that?

2            MR. ADAMS:  Yes.  Thank you.

3            THE COURT:  Is there anything else I can help you with?

4            MR. ADAMS:  No.  Thank you.

5            MS. BINGHAM:  No.  Thank you, Your Honor.

6            THE COURT:  All right.  Then have a good evening.

7                      (Adjourned.)

8

9

10                    C E R T I F I C A T E

11

12       I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

13  United States District Court in the Western District of

14  Washington at Seattle, do certify that the foregoing is a correct

15  transcript, to the best of my ability, from the record of

16  proceedings in the above-entitled matter.

17

18

19                      /s/ Nickoline Drury

20                      Nickoline Drury

21

22

23

24

25