UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YOLANY PADILLA, et al.,<br><br>                    Plaintiffs,<br><br>   v.<br><br>US IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>                  Defendants. | CASE NO. C18-928 MJP<br><br>ORDER GRANTING PRELIMINARY INJUNCTION |

The above-entitled Court, having received and reviewed:

1. Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 45),

2. Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 82),

3. Plaintiffs' Reply in Support of Motion for Preliminary Injunction (Dkt. No. 85),

all attached declarations and exhibits, and relevant portions of the record, and having heard oral argument thereon, rules as follows:

IT IS ORDERED that the motion is GRANTED.  With regard to the Bond Hearing Class, Defendant Executive Office for Immigration Review must, within 30 days of this Order:

1. Conduct bond hearings within seven days of a bond hearing request by a class member, and release any class member whose detention time exceeds that limit;

2. Place the burden of proof on Defendant Department of Homeland Security in those bond hearings to demonstrate why the class member should not be released on bond, parole, or other conditions;

3. Record the bond hearing and produce the recording or verbatim transcript of the hearing upon appeal; and

4. Produce a written decision with particularized determinations of individualized findings at the conclusion of the bond hearing.

**Background**

Under the Immigration and Nationality Act ("INA"), detained asylum seekers who are determined by Defendant U.S. Immigration and Customs Enforcement ("ICE") to have a credible fear of persecution are entitled to request release from custody during the pendency of the asylum process.  See Matter of X-K, 23 I. & N. Dec. 731 (BIA 2005).  The initial decision of whether the detainees may be released is made by Defendant Department of Homeland Security ("DHS") (see 8 C.F.R. § 236.1(c)(8)), and the asylum seekers may request review of the DHS determination before an immigration judge ("IJ") by means of a bond hearing.  See 8 U.S.C. § 1226(a); 8 C.F.R. § 1003.19(a).

The agencies' own guidelines and regulations reflect a recognition of the significance of the deprivation of liberty and the need for expeditious processing of these requests.  See, e.g., 8 C.F.R. § 1003.47(k) (referring to "the expedited nature" of initial custody redetermination cases);

1 | 52 Fed. Reg. 2931, 2932 (Aliens and Nationality; Rules of Procedure Before Immigration
2 | Judges: Jan. 29, 1987) (emphasizing the need for procedures at that time to "maximize the
3 | prompt availability of Immigration Judges for respondents applying for bond determinations");
4 | Immigration Court Practice Manual § 9.3(d)(2016) ("In general, after receiving a request for a
5 | bond hearing, the Immigration Court schedules the hearing for the earliest possible date . . .").
6 | The DHS regulations allow for bond hearings even prior to the agency filing immigration
7 | charges. 8 C.F.R. § 1003.14(a). The critical nature of the interest at stake is reflected in an
8 | underlying theme calling for hearings of this nature to be held as expeditiously as possible.

9 |     Despite this mandate, Plaintiffs have submitted a plethora of declarations reflecting a
10 | practice by Defendant Executive Office for Immigration Review ("EOIR") of delaying bond
11 | hearings for members of this class for weeks, even months, following a hearing request. (See
12 | Dkt. No. 37 at 14, Motion for Class Certification; Dkt. No. 46, Decl. of Antonini at ¶ 5; Dkt. No.
13 | 47, Decl. of Beckett at ¶ 5; Dkt. No. 48, Decl. of Byers at ¶ 5; Dkt. No. 50, Decl. of Inlender at
14 | ¶¶ 12-13; Dkt. No. 51, Decl. of Jong at ¶¶ 3-4; Dkt. No. 52, Decl. of Koh at ¶ 14; Dkt. 53, Decl.
15 | of Levy at ¶ 6; Dkt. No. 54, Decl. of Love at ¶¶ 4-5; Dkt. No. 55, Decl. of Lunn at ¶ 5; Dkt. No.
16 | 56, Decl. of Mercado at ¶ 10; Dkt. No. 57, Decl. of Orantes at ¶ 13; Dkt. No. 58, Decl. of
17 | Shulruff at ¶ 4; Dkt. No. 60, Decl. of Yang at ¶¶ 5-6.

