Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YOLANY PADILLA, *et al.*,

      Plaintiffs-Petitioners,

      v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

      Defendants-Respondents.

Case No. 2:18-cv-00928-MJP

**PLAINTIFFS' MOTION FOR
MODIFICATION OF THE EXISTING
PRELIMINARY INJUNCTION**

Noted on Motion Calendar:
June 14, 2019

ORAL ARGUMENT REQUESTED

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ.
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.   Legal Framework Governing the Detention of Individuals Who Have Entered
        the United States and Are Placed in Removal Proceedings ................................. 2

    II.  *Matter of M-S-* ................................................................................................. 4

ARGUMENT ...................................................................................................................... 6

    I.   Plaintiffs Likely Will Succeed on the Merits ..................................................... 6

       A.  *Matter of M-S-* Violates Plaintiffs' Rights to Due Process ......................... 6

          1.  Substantive Due Process Requires an Individualized Hearing Before
              a Neutral Decision-maker on Flight Risk and Danger to the Community .............. 8

          2.  Procedural Due Process Requires an Individualized Bond Hearing ................... 13

       B.  *Matter of M-S-* Violates the APA ............................................................ 15

    II.  Plaintiffs and Members of the Bond Hearing Class Will Suffer Irreparable
        Harm Absent a Preliminary Injunction ............................................................ 18

    III. The Balance of Hardships Tip Sharply in Plaintiffs' Favor, and a Preliminary
         Injunction is in the Public Interest .................................................................. 21

CONCLUSION ................................................................................................................. 22

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – i
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

**INTRODUCTION**

Plaintiffs Blanca Orantes and Baltazar Vasquez, on behalf of themselves and the certified Bond Hearing Class (together, "Plaintiffs"), move for modification of this Court's preliminary injunction order, Dkt. 110, to enjoin the Attorney General's recent decision in *Matter of M-S-,* 27 I. & N. Dec. 509 (A.G. 2019). Plaintiffs ask this Court to preserve the most basic requirement of due process: a bond hearing before an impartial adjudicator to determine if their detention is justified. No other modification of the existing order is sought.

On April 16, 2019—approximately two weeks after the Court issued the preliminary injunction—the Attorney General issued *Matter of M-S-,* eliminating bond hearings for asylum seekers who, like Plaintiffs, entered the United States without inspection to seek protection and were initially placed in expedited removal proceedings but were referred for regular removal proceedings after being found by an immigration officer to have a credible fear of persecution or torture. If *Matter of M-S-* is permitted to go into effect, for the first time in nearly half a century asylum seekers who are present in the United States after having effected an entry will be locked up pending their removal proceedings—potentially for months or years—without ever receiving a bond hearing on whether their detention is justified.

The elimination of custody hearings for individuals who are present in the United States after having effected an entry violates the Due Process Clause of the U.S. Constitution. For more than a century, the Supreme Court has recognized that noncitizens who enter the United States— even unlawfully—are protected by due process. And for fifty years, the immigration courts have provided bond hearings to these individuals. The Attorney General's decision in *Matter of M-S-* also violates the Administrative Procedure Act (APA) by invalidating the agency's own bond hearing regulations without complying with the notice and comment requirement.

Modification of the preliminary injunction to enjoin *Matter of M-S-* is warranted to maintain the availability of bond hearings and protect the status quo. In the absence of immediate judicial intervention, Plaintiffs and members of the Bond Hearing Class will no longer be

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 1
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

entitled to bond hearings before a neutral adjudicator to determine if they pose a flight risk or danger to the community that justifies their continued civil detention. As a result, thousands of individuals with *bona fide* claims to asylum or other forms of protection face the prospect of months or years of imprisonment while their claims are adjudicated, even if they pose no flight risk or danger.

For Plaintiffs and members of the Bond Hearing Class, the stakes are enormous. As this Court has found, arbitrary imprisonment is an irreparable harm in itself, and one that takes a significant toll on detainees' medical and mental health. *See* Dkt. 110 at 15-16. This is particularly true for individuals like the Plaintiffs who have already experienced trauma. In addition, detention significantly impedes Plaintiffs' ability to successfully litigate their claims to protection, since most detainees are unable to obtain the assistance of counsel and therefore are forced to proceed *pro se*. *See id*. at 16.

Because Plaintiffs are likely to succeed on the merits of their due process and APA claims, will suffer irreparable injury from the discontinuation of bond hearings, and satisfy all other requirements for injunctive relief, this Court should maintain its preliminary injunction but modify it to enjoin *Matter of M-S-* to expressly safeguard Plaintiffs' right to individualized bond hearings.

## BACKGROUND

I.      **Legal Framework Governing the Detention of Individuals Who Have Entered the United States and Are Placed in Removal Proceedings**

For nearly half a century, consistent with Supreme Court precedent, the law has afforded bond hearings to individuals placed in deportation proceedings after having entered the United States—including those who entered without inspection (also referred to as "EWIs"). *See Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) (establishing that noncitizens who enter the United States, even unlawfully, are protected by due process).

Until 1996, the Immigration and Nationality Act (INA) provided for two types of removal proceedings: "deportation" proceedings for those individuals who had entered the

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 2
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

United States (including EWIs), and "exclusion" proceedings for those individuals who were

apprehended at the border before effectuating an entry. *See Judulang v. Holder*, 565 U.S. 42, 45-

46 (2011); 5 Charles Gordon, et al., *Immigration Law and Procedur*e § 63.01 (2019). The statute

governing deportation proceedings provided for discretionary release on bond, and the

implementing regulations provided for review of the agency's decision to detain at a hearing

before an immigration judge (IJ). *See* 8 U.S.C. § 1252(a)(1) (1994); 8 C.F.R. §§ 242.2(d), 3.19

(1994).[1] In contrast, individuals placed in exclusion proceedings were not entitled to an IJ bond

hearing; their only option for release was a "parole" review by the Attorney General. *See* 8

U.S.C. §§ 1182(d)(5), 1225(b) (1994); 8 C.F.R. §§ 212.5(a), 235.3(b) (1994).

