# DECLARATION OF MICHELLE BRANÉ

I, Michelle Brané, declare the following:

## I.     Qualifications

1. I am the Director of the Migrant Rights and Justice (MRJ) Program of the Women's Refugee Commission (WRC), where I have been employed since June 2006. The WRC is a non-profit organization that advocates for the rights of women, children, and youth fleeing violence and persecution. The MRJ program focuses on the right to seek asylum in the United States.

2. From 2002 until 2006 I served as the Director of Access to Justice and Coordinator of the Program for Detained Torture Survivors at Lutheran Immigration and Refugee Service (LIRS). Prior to that I served as a Human Rights Officer for the Organization for Security and Cooperation in Europe (OSCE), seconded by the U.S. Department of State from 1998–2001, and as an Attorney Advisor at the U.S. Department of Justice, Board of Immigration Appeals from 1995–1998.

3. I was a member of the Department of Homeland Security Advisory Committee on Family Residential Centers, and on the Community Reference Committee for the ICE Family Case Management Program for the length that the program was in operation. I have testified before Congress, at United Nations High Commission for Human Rights, and the United Nations High Commission for Refugees as well as various other governmental and international bodies. I have been on the Governance Board of the International Detention Coalition since 2006, served on the Board of the Detention Watch Network from 2006–2013.

4. I am the principal author, co-author and/or supervisor and editor of numerous reports on detention, asylum, and alternatives to detention, including: *Locking Up Family Values: The Detention of Immigrant Families* (WRC with LIRS, 2007), *Halfway Home: Unaccompanied Children in Immigration Custody* (WRC, 2009), *Migrant Women and Children at Risk: In Custody in Arizona* (WRC, 2010); *Politicized Neglect: A Report from Etowah County Detention Center* (WRC, 2012); *How to Protect Refugees and Prevent Abuse at the Border: Blueprint for U.S. Government Policy* (HRF, 2014); *Locking Up Family Values, Again: A Report on the Renewed Practice of Family Immigration Detention* (WRC, with LIRS, 2014); *Betraying Family Values: How Immigration Policy at the United States Border is Separating Families* (WRC, with LIRS and Kids in

Need of Defense, 2017); and *Prison for Survivors: the Detention of Women Seeking Asylum in the U.S.* (WRC, 2017).

5. As part of my research experience on immigration detention and alternatives to detention in the United States, I have toured and interviewed detained men, women, and families at over 20 Immigration and Customs Enforcement (ICE) facilities; toured various U.S. Customs and Border Protection facilities; done extensive research and made recommendation in the design and implementation of various alternatives programs; and visited alternatives to detention programs in both the United States and internationally.

## II. Alternatives to Detention Are An Available and Effective Mechanism to Ensure Compliance with Immigration Court Proceedings

6. I submit this declaration to document that immigration detention is not necessary to ensure the compliance of immigrants with immigration procedures. The evidence shows that alternative to detention are available, cost-efficient and effective mechanisms for ensuring compliance of all immigrants, but in particular of asylum seekers.

7. Immigration detention has been proven to traumatize vulnerable populations, jeopardize the basic health and safety of those detained, and undermine meaningful access to counsel in isolated, remote facilities.

8. Immigrants in detention suffer from high levels of depression and trauma. Many immigration detainees have suffered trauma prior to their arrival – either as part of the source of their claim, their journey to the U.S., or their apprehension experience and this trauma can be exacerbated by the isolation and criminalization of detention.[1]

9. Both detention itself, and the particular conditions of immigration detention currently, cause numerous obstacles to pursuing asylum or other immigration relief. Detainees are significantly less likely to have legal representation that those pursuing their immigration case from the community. Attorneys are often not available or have to travel long distances to remote facilities. Detention centers often lack confidential meeting space and participation

---

[1] Allen S Keller, Barry Rosenfeld, Chau Trinh-Shevrin, Chris Meserve, Emily Sachs, Jonathan A Leviss, Elizabeth Singer, Hawthorn Smith, John Wilkenson, Glen Kim, Kathleen Allden, Douglas Ford; Mental Health of Detained Asylum Seekers, Lancet 2003, 1721-23, https://www.scribd.com/document/358865292/Mental-Health-of-Detained-Asylum-Seekers.

in court may occur through video or telephonic conferencing that impedes communication.

10. In addition to the harm to the detainee, immigration detention is expensive and difficult to manage in comparison with alternatives to detention.[2] Alternatives to detention ("ATD") have long been a proven working model for ensuring that those in immigration proceedings appear for hearings and deportation. Study after study has shown that alternatives work.[3]

11. A broad spectrum of alternatives is already in place and have been used by ICE (and previously INS) for over 20 years, to ensure appearance of non-detained immigrants in removal proceedings. These alternatives include the following:

12. Release on recognizance.

13. Bond, and orders of supervision, can serve to mitigate concerns of a flight risk if such a risk has been identified. Other conditions of release can and often include telephonic check-ins, or in-person reporting.