18 |     Members of the Bond Hearing class face other obstacles to securing their freedom. At
19 | the bond hearing, the IJ bases his or her decision on an evaluation of whether the asylum seeker
20 | poses a danger to the community and is likely to appear at future proceedings. 8 C.F.R.
21 | §§ 1236.1(d)(1), 1003.19; Matter of Adeniji, 22 I. & N. 1102, 1112 (BIA 1999). Unique among
22 | civil detention hearings, however, EOIR places the burden of establishing these factors on the
23 | detainees instead of the government. Matter of Guerra, 24 I. & N. Dec. 37, 40 (BIA 2006).
24 |

An asylum seeker denied bond can appeal the IJ's decision to the Board of Immigration Appeals ("BIA") or seek another bond hearing in front of the IJ based on a material change in circumstances. 8 C.F.R. §§ 1003.19(e), (f). But the potential appellant must make the decision of whether to appeal without the aid of a record of the initial bond proceeding or a written decision detailing the reasons for the ruling. There is no requirement that immigration courts record their proceedings or provide a transcript thereof, and the IJs do not release a written decision unless an administrative appeal of the bond decision has already been filed. See, e.g., Immigration Court Practice Manual §§ 9.3(e)(iii), e(vii); BIA Practice Manual §§ 4.2(f)(ii), 7.3(b)(ii).

In addition to the deprivation of liberty, detainees face a number of other hardships attendant upon their incarceration: separation from their families, substandard conditions, subpar medical and/or mental health care, and decreased access to legal assistance and the other resources required to pursue their goal of asylum (leading to a decreased likelihood of success). See, e.g., Ingrid Eagly & Stephen Shafter, Am. Imm. Council, *Access to Counsel in Immigration Court* (2016), https://tinyurl.com/y7hbl2rm; Dkt., Decl. of Lunn at ¶ 7; Dkt. No. 49, Decl. of Cooper at ¶¶ 3-14, 17-20. The stakes are high, and the obstacles to success can loom even higher.

**Discussion**

The elements to be established prior to the issuance of injunctive relief are well-known:

1. Likelihood of success on the merits
2. Irreparable harm in the absence of the injunction
3. A balance of equities which favors the moving party
4. The existence of a public interest which favors the injunction

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

Here in the Ninth Circuit a "sliding scale" approach to this analysis is utilized – if the balance of hardships tips sharply in favor of the moving party, that party is only required to demonstrate claims that raise serious legal questions, as well as meet the other two criteria. See, e.g., Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

*1. Likelihood of success on the merits*

Prior to addressing the substantive merits of the claims of the Bond Hearing Class, the Court turns briefly to the Defendants' argument that these Plaintiffs have no standing to bring this motion because they have no cognizable injury; i.e., they are no longer being detained and have been given bond hearings. The Court has previously addressed the recognized right of these class representatives to prosecute "inherently transitory" claims (claims which by their nature may expire for any one individual during the course of the litigation) for those remaining members of the class who are still being injured by the policy or practice. See Sosna v. Iowa, 419 U.S. 393, 402 (1975); (Dkt. No. 102, Order Certifying Class at 8.)

Further, there is ample precedent for the granting of injunctive relief on behalf of a class at the behest of class representatives who were not suffering the complained-of injury at the time of the request. See Hernandez v. Sessions, 872 F.3d 976, 986 (9th Cir. 2017) (injunction granted concerning certain bond determination practices although Plaintiffs were no longer in custody); Ms. L. v. ICE, 310 F.Supp.3d 1133, 1146-47 (S.D.Cal. 2018) (enjoining immigrant family separation even though Plaintiffs were already reunited with their children); R.I.L-R v. Johnson, 80 F.Supp.3d 164, 191 (D.D.C. 2015) (enjoining a detention policy at the request of Plaintiffs who had been previously released).

1    Turning to the likelihood of success on the merits, the parties are in agreement that these

2 issues should be analyzed using the balancing test enunciated in Mathews v. Eldridge, 424 U.S.

3 319, 335 (1976), which calls for the court to weigh:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's interest, including
> the function involved and the fiscal and administrative burdens that the
> additional or substitute procedural requirement would entail.

A.    Private interest

It has long been recognized that immigration detainees have a constitutionally-protected interest in their freedom. Zadvydas v. Davis, 533 U.S. 678, 690 (2001). The Ninth Circuit has recognized that, in the area of non-criminal detention of immigrants, "the private interest at issue here is 'fundamental': freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'" Hernandez v. Sessions, 872 F.3d 976, 993 (9th Cir. 2017) (quoting Foucha v. Lousiana, 504 U.S. 71, 80 (1992)). The Ninth Circuit described the fundamental nature of that interest as "beyond dispute." Id.