Congress enacted major changes to the immigration statute in 1996, replacing

"exclusion" and "deportation" proceedings with a single "removal" proceeding. *See* 8 U.S.C. §

1229. However, the detention scheme remained essentially the same. As before, noncitizens who

had entered the United States, including EWIs, were generally entitled to bond hearings, while

noncitizens apprehended at the border before effectuating an entry were limited to seeking

release on parole. *See* 8 C.F.R. §§ 1003.19(a), 1236.1(d)(1) (providing in general for IJ review of

custody determinations pending removal proceedings); *id*. §§ 1003.19(h)(2)(i)(B), 1236.1(c)(11)

(barring IJs from reviewing custody of "arriving" noncitizens stopped at border and certain

others suspected of terrorism or charged with removability on criminal grounds, but not EWIs).

Formerly classified as "excludable," individuals stopped at the border are now classified as

"arriving." 8 C.F.R. § 1.2 (defining "arriving [noncitizen]" *inter alia*, as "an applicant for

admission coming or attempting to come into the United States at a port-of-entry"); *see also* 8

C.F.R. § 1235.3(c) (limiting noncitizens stopped at border to seeking release on parole).

---

[1] The government first provided bond hearings before special inquiry officers in 1969. *See* 34 Fed. Reg. 8037 (May 22, 1969). It later replaced special inquiry officers with immigration judges in 1973. *See* 38 Fed. Reg. 8590 (Apr. 4, 1973) (amending 8 C.F.R. § 1.1 to define "immigration judge" as interchangeable with "special inquiry officer"); *see also* 48 Fed. Reg. 8038 (Feb. 25, 1983) (establishing the Executive Office for Immigration Review).

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 3
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

The creation of expedited removal in the 1996 amendments did not disrupt the well-settled entitlement of those who had already entered to bond hearings. *See* 8 U.S.C. § 1225(b)(1). Congress applied the expedited removal process to certain noncitizens apprehended at the border without proper documents, 8 U.S.C. § 1225(b)(1)(A)(i), but authorized the Attorney General to expand the expedited removal provisions to certain persons who are apprehended inside the country and cannot demonstrate that they have been present for a continuous two-year period. 8 U.S.C. § 1225(b)(1)(A)(iii). In all cases, Congress protected the right to a fair adjudication of *bona fide* asylum claims: individuals in expedited removal who express a fear of persecution and pass a credible fear interview are referred for regular removal proceedings before an IJ to consider their asylum claim. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B)(ii); 8 C.F.R. §§ 208.30(f), 1235.6(a)(ii), (iii).

Even when the government began applying these new "expedited removal" proceedings to EWIs in 2004, 69 Fed. Reg. 48,877-01 (Aug. 11, 2004), regulations provided that those persons referred for regular removal proceedings after entering the United States without inspection and then passing a credible fear screening were entitled to IJ bond hearings. *See Matter of X-K-*, 23 I. & N. Dec. 731, 732, 734-35 (BIA 2005) (reading 8 C.F.R. §§ 1003.19(h)(2), 1236.1(c)(11), (d), as clearly authorizing bond hearings for such individuals).

**II.**    *Matter of M-S-*

The Attorney General's decision in *Matter of M-S-* purports to eliminate the right to a bond hearing for all asylum seekers who entered without inspection and subsequently demonstrated a credible fear of persecution or torture. If permitted to take effect, these individuals will be denied the basic due process of a bond hearing for the first time since bond hearings were implemented fifty years ago.

In *Matter of M-S-*, the Attorney General reversed *Matter of X-K*, in which the Board of Immigration Appeals (BIA) held that EWIs who are referred to regular removal proceedings after having initially been placed in expedited removal are entitled to bond hearings under the

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 4
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

regulations. 27 I. & N. Dec. at 509-10. Citing the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Attorney General held that when individuals who are initially placed in expedited removal are referred for full removal proceedings before an IJ, their detention continues to be governed by the expedited removal detention provision, 8 U.S.C. § 1225(b)(1)(B)(ii), and not 8 U.S.C. § 1226, the statute that generally governs detention pending regular removal proceedings. *Matter of M-S-*, 27 I. & N. Dec. at 515-17 (citing *Jennings*, 138 S. Ct. at 839, 844-45). Moreover, the Attorney General held that the expedited removal detention provision, 8 U.S.C. § 1225(b)(1)(B)(ii), permits release in only one circumstance: under a discretionary grant of parole by the Secretary of Homeland Security. *Matter of M-S-*, 27 I. & N. Dec. at 516-17 (citing *Jennings,* 138 S. Ct. at 844, and 8 U.S.C. § 1182(d)(5)). Thus, the Attorney General concluded that the bond hearing regulations that the Board relied upon in *Matter of X-K* cannot authorize bond hearings for individuals initially placed in expedited removal without violating the detention statute. *Id*. at 518.

The result of *Matter of M-S-* is that thousands of individuals who are pursuing *bona fide* claims for protection in regular removal proceedings will be detained for months and sometimes years without ever receiving a bond hearing simply because they were initially placed into expedited removal proceedings. In Fiscal Year 2017 alone, more than 42,000 such individuals were entitled to bond hearings. *See* U.S. Citizenship and Immigration Services, Credible Fear Workload Report Summary, FY2017 Inland Caseload (Apr. 24, 2018), https://www.uscis.gov/sites/default/files/USCIS/Outreach/Upcoming%20National%20Engagements/PED_FY17_CFandRFstatsThru09302017.pdf. By Plaintiffs' estimate, half of such individuals who are detained are found by an IJ to pose no flight risk or danger to the community and granted release on bond. Declaration of David Hausman (Hausman Decl.) ¶ 9; *see also* Transactional Records Access Clearinghouse (TRAC) Immigration, *Three-fold Difference in Immigration Bond Amounts by Court Location*, Tbl. 2 (Jul. 2, 2018), http://trac.syr.edu/immigration/reports/519/ (showing that 47.1% of IJ bond decisions in the first 8 months of FY2018 granted release on bond).

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 5
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1

**ARGUMENT**

2          Plaintiffs ask this Court to modify the existing preliminary injunction to expressly enjoin

3     *Matter of M-S-* and specifically require that Defendants continue to provide bond hearings. The

4     party moving for a preliminary injunction must show: (1) a likelihood of success on the merits,

5     (2) irreparable harm absent injunctive relief, (3) that the balance of equities favors injunctive

6     relief, and (4) that an injunction serves the public interest. *Winter v. Natural Res. Def. Council,*

7     *Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit uses a "sliding scale," approach, such that where

8     the balance of hardships tips strongly in the movant's favor, she need only show that her claims

9     raise "serious questions going to the merits" and that the other two elements are met. *See, e.g.*,

10    *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

11         Because Defendants must follow the Constitution and maintain the status quo—that is,

12    continue to provide individualized bond hearings—Plaintiffs merit a prohibitory injunction. *See*

13    *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (noting that an injunction that

14    "prevents future constitutional violations" is "a classic form of prohibitory injunction").