14. Electronic monitoring provides an additional level of supervision in cases where bond or check-ins are not enough. These can range from more frequent telephonic controls, to GPS monitors and ankle bracelets. They can allow for free movement, or a restricted geographic range such as a city, neighbourhood, or even house arrest.

15. In addition to combinations of the above, ICE implements the Intensive Supervised Appearance Program, ISAP-II which is run by the private for-profit prison company Geo-Group. The ISAP program has a full-service component and also an electronic monitoring only program. ISAP uses electronic ankle monitors, installation of biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants.

---

[2] Dora Schriro, Immigration Detention Overview and Recommendations, October 6, 2009, https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

[3] In 2009, a bipartisan Independent Task Force on U.S. Immigration Policy sponsored by the Council on Foreign Relations called for an expansion of the use of alternatives to immigration detention as one of its recommendations to ensure that all immigrants have the "right to fair consideration under the law and humane treatment." Council on Foreign Relations, Independent Task Force Report No. 63: U.S. Immigration Policy (2009), https://www.cfr.org/sites/default/files/pdf/2009/08/Immigration_TFR63.pdf.

16. ATDs cost far less than detention, even if one is enrolled in ATD longer than in detention. The average cost of alternatives in the United States varies from 17¢ to $44 a day depending on the level of restriction or services provided. The Department of Homeland Security (DHS) estimated in its Congressional Budget Justification for fiscal year (FY) 2018 that it costs the taxpayers $133.99 per day to hold an adult immigrant in detention and $319.37 for an individual in family detention.[4] In FY 2018, DHS estimated that the average cost per ATD participant would be $4.50 per day.[5] A 2014 Government Accountability Office (GAO) report found that the daily rate of ATD was less than 7% of that of detention.[6] Although participants may be enrolled on ATD for a longer period of time due to court delays when they are not detained, GAO found that an individual would have had to be on ATD for 1,229 days before time on ATD and time in detention cost the same amount.[7]

17. ATDs are extremely effective at ensuring compliance. ICE's current ATD program and several community supported pilot programs have shown high rates of compliance with immigration check-ins, hearings and - if ordered - removal. Over 95% of those on "full-service" ATDs (which include case management) are found to appear for their final hearings.[8] Data from Contract Year 2013 from Geo-Group.BI, Inc., the private contractor who operates some of the government's ATD programming, showed a 99.6% appearance rate at immigration court hearings for those enrolled in its "Full Service" program and a 79.4% compliance rates with removal orders for the same population.[9]

---

[4] DHS Immigration and Customs Enforcement Congressional Justification for FY 2018 (ICE Budget Justification) at page 128, https://www.dhs.gov/sites/default/files/publications/CFO/17_0524_U.S._Immigration_and_Customs_Enforcement.pdf.

[5] ICE Budget Justification at 180.

[6] United States Government Accountability Office. Alternatives to Detention, (Nov. 2014), http://www.gao.gov/assets/670/666911.pdf.

[7] American Immigration Lawyers Association, Lutheran Immigration and Refugee Service, National Immigrant Justice Center, Women's Refugee Commission, *The Real Alternatives to Detention*, available at: http://lirs.org/wp-content/uploads/2017/06/The-Real-Alternatives-to-Detention-FINAL-06.27.17.pdf

[8] United States Government Accountability Office. Alternatives to Detention, (Nov. 2014), http://www.gao.gov/assets/670/666911.pdf.

[9] American Civil Liberties Union. Alternatives to Immigration Detention: Less Costly and More Humane than Federal Lock Up at FN 9, https://www.aclu.org/other/aclu-fact-sheet-alternatives-immigration-detention-atd.

18. DHS's own Congressional Budget Justification released in May 2017 notes that, "[h]istorically, ICE has seen strong alien cooperation with ATD requirements during the adjudication of immigration proceedings."[10]

19. Asylum seekers and those with credible legal claims in particular have strong incentives to appear in immigration court and comply with requirements. Empirical research has found that asylum seekers fleeing persecution arrive predisposed to comply with legal processes and trust the system to provide them a fair hearing, even if they might lose.[11]

20. For example, a 2000 study, commissioned by the U.S. government and conducted by the Vera Institute of Justice, reported an 83 percent rate of compliance with court proceedings among non-detained asylum seekers who were found to have a credible fear in the expedited removal process.[12] The study also showed a compliance rate of 84 percent among asylum seekers who were under minimal supervision, and 78 percent among those simply released without supervision. The Vera Institute concluded that "[a]sylum seekers do not need to be detained to appear…. They also do not seem to need intensive supervision."[13]

21. Canada's Toronto Bail Program, which used more restrictive supervision than the Vera study, reported a "lost client" ratio among refugee claimants of 8.42 percent from 2002 to 2003.[14]

22. ICE has used several additional community based models that were either pilots or discontinued, despite their effectiveness:

---

[10] ICE Budget Justification at 179.