The extent of those due process rights is among the many issues hotly-contested by these parties. Defendants ask the Court to find that these Plaintiffs are no different from any other immigrants who present themselves at an official Point of Entry (POE) and request admission to this country, a class of "excludable aliens" which has been found to have no inherent due process rights. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953).

Again, the Court cites its earlier Order on Motion to Dismiss for a previous ruling that, because these Plaintiffs (and the class they represent) were already within the territorial borders of the U.S. when they were detained, they are not considered on a similar footing to "excludable"

aliens. (See Dkt. No. 91, Order on Motion to Dismiss at 8-10.) "[O]nce an individual has entered the country, he is entitled to the protection of the *Due Process Clause.*" United States v. Raya-Vaca, 771 F.3d 1995, 1202 (9th Cir. 2014) (emphasis in original)[1]; see also Zadvydas, 553 U.S. at 693. The Court finds that this class of plaintiffs has a considerable private interest at stake: A constitutional right to press their due process claims, including their right to be free from indeterminate civil detention, and their right to have the bond hearings conducted in conformity with due process.

Defendants also argue that Jennings v. Rodriguez, 138 S.Ct. 830 (2018) (the Supreme Court case cited by this Court in initially finding jurisdiction over this lawsuit; (Dkt. No. 91, Order on Motion to Dismiss at 6-7)) "concluded that the statute bars such aliens from being afforded a bond hearing during the pendency of their removal proceedings." (Dkt. No. 82, Response at 10 (citing 138 S.Ct. at 845.)) This is an oversimplified and inaccurate reading of that portion of the ruling, which concerns 8 U.S.C. § 1225(b)(1), and quotes its language that "[a]ny alien . . . shall be detained pending a final determination of credible fear of persecution and, *if found not to have such a fear*, until removed." Jennings, 138 S.Ct. at 845 (emphasis supplied). The members of the Bond Hearing Class have been found "to have such a fear" and that finding removes them from the detention requirements referenced in Jennings.

The Court further finds that the fundamental liberty interest implicated by the Bond Hearing Class's prolonged and indeterminate detention extends to the procedural remedies which they are seeking as well: Being forced to bear the burden of proof and being denied both some form of automatic verbatim record and timely written findings—impacting both the likelihood of

---

[1] Defendants' argument that Raya-Vaca is "strictly limited" to criminal defendants is not supported by the opinion. The "criminal case limitation" is applicable only to attacks on removal orders which are not at issue here. There is no restriction on the Ninth Circuit's holding regarding the due process rights of aliens apprehended within the borders of the U.S.

release and the ability to effectively appeal adverse determinations—can all be seen as potential threats to the class members' liberty.

Defendants reiterate the "harmless error" argument from their earlier dismissal motion, asserting that Prieto-Romero v. Clark, 534 F.3d 1053 (9th Cir. 2008) sets a standard requiring that the Plaintiffs demonstrate that the "alleged due process violations adversely affected the IJ's determination that [Plaintiff] was eligible for bond." Id. at 1066. Defendants argue that the class representatives fail under the harmless error standard because none of them are in custody and, further, that the putative class members' proof fails because they have not yet had their hearings. The Court is not persuaded, and is mindful that, in the case of both of the named representatives of the Bond Hearing Class, it was proactive intervention by the government that eliminated the need for an appeal of an adverse determination at the bond hearing. (See Dkt. No. 26, Second Amended Complaint, ¶¶ 121, 123; Dkt. No. 61, ¶ 10.) In Pitts v. Terrible Herbst, Inc., 653 F.3d 1081 (9th Cir. 2011), Defendant attempted to "moot" Plaintiff's claim during the pendency of the lawsuit by making him an offer of judgment. The Ninth Circuit ruled that such a strategy could not defeat an otherwise valid class action: "[T]he termination of a class representative's claim does not moot the class claims." Id. at 1089.

Regarding the putative class members, there is Ninth Circuit authority that there are circumstances where, if the injury is imminent, prior or present harm need not be shown. In Amer. Trucking Assoc's v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009), the court noted that enforcing a requirement of proven past harm would put the plaintiffs to a "Hobson's choice" – refuse to abide by the challenged regulation and lose the right to do business, or submit to the regulation and be driven out of business by the cost of compliance. Under those circumstances, the Ninth Circuit found that "the constitutional violation alone, coupled with the damages

1  incurred, can suffice to show irreparable harm." Id. at 1058. See also Hernandez, 872 F.3d at

2  994 ("It is well-established that the deprivation of constitutional rights 'unquestionably

3  constitutes irreparable injury.'") (citations omitted).