15    Plaintiffs can demonstrate not only serious questions going to the merits, but a likelihood of

16    success on those merits, satisfying both the "sliding scale" and traditional inquiries.

17         This Court retains inherent authority to modify a preliminary injunction order based on

18    changed circumstances, including a change in law. *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642,

19    647 (1961). "A party seeking modification . . . of an injunction bears the burden of establishing

20    that a significant change in facts or law warrants revision . . . of the injunction." *Sharp v. Weston*,

21    233 F.3d 1166, 1170 (9th Cir. 2000).

22    **I.      Plaintiffs Likely Will Succeed on the Merits.**

23         **A.  *Matter of M-S-* Violates Plaintiffs' Rights to Due Process.**

24         *Matter of M-S-*'s elimination of bond hearings violates Plaintiffs' substantive and

25    procedural due process rights. As this Court has recognized, because Plaintiffs all have entered

26    the country, they are entitled to due process protections under longstanding Supreme Court and

27

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 6
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Ninth Circuit precedent. *See* Dkt. 91 at 9-10; Dkt. 110 at 6-7 (citing *United States v. Raya-Vaca*, 771 F.3d 1995, 1202 (9th Cir. 2014)); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce [a noncitizen] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (due process protects every person within the United States, "[e]ven one whose presence in this country is unlawful, involuntary, or transitory"); *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1112 n.15 (9th Cir. 2018) ("[P]resence matters to due process."); *Bayo v. Napolitano*, 593 F.3d 495, 502 (7th Cir. 2010) (en banc) (explaining that, once the noncitizen "crossed the border," he "became entitled to certain constitutional rights, including the right to due process"); *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (similar); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1108 (9th Cir. 2001) ("[O]nce [a noncitizen] has 'entered' U.S. territory, legally or illegally, he or she has constitutional rights, including Fifth Amendment rights.").

This principle applies regardless of how long individuals have been present or the nature of their entry to the United States. Indeed, the Ninth Circuit has routinely applied this rule to noncitizens who only recently entered the country. *See, e.g.*, *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1153, 1160-62 (9th Cir. 2004) (due process for noncitizen apprehended same day as unlawful entry); *Jie Lin v. Ashcroft*, 377 F.3d 1014 (9th Cir. 2004) (requiring due process for child found alone in international airport); *Padilla-Agustin v. INS*, 21 F.3d 970, 972, 974-77 (9th Cir. 1994) (requiring due process for noncitizen apprehended shortly after crossing border), *abrogated on other grounds by Stone v. INS*, 514 U.S. 386 (1995) (same); *Reyes-Palacios v. INS*, 836 F.2d 1154, 1155-56 (9th Cir. 1988) (same); *Rios-Berrios v. INS*, 776 F.2d 859, 860, 863 (9th Cir. 1985) (same).

Significantly, the government has repeatedly acknowledged in prior cases that noncitizens who have entered the country unlawfully, even for very brief periods of time, have

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 7
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

due process rights. For example, at oral argument before the Supreme Court in *Clark v. Martinez*, the Court specifically asked the Deputy Solicitor General for the position of the United States on the procedural due process rights of unlawful entrants apprehended after crossing the border:

> JUSTICE BREYER: A person who runs in illegally, a person who crosses the border illegally, say, from Mexico is entitled to these rights when you catch him.
>
> [Government Counsel]: He's entitled to procedural due process rights.

Transcript of Oral Argument at 25, *Clark v. Martinez*, 543 U.S. 371 (2005) (Nos. 03-878, 03-7434).

Moreover, as a practical matter, expedited removal does not apply only to individuals who recently entered the country. As the BIA has recognized, some individuals "may have been living, working, and raising a family in the United States for many years, but were either absent for some part of the 14 days preceding their apprehension by the [Department of Homeland Security ("DHS")] or were unable to provide adequate evidence to prove their continuous physical presence for that period." *Matter of X-K-*, 23 I. & N. Dec. at 736. And indeed, although it would raise serious due process concerns to do so, the statute purports to allow the agency to expand expedited removal to individuals who have been living in the United States for up to two years. 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

### 1. Substantive Due Process Requires an Individualized Hearing Before a Neutral Decision-maker on Flight Risk and Danger to the Community.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas*, 533 U.S. at 690. The Supreme Court in *Zadvydas* affirmed the due process requirement that immigration detention, like all civil detention, is justified only where "a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)); *see also United States v. Salerno*, 481 U.S. 739, 747 (1987) (substantive due process prohibits detention

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 8
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

that is "excessive in relation to [the government's] regulatory goal"). The purpose of immigration detention is to effectuate removal, and to protect against danger and flight risk during that process. *Zadvydas*, 533 U.S. at 690-91. Immigration detention violates due process unless it is reasonably related to these legitimate purposes. *Id*. at 690; *see also Hernandez*, 872 F.3d at 990. Moreover, detention must be accompanied by adequate procedural safeguards to ensure that those purposes are served. *Zadvydas*, 533 U.S. at 690-91; *see also Hernandez*, 872 F.3d at 990.

Defendants' elimination of bond hearings means that the only procedure available to Plaintiffs to challenge their detention is a discretionary parole determination made by a DHS officer. However, with only one exception—*Demore v. Kim*, 538 U.S. 510 (2003), a case which is clearly distinguishable, *see infra* pp. 10-11—the Supreme Court has never upheld civil detention as constitutional without an individualized hearing before a neutral decision-maker, to ensure that the person's imprisonment is actually serving the government's goals. *See, e.g.*, *Salerno*, 481 U.S. at 750 (upholding pretrial detention where Congress provided "a full-blown adversary hearing" on dangerousness, where the government bears the burden of proof by clear and convincing evidence); *Hendricks*, 521 U.S. at 357-58 (upholding civil commitment when there are "proper procedures and evidentiary standards," including an individualized hearing on dangerousness); *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992) (noting individual's entitlement to "constitutionally adequate procedures to establish the grounds for his confinement"); *Schall v. Martin*, 467 U.S. 253, 277, 279-81 (1984) (upholding detention pending a juvenile delinquency determination where the government proves dangerousness in a fair adversarial hearing with notice and counsel).