[11] Cathryn Costello and Esra Kaytaz, Building Empirical Evidence into Alternatives to Detention. Perceptions of Asylum-Seekers and Refugees in Toronto and Geneva, Geneva: UNHCR, 2013 [hereinafter "Costello and Kaytaz 2013"] http://www.refworld.org/pdfid/51a6fec84.pdf, p.15.

[12] Vera Institute of Justice, "Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program," New York: Vera Institute of Justice, 2000 [hereinafter, "Vera 2000"], http://www. vera.org/sites/default/files/resources/downloads/INS_finalreport. pdf, p. 10, 27. Vera's study examined 83 asylum seekers, detained but released into supervision, compared to 214 asylum seekers detained and simply released. Ibid., p. 27. Vera's lower-supervision program was voluntary, and without mandatory reporting requirements. That program mainly involved orientation, information about compliance and noncompliance, and referrals to services upon request. Ibid., p. 17-18.

[13] Id., p. 3

[14] Ophelia Field, with Alice Edwards, Alternatives to Detention of Asylum Seekers and Refugees, Geneva: UNHCR, 2006, http://www. refworld.org/docid/4472e8b84.html, p. 88, 95.

23. In 1999 the legacy Immigration and Naturalization Service (INS) partnered with Lutheran Immigration and Refugee Service to assist 25 Chinese asylum seekers released from detention. The asylum seekers were released into open shelters around the country, where they received housing, food, medical care, and case management. Participants had a 96% appearance rate to their immigration hearings.[15]

24. The Family Case Management Program (FCMP) was operated by Geo-Care, and provided a case management release program for families as an alternative to family detention. It reported a 99% appearance rate, including through the removal of some families. It was discontinued in 2017.[16]

25. From 1999–2002, INS worked with Catholic Charities of New Orleans to release 39 asylum seekers and 64 "indefinite detainees" who could not be removed from the United States. The court appearance rate for participants was 97%.[17]

26. Between 2012 and 2015 ICE entered into a memorandum of understanding with LIRS and USCCB to screen vulnerable immigrants into a community support initiative with a 97% appearance rate.[18]

27. In sum, ICE has sufficient capacity and managerial experience with alternatives to detention that are far cheaper, provide for compliance with court hearings, and promote fair adjudication of immigration cases. If implemented effectively and with case management that matches flight risk to mitigating factors, as shown through countless current alternatives to detention programs and past pilots, alternatives to detention are an effective, affordable and much more humane method of managing immigration enforcement while ensuring court appearance and compliance with final immigration court orders.

---

[15] Unlocking Liberty: A Way Forward for U.S. Immigration Detention Policy, Lutheran Immigration and Refugee Service, October 27, 2011, www.lirs.org/dignity.

[16] ICE Fact Sheet: Stakeholder Referrals to the ICE/ERO Family Case Management Program, http://www.aila.org/infonet/ice-fact-sheet-family-casemanagement-program?utm_source=aila.org&utm_medium=InfoNet%20Search. See also Bajak, ICE shutters detention alternative.

[17] A More Human System: Community-Based Alternatives to Immigration Detention (Part 2), Sue Weishar, Just South Quarterly.

[18] Lutheran Immigration and Refugee Service, Family Placement Alternatives: Promoting Compliance with Compassion and Stability through Case Management Services (April 2016), http://lirs.org/wp-content/uploads/2016/04/LIRS_FamilyPlacementAlternativesFinalReport.pdf.

Pursuant to 28 U.S.C. § 1746, on this date, May 27, 2019, I state under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge, information, and belief.

*Michelle Brané*

Michelle Brané

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Lauren C. Bingham | lauren.c.bingham@usdoj.gov |
| | ecf.oil-dcs@usdoj.gov |
| | crystal.greene@usdoj.gov |
| | |
| Joseph A. Darrow | joseph.a.darrow@usdoj.gov |
| | |
| Archith Ramkumar | archith.ramkumar@usdoj.gov |
| | ar4kc@virginia.edu |
| | |
| Sarah S. Wilson | Sarah.Wilson2@usdoj.gov |
| | Daniel.C.Meyer@usdoj.gov |

And I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: None.

Dated: May 28, 2019.

*s/ Leila Kang*
Leila Kang
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8608
leila@nwirp.org

CERTIFICATE OF SERVICE
Case No. 2:18-cv-00928-MJP

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611