4        Plaintiffs here are faced with a similar choice – accept their indeterminate detention and

5  receive bond hearings at the Government's pleasure with a reversed and inequitable burden of

6  proof and procedural deficiencies which impact their ability to appeal an adverse determination

7  or (as the Defendants have suggested) give up their asylum claim and allow themselves to be

8  deported back to a homeland where they have already been found to have a credible fear of

9  injury or death. The Constitution does not require these Plaintiffs to endure such a no-win

10 scenario.

11       Defendants also claim that Plaintiffs are not entitled to relief because they have not

12 exhausted their administrative rights. The exhaustion requirement is "prudential, rather than

13 jurisdictional," and it is within the discretion of a district court to

14     waive the prudential exhaustion requirement if "administrative remedies
    are inadequate or not efficacious, pursuit of administrative remedies would
15     be a futile gesture, irreparable injury will result, or the administrative
    proceedings would be void."
16

17 Hernandez, 872 F.3d at 987 (citation omitted). As has already been observed, "[i]t is

18 well-established that the deprivation of constitutional rights 'unquestionably constitutes

19 irreparable injury.'" Hernandez, 872 F.3d at 994 (citations omitted). Furthermore, Plaintiffs'

20 evidence demonstrates that, Defendants having shown no inclination to modify any of their

21 policies, the administrative remedy is "inadequate." Indeed, the thrust of that evidence

22 (regarding the lack of either an automatic verbatim record or mandatory written findings at the

23 time of ruling) is that the current practices negatively impact their ability to effectively appeal

24

and it would be futile to continue to pursue the administrative remedy in the face of Defendants' ongoing refusal to alter the procedural framework.

In attempting to argue that Plaintiffs have no constitutional right to a verbatim record or automatic written findings, Defendants again turn to the argument that there is not even a guaranteed right to verbatim record in criminal proceedings. This argument was addressed—and rejected—in the Court's Order on Motion to Dismiss:

> The government goes on to claim that, because "[t]he Supreme Court has declined to impose a contemporaneous verbatim record requirement on *criminal* trials," the Court should not do so in immigration custody redetermination hearings. (Dkt. No. 36 at 18 (emphasis in original).) The problem with this argument is that every case cited in support of this proposition says the *opposite*: that indigent defendants must be provided with "a record of sufficient completeness" (Coppedge v. United States, 369 U.S. 438, 446 (1962) for an appeal or "a complete transcript of the proceedings at trial." United States v. Carrillo, 902 F.2d 1405, 1409 (9th Cir. 1990).

(Dkt. 91 at 15, n.3.)

Defendants also assert that, because there are "less intrusive ways for the Board to ensure detainees have notice of the basis for their bond decisions," Plaintiffs' interests should not be elevated over the adverse impact on the Government's interest. (Dkt. No. 82, Response at 19.) The example of a "less intrusive way" which Defendants cite is a case which remanded a bond decision to the IJ for a more thorough bond decision. In re: Fernando Antonio Garro-Rojas, 2007 WL 1430371, at *1 (BIA Mar. 23, 2007). But it is the prolongation of Plaintiffs' detention that is at the heart of the interest which they seek to protect. Defendants do not have a right to a "less intrusive" solution that continues to undermine the fundamental interest at stake here.

As an example of the nature of their interest in the issuance of written findings before their appeal is filed, Plaintiffs cite to 8 C.F.R. § 1003.3(b) (which mandates dismissal of a Notice

of Appeal which is insufficiently detailed), as well as Matter of Keyte, 20 I. & N. Dec. 158, 159 (BIA 1990), wherein a notice of appeal was summarily dismissed for "offer[ing] only a generalized statement of [the] reason for the appeal." Written findings issued after the notice of appeal is filed are of little benefit to this class. Additionally, written findings, often composed weeks after the hearing itself,[2] may overlook key facts and findings, and may be subject to bias in favor of the adverse ruling. See Bergerco, U.S.A. v. Shipping Corp. of India, Ltd., 896 F.2d 1210, 1214 (9th Cir. 1990) ("[O]nce the court has entered judgment, it may become subject to the very natural weight of its conviction, tending to focus on that which supports its holding.")