Indeed, the Supreme Court has required individualized hearings for far lesser interests, including for criminals facing revocation of parole (despite their having already been sentenced to the full term of their confinement), *see Morrissey* v. *Brewer*, 408 U.S. 471, 485-86 (1972), and even for property deprivations, *see, e.g.*, *Goldberg* v. *Kelly*, 397 U.S. 254, 268 (1970) (failure to

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 9
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1  provide in-person hearing prior to termination of welfare benefits was "fatal to the constitutional

2  adequacy of the procedures"); *Califano* v. *Yamasaki*, 442 U.S. 682, 696-97 (1979) (in-person

3  hearing required for recovery of excess Social Security payments); *see also Zadvydas*, 533 U.S.

4  at 692 (criticizing the administrative custody reviews in that case and noting that "[t]he

5  Constitution demands greater procedural protection even for property").

6        Although the Supreme Court upheld immigration detention without a hearing in *Demore*

7  *v. Kim*, that case is clearly distinguishable. First, the statute in *Demore* imposed mandatory

8  detention on a subset of noncitizens who had committed an enumerated list of crimes, based on

9  Congress's determination that they posed a categorical bail risk. *See* 8 U.S.C. § 1226(c). The

10  Court emphasized that this "narrow detention policy" was reasonably related to the government's

11  purpose of effectuating removal and protecting public safety. 538 U.S. at 526-28. By contrast,

12  the detention statute here applies broadly to individuals with no criminal records and who all

13  have been found to have *bona fide* claims to protection in the United States. *Cf. Zadvydas*, 533

14  U.S. at 691 (stating that the government's indefinite detention policy raised due process concerns

15  because the detention statute did "not apply narrowly to 'a small segment of particularly

16  dangerous individuals,' . . . but broadly to [noncitizens] ordered removed for many and various

17  reasons, including tourist visa violations" (quoting *Hendricks*, 521 U.S. at 368)).

18        Second, in reaching its conclusion, the Court in *Demore* placed great reliance on the

19  voluminous record before Congress, which showed that the population of "criminal aliens"

20  targeted by the mandatory detention statute posed a heightened categorical risk of flight and

21  danger to the community. *See* 538 U.S. at 518-21 (citing studies and congressional findings

22  regarding the "wholesale failure by the INS to deal with increasing rates of criminal activity by

23  [noncitizens]"). In contrast, Congress made no such findings regarding the population at issue

24  here—that is, individuals who have all been screened by DHS and found to have a credible fear

25  of persecution or torture. Indeed, Congress instead permitted their release from custody. *See*

26  8 U.S.C. § 1182(d)(5).

27

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 10
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Third, the Supreme Court placed great emphasis on what it understood to be the brief period of time that mandatory detention typically lasts. *See id.* at 529 (noting that mandatory detention lasts about 45 days in 85% of cases and about 5 months for those 15% of cases where individuals seeks appeal to BIA). In contrast, asylum seekers can expect to spend a median time of nearly six months for their protection claims to be adjudicated before the IJ and nearly a year in cases involving an appeal to the BIA, *see* Hausman Decl. ¶ 8, along with any additional needed time for judicial review.

Under *Matter of M-S-*, Plaintiffs would only qualify for release on parole. *See* 27 I. & N. Dec. at 516-18. However, parole reviews are not an adequate substitute for an individualized hearing. In contrast to a bond hearing before an IJ, the parole process consists merely of a custody review conducted by low-level Immigration and Customs Enforcement (ICE) detention officers. *See* 8 C.F.R. § 212.5. It includes no hearing before a neutral decision maker, no record of any kind, and no possibility for appeal. *See id.* Instead, ICE officers make parole decisions—that can result in months or years of additional incarceration—by merely checking a box on a form that contains no factual findings, no specific explanation, and no evidence of deliberation. *See, e.g.*, *Abdi v. Duke*, 280 F. Supp. 3d 373, 404 (W.D.N.Y. 2017); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 324-25, 341 (D.D.C. 2018). As the Supreme Court recognized in *Zadvydas*, "the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." 533 U.S. at 692 (internal quotation marks omitted); *see also Morrissey*, 408 U.S. at 486-87 (requiring a neutral decision-maker for parole revocation hearings); *St. John v. McElroy*, 917 F. Supp. 243, 251 (S.D.N.Y. 1996) (due process is not satisfied by parole reviews, but requires an "impartial adjudicator" to review detention since, "[d]ue to political and community pressure, the INS, an executive agency, has every incentive to continue to detain [certain noncitizens]"); *accord Cruz-Taveras v. McElroy*, No. 96 CIV 5068, 1996 WL 455012, at *6-7 (S.D.N.Y. Aug. 13, 1996); *Thomas v. McElroy*, No. 96 Civ 5065, 1996 WL 487953, at *3 (S.D.N.Y. Aug. 27, 1996).

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 11
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1    In addition, parole reviews fail to provide due process in practice. Government data and

2    reports from service providers confirm that, under the Trump administration, the parole process

3    has been largely eviscerated, and ICE uses the parole process to rubberstamp asylum seekers'

4    arbitrary detention. For example, in *Damus v. Nielsen*, government statistics showed that from

5    February to September 2017, three of the defendant ICE Field Offices *denied 100% of parole*

6    *applications*, and the two other defendant Field Offices *denied 92% and 98% of applications*—

7    despite the fact that (1) only a few years ago, those same Field Offices *granted* more than 90% of

8    parole applications, and (2) there has been no change in the types of individuals seeking asylum

9    in the United States. *Damus*, 313 F. Supp. 3d at 339-40. These blanket parole denials contrast

10   starkly with bond hearings, where IJs routinely release asylum seekers from detention upon

11   finding that they pose no flight risk or danger to the community. *See* Hausman Decl. ¶ 9.