Regarding Plaintiffs' interest in shifting the burden of proof at the bond hearings, Defendants again wrongly cite Jennings for their argument that Plaintiffs must continue to bear the burden of proof. (Response at 18.) The Supreme Court in Jennings declined to address the constitutional arguments on their merits, instead remanding them to the appellate court for that purpose. 138 S.Ct. at 851. In every other context (both civil and criminal detention), the Government bears the burden of proof regarding suitability for release (with the corresponding presumption in favor of release) – the Supreme Court has upheld that allocation of the burden where it was found (see United States v. Salerno, 481 U.S. 739, 751 (1987); Kansas v. Hendricks 521 U.S. 346, 353 (1997)), and struck it down where it was not (see Foucha v. Lousiana, 504 U.S. 71, 81 (1992); Addington v. Texas, 441 U.S. 418, 427 ("The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state."); and Zadvydas, 533 U.S. at 692

---

[2] See Dkt. No. 49, Decl. of Cooper at ¶ 16; Dkt. No. 51, Decl. of Jong at ¶ 10.

(striking down a regulation which required immigrant detainees to prove they were not dangerous)).[3]

The Court finds that Plaintiffs have succeeded in establishing the existence of the private interests (shared by the class) that are being impacted by the government action.

B. <u>Risk of deprivation/value of procedural safeguards</u>

The risk of deprivation occasioned by the indeterminate prolonged civil detention of this class seems almost too obvious to state. The Court's Order on Motion to Dismiss quoted the Ninth Circuit in <u>Rodriguez v. Marin</u>, 909 F.3d 252, 256 (9th Cir. 2018):

> We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so. Arbitrary civil detention is not a feature of our American government.

The <u>Hernandez</u> court, conducting a similar <u>Mathews</u> analysis in the context of immigrant detention, described the second factor as follows: "[T]here is a significant risk that the individual will be needlessly deprived of the fundamental right to liberty." 872 F.3d at 993. That Defendants' procedures here occasion the deprivation of such a fundamental right suffices as an adequate description of "the risk of an erroneous deprivation of such interest through the procedures used," including the absence of any deadline for conducting the bond hearing once requested and placing the burden on the detainee to establish grounds for release. Additionally, the failure to supply a verbatim record of the hearing or a contemporaneous set of written

---

[3] Further support can be found in an S.D.N.Y. case, <u>Martinez v. Decker</u>, 2018 U.S. Dist. LEXIS 178577 at *13 (S.D.N.Y., October 17, 2018): "Thus, in accordance with every court to have decided this issue, the Court concludes that due process requires the Government to bear the burden of proving that detention is justified at a bond hearing under Section 1226(a)."

1  findings jeopardizes the class members' ability to effectively appeal an adverse decision – a
2  further incursion upon their constitutionally-protected liberty interest.

3  Having identified the risk, the Court moves on to examine "the probable value, if any, of
4  additional or substitute procedural safeguards."  Mathews, 424 U.S. at 335.  In establishing by
5  this injunction the requirement that Defendant EOIR hold a bond hearing for class members
6  within seven days of their request, the Court is informed, first, by its previous findings of "a
7  plethora of district court and Board of Immigration Appeals cases affirm[ing] the requirement of
8  a 'prompt' or 'expeditious' bond hearing for immigrants seeking entry." (See Dkt. No. 91, Order
9  on Motion to Dismiss at 13-14.)  Further guidance is found in the Congressional mandate that, in
10 the statutory scheme by which asylum determinations are made, Defendants are required to
11 review credible fear determinations "as expeditiously as possible," a phrase which is defined as
12 requiring review "to the maximum extent practicable within 24 hours, but in no case later than 7
13 days." 8 U.S.C. § 1225(b)(1)(B)(III)(iii); see also 8 C.F.R. §§ 287.3(d), 1003.42(e).

14 Elsewhere in the civil commitment context, there is a long history of courts which have
15 found that due process requires an expeditious hearing, often defined as a period of no longer
16 than seven days.  See, e.g., Doe v. Gallinot, 657 F.2d 1017 (9th Cir. 1982)(affirming a ruling
17 which required a probable cause hearing for an involuntary mental health commitment after 72
18 hours, "but in no event . . . later than the seventh day of confinement;" Id. at 1025[4]); Saravia v.
19 Sessions, 280 F.Supp.3d 1168 (N.D.Cal. 2017) (finding, using a Mathews balancing test, that the
20 due process clause required, for minors re-arrested by DHS, "the opportunity to be heard 'at a

---

[4] The Ninth Circuit further found in Gallinot that "the seven-day limit represents a responsible balance of the competing interests involved." Id. at 1025.