12       This data has been confirmed by the courts. For example, the court in *Damus* cited

13   evidence of ICE officers informing immigration attorneys that "there is no more parole" and that

14   the agency is "not granting parole." *Damus*, 313 F. Supp. 3d at 340 (internal quotation marks and

15   citations omitted). Indeed, the government's own submissions revealed that ICE was providing

16   sham parole reviews. *See, e.g.*, *id*. at 341 (citing example of plaintiff denied parole due solely to

17   her status as a "recent entrant" to the U.S., despite the fact this characteristic applies

18   categorically to asylum seekers who pass a credible fear screening); *id*. (citing plaintiffs who

19   "received letters advising them of the right to apply for parole only one day prior to receiving

20   nearly identical boilerplate letters informing them of parole denial"); *id*. (citing asylum seekers

21   who were never provided a parole interview by ICE, as required by ICE's own parole directive);

22   *id*. (finding that ICE's "summary and often boilerplate" parole denials failed to show

23   individualized parole determinations). *See also Abdi*, 280 F. Supp. 3d at 404-05 (citing evidence

24   that asylum seekers were "*never* provided with any paperwork explaining how to seek parole"

25   and were "denied multiple requests for parole via perfunctory form denials"); Human Rights

26   First, *Judge and Jailer: Asylum Seekers Denied Parole in Wake of Trump Executive Order* 1, 11-

27

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 12
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

15 (Sept. 2017), https://www.humanrightsfirst.org/sites/default/files/hrf-judge-and-jailer-final-report.pdf (citing arbitrary parole denials).

In sum, parole reviews do not provide the process that Plaintiffs and class members are due. Instead, substantive due process requires that Plaintiffs receive an individualized bond hearing, before a neutral decision-maker, to determine if their detention is justified.

### 2. Procedural Due Process Requires an Individualized Bond Hearing.

For many of the same reasons, procedural due process likewise requires individualized bond hearings before an IJ. In assessing the sufficiency of the government's custody review procedures, this Court must consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Parole reviews do not provide due process under a *Mathews* analysis. First, Plaintiffs have a profound interest in preventing their arbitrary detention. *See Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment . . . lies at the heart of the liberty" protected by the Due Process Clause); *see also Hernandez*, 872 F.3d at 993; Dkt. 110 at 6; *supra* Section I.A.

Second, the parole process creates an unacceptable risk of the erroneous deprivation of Plaintiffs' liberty. As set forth above, the parole process permits low-level ICE officers to authorize months or even years of incarceration by checking a box on a form that contains no factual findings, no specific explanation, and no evidence of deliberation. *See supra* Section I.A.1. Indeed, as several courts have found, ICE is no longer providing individualized reviews of flight risk and danger, but instead using the parole process to rubberstamp arbitrary detention. *See Damus*, 313 F. Supp. 3d at 339-43; *Abdi*, 280 F. Supp. 3d at 403-10; *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 145-57 (D.D.C. 2018). In contrast, bond hearings provide a critical check

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 13
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1 on arbitrary detention. For example, nearly half of the individuals who entered without

2 inspection, applied for asylum or other protection, and sought a bond hearing were found by an

3 IJ to pose no flight risk or danger to the community and granted release on bond. Hausman Decl.

4 ¶ 9; *see also* TRAC Immigration, *Three-fold Difference in Immigration Bond Amounts by Court*

5 *Location*, Tbl. 2 (July 2, 2018), http://trac.syr.edu/immigration/reports/519/ (47.1% of

6 immigration court bond decisions in the first 8 months of FY2018 granted release on bond).

7   Finally, the government lacks any countervailing interest in denying Plaintiffs' bond

8 hearings. The government has no legitimate interest in detaining individuals who pose no flight

9 risk or danger to the community. *See* Dkt. 110 at 15; *Hernandez*, 872 F.3d at 994. Thus,

10 administrative cost is the only possible factor that could weigh against providing bond hearings.

11 *See id*. Yet the government has provided bond hearings to asylum seekers initially placed in

12 expedited removal proceedings pursuant to *Matter of X-K-* for more than a decade, and more

13 generally to noncitizens who have entered the U.S. for nearly the past 50 years. The government

14 cannot seriously argue that providing bond hearings it has provided for years imposes excessive

15 burdens on the agency. Indeed, the government itself has an interest in maintaining bond

16 hearings and ensuring accurate custody determinations. *See Matter of X-K-*, 23 I. & N. Dec. at

17 736 (explaining that "some [noncitizens] may demonstrate to the Immigration Judge a strong

18 likelihood that they will be granted relief from removal and thus have great incentive to appear

19 for further hearings"). This is particularly true given that the government already has determined

20 that Plaintiffs and class members have *bona fide* protection claims, which gives them the right to

21 remain in the United States while their applications for protection are considered in immigration

22 proceedings. *See* H.R. Rep. No. 104-469, pt.1, at 158 (1996) ("If the [noncitizen] meets [the

23 credible fear] threshold, the [noncitizen] is permitted to remain in the United States to receive a full

24 adjudication of the asylum claim . . . .").

25

26

27

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 14
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

### B. *Matter of M-S-* Violates the APA.

Finally, the Attorney General's invalidation, without notice and comment, of the regulations governing bond hearings violates the rulemaking requirements of the APA. The APA expressly requires notice and an opportunity to comment prior to agency decisions to amend or repeal a rule. Section 551(5) defines "rule making" to mean "agency process for formulating, *amending, or repealing* a rule." 5 U.S.C. § 551(5) (emphasis added). The APA requires that notice of proposed rulemaking shall be published in the Federal Register; that there be at least a 30-day period between notice and effective date; and that interested persons be given an opportunity to participate. 5 U.S.C. § 553(b)-(d).

As the BIA explained in *Matter of X-K-*, the existing regulations entitle Plaintiffs to bond hearings. *See* 23 I. & N. Dec. at 731-32, 734-35. Specifically, the regulations give IJs general authority to hold bond hearings for individuals in removal proceedings, at any time prior to the entry of a final order of removal, except for specifically excluded classes of noncitizens.

8 C.F.R. § 1236.1(d) provides that:

> Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act . . . to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in § 1003.19 of this chapter.

*Id*.

8 C.F.R. § 1003.19(h)(2)(i), in turn, excludes specific classes of individuals from the immigration judge's general custody jurisdiction. The regulation provides that:

> an immigration judge may not redetermine conditions of custody imposed by the Service with respect to the following classes of aliens:
>
> (A)   Aliens in exclusion proceedings;
>
> (B)   Arriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act;
>
> (C)   Aliens described in section 237(a)(4) of the Act;
>
> (D)   Aliens in removal proceedings subject to section 236(c)(1) of the Act . . . and

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 15
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

     (E)     Aliens in deportation proceedings subject to section 242(a)(2) of the
            Act (as in effect prior to April 1, 1997 . . . .).