1  meaningful time,'" and fixed that period at no later than seven days following the re-arrest; Id. at

2  1197); Nguti v. Sessions, 259 F.Supp.3d 6 (W.D.N.Y. 2017) (requiring an immigrant detainee's

3  bond hearing to be held within one week of the order; Id. at 14).  The Court finds that a timeline

4  of seven days from the date of the bond hearing request is consistent with both Congressional

5  intent and judicial precedent and represents a procedural safeguard providing the value of an

6  opportunity to be heard at a meaningful time regarding this fundamental interest possessed by the

7  class members.

8        The probable value of the other safeguards (the burden of proof borne by the government,

9  an automatic contemporaneous recording of the proceedings, and written findings at the time of

10 decision) required by this injunction has been mentioned supra and may be summarized as: (1)

11 the burden of proof being borne by the party which has traditionally been responsible for it and

12 which has the greater resources to elicit the necessary facts; and (2) the provision to these class

13 members of a meaningful opportunity to decide whether to appeal an adverse determination and

14 to prepare a sufficiently detailed notice of appeal that the process may go forward with a

15 complete representation of their position.  Generally speaking, the "probable value, if any, of

16 additional or substitute procedural safeguards" is the increased likelihood that Plaintiffs will be

17 deprived of their fundamental liberty interest only where absolutely necessary, and for no longer

18 than necessary.

19     C.    The Government's interest

20 "The government has legitimate interests in protecting the public and in ensuring that

21 non-citizens in removal proceedings appear for hearings . . . ."  Hernandez, *supra* at 990.  The

22 Defendants present their interests primarily in terms of the burden on their resources that

23 implementing additional procedural safeguards (and a mandated timeline) will impose; i.e.,

24

"available resources and docketing realities." (Response at 12.)  While those concerns are certainly within the scope of a Mathews balancing test (this third factor is described as "the Government's interest, including the function involved and *the fiscal and administrative burdens that the additional or substitute procedural requirement would entail*"), the Court will not exalt expense over fundamental rights to liberty.  As the Ninth Circuit has stated,

> [T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured . . . .

Hernandez, *supra* at 994.

The Court finds that the Mathews balancing test favors the Plaintiffs' position in terms of a finding of "likelihood of success on the merits" – Plaintiffs have established the existence of a fundamental liberty interest, the risk of erroneous deprivation of that interest, and the value of additional procedural safeguards.  The Government interest, while hardly nonexistent, is not sufficient to outweigh the other factors.

### 2. *Irreparable harm*

The Court finds that Plaintiffs have provided solid evidentiary and jurisprudential proof of the multiple layers of irreparable injury occasioned by Defendants' policies and practices. The Court's analysis begins by noting again that the courts of the United States recognize that "any deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Hernandez, supra at 995 (citation omitted).

Next, the analysis turns to the more concrete types of harm inflicted by prolonged detention, including physical and psychological trauma (e.g., malnutrition, poor medical care, depression; see declarations of Plaintiffs and counsel at Dkt. Nos. 46, 48, 51, 54-58).  Plaintiffs attach to their opening brief a series of declarations establishing the spectrum of harms attendant

upon prolonged detention (including panic attacks, depression, and exacerbation of pre-existing trauma). (see Opening Brief at 23.) Additionally, the Ninth Circuit has cited with approval an amicus brief from the American Bar Association in Hernandez which

> describes evidence of subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained.

872 F.3d at 994.

Secondarily, prolonged indefinite detention negatively impacts detainees who are required to bear the burden of proof of their eligibility for release. Detention poses "serious obstacles in demonstrating eligibility for release at a bond hearing, including impediments to gathering evidence, communicating with potential witnesses or attorneys . . . or accessing documents that immigration officials have confiscated." (Opening Brief at 24; see declarations of immigration counsel at Dkt. Nos. 46-52, 54, 59.)