*Id*. Critically, this list of exclusions does *not* include Plaintiffs—namely, persons who entered without inspection and who were initially subject to expedited removal but passed a credible or reasonable fear screening and were placed in removal proceedings.

The regulatory history reinforces the plain meaning of § 1003.19(h)(2)(i). The regulation the agency initially proposed in 1997 *eliminated* IJ jurisdiction over bond hearings for EWIs. *See* 62 Fed. Reg. 444, 483 (Jan. 3, 1997) (providing that that "an immigration judge may not exercise authority" over bond for "inadmissible aliens in removal proceedings," including EWIs). However, the agency *deleted* that language from the final rule, thereby maintaining IJ bond jurisdiction over EWIs. *See* 8 C.F.R. § 1003.19(h)(2)(i).[2]

The Attorney General's contrary reading of the regulations in *Matter of M-S-* lacks merit. The Attorney General cites 8 C.F.R. § 208.30(f)'s statement that "parole" of an individual who establishes a credible fear of persecution "may be considered only in accordance with section 212(d)(5) of the Act and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f). But as the Attorney General himself acknowledges, that regulation is *silent* on whether such an individual is eligible for a bond hearing. *See Matter of M-S-*, 27 I. & N. Dec. at 518. Moreover, the agency had previously recognized that, as "applicants for admission," EWIs were eligible to seek release on either parole *or bond*. *See* Paul W. Virtue, Memorandum on Authority to Parole Applicants For Admission Who Are Not Also Arriving Aliens, Legal Op. No. 98-10 (INS), 1998 WL 1806685, at *2 (Aug. 21, 1998).

The Attorney General also cites a 2004 Federal Register notice that purports to deem EWIs who establish a credible fear ineligible for bond hearings. *Matter of M-S-*, 27 I. & N. Dec. at 518 (citing 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004)). But the notice fails to acknowledge the regulation rendering EWIs eligible for bond hearings, 8 C.F.R. § 1003.19(h)(2)(i), which the BIA subsequently applied in *Matter of X-K-*.

---

[2] *See also* Margaret H. Taylor, *The 1996 Immigration Act: Detention and Related Issued*, 74 No. 5 Interpreter Releases 209, 215 (Feb. 3, 1997) (discussing regulatory history).

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 16
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1    Furthermore, even assuming that the regulations are not compatible with the statute, that

2    does not entitle the agency to effectively rewrite the regulations without complying with the

3    required rulemaking procedures. *Matter of M-S-* effectively modifies the regulations to exclude

4    an additional class of individuals from the IJ's custody jurisdiction—EWIs who are in regular

5    removal proceedings after having been initially placed in expedited removal. But the only legal

6    process to substantively amend a rule is through notice and comment rulemaking. *See Perez v.*

7    *Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) (explaining that the APA "mandates that

8    agencies use the same procedures when they amend or repeal a rule as they used to issue the rule

9    in the first instance").

10    Nor can the government somehow waive its rulemaking obligations by claiming that the

11    regulations were void *ab initio*. As the D.C. Circuit has explained:

12    The . . . argument that notice and comment requirements do not apply to
      "defectively promulgated regulations" is untenable because it would permit
13    an agency to circumvent the requirements of § 553 merely by confessing
      that the regulations were defective in some respect and asserting that
14    modification or repeal without notice and comment was necessary to correct
      the situation.
15

16    *Consumer Energy Council v. Federal Energy Regulatory Comm'n*, 673 F.2d 425, 447 n.79 (D.C.

17    Cir. 1982). *See also Nat'l Treasury Employees Union v. Cornelius*, 617 F. Supp. 365, 371-72

18    (D.D.C. 1985) ("It would significantly erode the usefulness of the APA if agencies were

19    permitted unilaterally to repeal regulations dealing with the substantive rights of individuals

20    under federal statutes, by declaring that the earlier regulations were just a mistake.").

21    Moreover, rulemaking here would serve a useful purpose. In deciding *Jennings*, the

22    Supreme Court expressly declined to consider the due process implications of its ruling. *See* 138

23    S. Ct. at 851 (limiting its holding to statutory questions and remanding to court of appeals to

24    address the constitutional issues). Although the Court held that the detention statute, 8 U.S.C. §

25    1225(b)(1), permits only release on parole under § 1182(d)(5), *Jennings*, 138 S. Ct. at 844, it did

26    not consider what kind of parole process was required under those statutes, especially in light of

27

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 17
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

the serious constitutional problems that are raised by detaining Plaintiffs and class members without bond hearings. *See supra*, Section I.A. A rulemaking process would give the public the opportunity to propose, and the agency the opportunity to consider, alternative ways of implementing the parole authority to potentially ameliorate these constitutional problems. *Cf.* 66 Fed. Reg. 56,967, 56,968 (Nov. 14, 2001) (amending the custody review process for individuals detained after receiving a final order of removal in light of constitutional concerns addressed in *Zadvydas v. Davis*, 533 U.S. 678 (2001)).

For these reasons, *Matter of M-S-* violates the APA.

## II. Plaintiffs and Members of the Bond Hearing Class Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Detention without a bond hearing will cause Plaintiffs and members of the Bond Hearing class irreparable harm for multiple reasons. *See* Dkt. 45 at 20-23; Dkt. 110 at 15-17. First, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez*, 872 F.3d at 994 (internal quotation marks and citation omitted); *see also* Dkt. 110 at 15.

Second, the "unnecessary deprivation of [Plaintiffs'] liberty clearly constitutes irreparable harm." *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1998). As the Supreme Court has explained, "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness . . . . The time spent in jail is simply dead time . . . ." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). *See also Hernandez*, 872 F.3d at 995 (noting the "the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained").