Furthermore, there is the impact of the procedural deficiencies alleged by Plaintiffs on their ability to effectively appeal any adverse determinations. If the detainee does not know the grounds on which the bond request was denied, how is the detainee—or the detainee's counsel—supposed to know whether an appeal would be well-taken? As one counsel declared: "It is near impossible to advise a client on his or her chances of appeal if I have little to no idea of what the [IJ]'s reasoning was for denying bond in the first place." (Dkt. No. 51, Decl. of Jong at ¶ 11; see also Dkt. No. 50, Decl. of Inlender at ¶ 15 ("Once an appeal is filed, the lack of a transcript means that there is no verifiable way to relay what happened before the immigration judge and, in some cases, to articulate specific errors requiring reversal.").)

Finally, there is the incalculable harm to those class members who, facing an uncertain length of time in custody and an arduous and obstacle-strewn road to establishing their right to

release (to say nothing of their right to asylum), simply abandon their claim and accept deportation back to countries where, as it has already been established to the Government's satisfaction, they face persecution, torture, and possibly death. (See Dkt. Nos. 46-47, 50-53, 55, 57-60.)

Defendants' arguments to the contrary are not persuasive. They claim that there are no allegations of prolonged detention awaiting a bond hearing, but Plaintiffs' declaratory evidence is replete with assertions of waiting times of weeks and months prior to a bond hearing. (E.g., Dkt. Nos. 46, 47, 57, 61.) They argue that claims of prolonged detention "could be addressed in the ordinary course of habeas litigation when they are ripe" (Response at 24) – apparently entirely missing the grim irony of Plaintiffs being forced to undergo a further delay in detention for an entirely separate legal proceeding. Even in the face of over a dozen declarations documenting excessive delays and its effects on the class members, Defendants insist that the injuries are "speculative," lacking any proof that they are "likely."

Plaintiffs have succeeded in establishing irreparable harm from the complained-of practices.

### 3. *Balance of equities/Public interest*

When the Government is a party to the case, the public interest and balance of equities factors "merge." Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014). The equities on Plaintiffs' side consist of the deprivation of a fundamental constitutional right, with accompanying harms that range from physical, emotional and psychological damage to unnecessarily prolonged separation from their families to denial of due process. The equities on Defendants' side are primarily concerned with the agencies' right to control their dockets and to

allocate what are unquestionably limited resources as they see fit.  This is not a close call.  As the Hernandez court stated:

> "Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."

872 F.3d at 996 (quoting Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983).

In considering the public interest factor in the injunctive equation, the Hernandez court found the following "public interest" factors favored plaintiffs; the Court finds them applicable here:

1. "[E]nsuring the government's bond determination procedures comply with the Constitution."
2. "In addition to potential hardships facing Plaintiffs, the court 'may consider . . . the indirect hardship to their friends and family members.'"  (quoting Golden Gate Rest. Ass'n v. City & County of San Francisco, 512 F.3d 1112, 1126 (9th Cir. 2008)).
3. "[T]he general public's interest in the efficient allocation of the government's fiscal resources" (citing the $158 a day cost to confine each detainee, with a total daily cost of $6.5 million [in 2017], compared to a maximum cost of $17 a day for supervised release).

Id.

Additionally, there is Ninth Circuit precedent for the principle that "it is always in the public interest to prevent the violation of a party's constitutional rights."  Melendres v. Arpaio, 695 F.3d 990, 102 (9th Cir. 2012).  It is the finding of this Court that both the balance of equities and the public interest favor the granting of the injunction requested by Plaintiffs.

## Conclusion

The Plaintiffs of the Bond Hearing Class have succeeded in establishing all the requisite elements for a granting of their request for injunctive relief: a likelihood of success on the merits, irreparable harm if their relief is not granted, a balance of equities in their favor, and that the

public interest will be benefited by the relief they seek. Accordingly, the Court GRANTS the requested relief and orders that Defendant EOIR institute the following procedural safeguards within 30 days of this Order:

1. Conduct bond hearings within seven days of a bond hearing request by a class member, and release any class member whose detention time exceeds that limit;
2. Place the burden of proof on Defendant Department of Homeland Security in those bond hearings to demonstrate why the class member should not be released on bond, parole, or other conditions;
3. Record the bond hearing and produce the recording or verbatim transcript of the hearing upon appeal; and
4. Produce a written decision with particularized determinations of individualized findings at the conclusion of the bond hearing.

The clerk is ordered to provide copies of this order to all counsel.

Dated April 5, 2019.

Marsha J. Pechman
United States District Judge