Third, Plaintiffs suffer irreparable harm from the circumstances of detention. "[I]mmigration detainees are treated much like criminals serving time: They are typically housed in shared jail cells with no privacy and limited access to larger spaces or the outdoors." *Rodriguez v. Robbins* (*"Rodriguez III"*), 804 F.3d 1060, 1073 (9th Cir. 2015), *rev'd on other*

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 18
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

*grounds by Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). *See also Hernandez*, 872 F.3d at 995 (noting the "subpar medical and psychiatric care in ICE detention facilities"); Dkt. 110 at 15 (noting irreparable harms of "physical and psychological trauma (e.g., malnutrition, poor medical care, depression[)]"); Dkt. 49 ¶ 3 (documenting "systemic, sub-human conditions in immigration custody"); Dkt. 55 ¶ 5 (client faced irreversible physical harm while detained); Dkt. 51 ¶ 6 (clients denied access to sanitary products and blankets and were detained in locations that used tear gas against noncompliant detainees); Dkt. 54 ¶ 6 (clients vulnerable to "medical crisis" and "horrible food and living conditions").

Fourth, these harms are even more severe for individuals seeking protection from persecution. Detention often re-traumatizes vulnerable individuals who have only recently escaped persecution and may cause mental disorders such as post-traumatic stress disorder ("PTSD"). *See* Dkt. 110 at 16 (citing "panic attacks, depression, and exacerbation of pre-existing trauma" caused by prolonged detention); *see also* Declaration of Allen Keller ¶¶ 11-12. Moreover, detention often causes related physical symptoms, including pain, headaches, and gastrointestinal issues, for which detention centers are poorly equipped to offer medical care. *Id.* ¶¶ 13-14. *See also* Dkt 50 ¶ 13 (client suffered "panic attacks, loss of consciousness, loss of appetite, and severe nightmares"); Dkt. 52 ¶ 18 (detainees experience anxiety and psychological and emotional harm); Dkt. 53 ¶ 7 (clients suffer depression and hopelessness); Dkt. 60 ¶ 7 (detainees who previously were tortured, wrongfully imprisoned, or sexually assaulted experience exacerbation of prior trauma); Dkt. 58 ¶ 6 (detention exacerbates PTSD for many individuals). Indeed, in some cases, detention may coerce Plaintiffs into abandoning meritorious claims to protection. *See* Dkt. 110 at 16-17; *see also* Dkt. 46 ¶¶ 4, 6 (noting large number of detainees who abandon their claims after passing credible fear interview due to detention); Dkt. 58 ¶ 6 (many "give up hope and abandon their asylum cases" due to "hardship of prolonged detention"); *accord* Dkt. 59 ¶ 5.

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 19
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1    Fifth, Plaintiffs and class members indisputably suffer irreparable harm by being unable

2    to adequately prepare their immigration cases. *See* Dkt. 46 ¶ 4 (detention prevents individuals

3    from contacting witnesses and obtaining support documents); ¶ 6 (detainees have no access to

4    "phone numbers, names and other vital information required for the proper identification and

5    preparation of witnesses and of persons who could help obtain evidence from the home

6    country"); Dkt. 49 ¶¶ 14, 17-19 (individuals face challenge in meeting burden of proof for

7    asylum applications because law libraries in detention center rarely contain relevant and updated

8    materials).

9    In particular, detention severely limits an individual's ability to litigate his removal case

10   by making it "more difficult to retain or meet with legal counsel." *Rodriguez III*, 804 F.3d at

11   1073. The overwhelming majority of immigration detainees—nearly 80 percent—are

12   unrepresented. 79 Fed. Reg. 55,659, 55,660 (Sept. 17, 2014). Yet having a lawyer in removal

13   proceedings is critical to defending one's right to remain in the United States. A nationwide

14   study of government data found that, between 2007 and 2012, *39 percent* of immigrants who

15   were released from detention and were represented by attorneys won their removal cases,

16   compared to *two percent* of detained immigrants who were pro se. Ingrid V. Eagly and Steven

17   Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 50

18   (2015).

19   Not surprisingly, then, release from detention had a decisive impact on individuals'

20   immigration cases. Between January 1, 2010 and February 1, 2019, the grant rate for such

21   individuals who were released from detention and who applied for asylum, withholding, or CAT

22   was 30% as compared to a less than 6% grant rate for those who were detained throughout their

23   proceedings. That is, individuals released from detention were *five times more likely* to prevail on

24   their claims. *See* Hausman Decl. ¶¶ 7, 10.

25   The challenges experienced by the named Plaintiffs bring these irreparable harms into

26   sharp focus. Detained for over two months, Plaintiff Orantes suffered significant emotional

27

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 20
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

distress and considered giving up her case due to prolonged confinement and separation from her son. Dkt. 57 ¶¶ 13, 17. She also faced unsanitary detention conditions and dehumanizing treatment from detention officers. *Id.* ¶¶ 4, 10. Similarly, Plaintiff Vasquez endured unsanitary conditions in detention and had to be hospitalized for four days due to illness from the food served in detention. Dkt. 61 ¶ 3. He suffered from feelings of depression and isolation, particularly from being unable to maintain contact with his wife. *Id.* ¶¶ 5, 12. After passing his credible fear interview and waiting to receive a bond hearing, Plaintiff Vasquez faced difficulty in communicating with those outside of detention to gather evidence in support of his case. *Id.* ¶ 9. These experiences underscore the irreparable harms that Plaintiffs will face if they are re-detained without a bond hearing pending their removal proceedings.

**III.    The Balance of Hardships Tip Sharply in Plaintiffs' Favor, and a Preliminary Injunction is in the Public Interest.**

The balance of equities and the public interest weigh heavily in favor of a preliminary injunction halting the implementation of *Matter of M-S-*. A preliminary injunction would "serve[] the interests of the general public by ensuring that the government's initial bond determination procedures comply with the Constitution." *Hernandez*, 872 F.3d at 996. Moreover, "any additional administrative costs to the government are far outweighed by the considerable harm to Plaintiffs' constitutional rights in the absence of the injunction." *Id.* at 995-96. When "[f]aced with . . . a conflict between financial concerns and preventable human suffering, [courts] have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). *Accord* Dkt. 110 at 17-18. The Court should also "consider . . . the indirect hardship" that detention causes "friends and family members." *Hernandez*, 872 F.3d at 996 (internal quotation marks and citation omitted); *see also id.* (noting the "financial and psychological strain" that unnecessary detention imposes on the families of detainees); Dkt. 110 at 18. Any additional administrative burden from a preliminary injunction are limited here: the government has provided bond hearings to Plaintiffs for a half-century, continued to do so for more than a year after the Supreme Court's decision in *Jennings*,

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 21
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

and the Attorney General ordered that they continue to do so for at least 90 days after he issued

his decision in *Matter of M-S-*. 27 I. &. N. Dec. at 519 n.8.

Moreover, the government has ample tools at its disposal to ensure that individuals

appear for removal proceedings. *See Hernandez*, 872 F.3d at 991 (noting that "demonstrated

effectiveness of [conditions of supervision] at meeting the government's interest in ensuring

future appearances"). Indeed, as the Ninth Circuit has found, ICE's "Intensive Supervision

Appearance Program—which relies on various alternative release conditions—resulted in a 99%

attendance rate at all [immigration court] hearings and a 95% attendance rate at final hearings."

*Id.*[3] *See also* Declaration of Michelle Brane ¶¶ 6-27. The social science literature confirms that

individuals seeking protection from persecution are highly motivated to appear for court

proceedings and generally can be supervised safely in the community. *Id.*

Finally, "the general public's interest in the efficient allocation of the government's fiscal

resources favors granting the injunction." *Hernandez*, 872 F.3d at 996. As the Ninth Circuit has

explained:

> The costs to the public of immigration detention are "staggering": $158 each
> day per detainee, amounting to a total daily cost of $6.5 million. Supervised
> release programs cost much less by comparison: between 17 cents and 17
> dollars each day per person . . . [R]educed detention costs can free up
> resources to more effectively process claims in Immigration Court.

*Id. Accord* Dkt. 110 at 18. In sum, the balance of hardships and public interest strongly favor a

modification of the preliminary injunction order.

## CONCLUSION

The Court should grant Plaintiffs' motion to modify the preliminary injunction order to

enjoin *Matter of M-S-* and preserve individualized bond hearings for the Bond Hearing Class.

RESPECTFULLY SUBMITTED this 28th day of May 2019.

---

[3] *Accord* U.S. Gov't Accountability Off., GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness 30 (2014), https://www.gao.gov/assets/670/666911.pdf.

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 22
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

_s/ Matt Adams_
Matt Adams, WSBA No. 28287
Email: matt@nwirp.org

_s/ Leila Kang_
Leila Kang, WSBA No. 48048
Email: leila@nwirp.org

_s/ Aaron Korthuis_
Aaron Korthuis, WSBA No. 53974
Email: aaron@nwirp.org

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

_s/ Trina Realmuto_
Trina Realmuto*
Email: trealmuto@immcouncil.org

_s/ Kristin Macleod-Ball_
Kristin Macleod-Ball*
Email: kmacleod-ball@immcouncil.org

AMERICAN IMMIGRATION COUNCIL
1318 Beacon Street, Suite 18
Brookline, MA 02446
Telephone: (857) 305-3600

_s/ Judy Rabinovitz_
Judy Rabinovitz*
Email: jrabinovitz@aclu.org

_s/ Michael Tan_
Michael Tan*
Email: mtan@aclu.org

_s/ Anand Balakrishnan_
Anand Balakrishnan*
Email: abalakrishnan@aclu.org

ACLU IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th floor
New York, NY 10004
Telephone: (212) 549-2618

_s/ Emily Chiang_
Emily Chiang, WSBA No. 50517
Email: echiang@aclu-wa.org

ACLU OF WASHINGTON FOUNDATION
901 5th Ave, Suite 630
Seattle, WA 98164
Telephone: 206-624-2184

*Admitted _pro hac vice_

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 23
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Lauren C. Bingham | lauren.c.bingham@usdoj.gov<br>ecf.oil-dcs@usdoj.gov<br>crystal.greene@usdoj.gov |
| Joseph A. Darrow | joseph.a.darrow@usdoj.gov |
| Archith Ramkumar | archith.ramkumar@usdoj.gov<br>ar4kc@virginia.edu |
| Sarah S. Wilson | Sarah.Wilson2@usdoj.gov<br>Daniel.C.Meyer@usdoj.gov |

And I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: None.

Dated: May 28, 2019.

           *s/ Leila Kang*
           Leila Kang
           Northwest Immigrant Rights Project
           615 Second Avenue, Suite 400
           Seattle, WA 98104
           (206) 957-8608
           leila@nwirp.org

PLS.' MOT. FOR MODIF. OF EXISTING
PRELIM. INJ. – 24
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Honorable Marsha J. Pechman

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  YOLANY PADILLA, *et al.*,

Plaintiffs-Petitioners,

10      v.

11  U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

12

13            Defendants-Respondents.

14

Case No. 2:18-cv-00928-MJP

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR MODIFICATION OF THE EXISTING PRELIMINARY INJUNCTION**

15        This matter having come before the Court on Plaintiffs' Motion for Modification of the

16  Existing Preliminary Injunction, and having considered the pleadings submitted in support and

17  response to the motion, as well as oral argument of the Parties, this Court finds that Plaintiffs

18  have demonstrated the need to modify the existing preliminary injunction, including that they

19  have satisfied the requirements for preliminary injunctive relief enjoining the Attorney General's

20  decision in *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019). Therefore, Plaintiffs' motion is

21  GRANTED.

22        Accordingly, with regard to the Bond Hearing Class, it is HEREBY ORDERED that

23  *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019) is enjoined and Defendant Executive Office for

24  Immigration Review must:

25      1.  Continue to conduct bond hearings.

26
27

Furthermore, beginning on July 2, 2019, Defendants must implement the Court's April 5, 2019 preliminary injunction order, Dkt. 110. Specifically, Defendant Executive Office for Immigration Review must:

2. Conduct bond hearings within seven days of a bond hearing request by a class member, and release any class member whose detention time exceeds that limit;

3. Place the burden of proof on Defendant Department of Homeland Security in those bond hearings to demonstrate why the class member should not be released on bond, parole, or other conditions;

4. Record the bond hearing and produce the recording or verbatim transcript of the hearing upon appeal; and

5. Produce a written decision with particularized determinations of individualized findings at the conclusion of the bond hearing.

It is so ORDERED.

DATED this _____ day of _____, 2019.

_____
MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

Presented this 28th day of May, 2019, by:

s/ Matt Adams
Matt Adams, WSBA No. 28287
615 Second Avenue, Suite 400
Seattle, WA  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025
matt@nwirp.org

[PROPOSED] ORDER GRANTING PLS.' MOT. FOR
MODIF. OF EXISTING PRELIM. INJ. – 2
Case No. 2:18 cv 00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611