**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YOLANY PADILLA; IBIS GUZMAN; BLANCA ORANTES; BALTAZAR VASQUEZ, | No. 19-35565 |
| *Plaintiffs-Appellees*, | D.C. No. 2:18-cv-00928-MJP |
| v. | |
| IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; MATTHEW ALBENCE, Acting Director of ICE; CHAD WOLF, Acting Secretary of DHS; MARK MORGAN, Acting Commissioner of CBP; KEN CUCCINELLI, Senior Official Performing the Duties of the Director of USCIS; MARC J. MOORE, Seattle Field Office Director, ICE; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; WILLIAM P. BARR, Attorney General, United States Attorney General; LOWELL CLARK, Warden of the Northwest Detention Center in Tacoma, Washington; CHARLES INGRAM, | OPINION |

Warden of the Federal Detention
Center in SeaTac, Washington;
DAVID SHINN, Warden; JAMES
JANECKA, Warden of the Adelanto
Detention Facility,
                    *Defendants-Appellants*,

            and

U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES, FKA Department
of Social Services; OFFICE OF
REFUGEE RESETTLEMENT; ALEX M.
AZAR II, Secretary of HHS; SCOTT
LLOYD, Director of ORR; MATTHEW
ALBENCE, Acting Deputy Director of
ICE; JOHN P. SANDERS, Acting
Commissioner of CBP; ELIZABETH
GODFREY, Acting Director of Seattle
Field Office, ICE,
                    *Defendants.*

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted October 22, 2019
San Francisco, California

Filed March 27, 2020

Before:  Sidney R. Thomas, Chief Judge, and Michael Daly
Hawkins and Bridget S. Bade, Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge Bade

## SUMMARY[*]

### Immigration

Affirming in part, and vacating and remanding in part, the district court's preliminary injunction ordering the United States to provide bond hearings to a class of noncitizens who were detained and found to have a credible fear of persecution, the panel affirmed the injunction insofar as it concluded that plaintiffs have a due process right to bond hearings, but remanded for further findings and reconsideration with respect to the particular process due to plaintiffs.

The district court certified a nationwide class of all detained asylum seekers who were subject to expedited removal proceedings, were found to have a credible fear of persecution, but were not provided a bond hearing with a record of hearing within seven days of requesting a hearing. Part A of the district court's modified preliminary injunction provided: 1) bond hearings must take place within seven days of a class member's request, or the member must be released; 2) the burden of proof is on the government to show why the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

4                           PADILLA V. ICE

member should not be released; and 3) the government must produce recordings or verbatim transcripts of the hearings, as well as written decisions. Part B concluded that the class is constitutionally entitled to bond hearings. A motions panel of this court previously denied the government's request to stay Part B, but granted the stay as to Part A.

The panel concluded that the district court did not abuse its discretion in concluding that plaintiffs were likely to prevail on their due process claim, explaining that immigration detention violates the Due Process Clause unless a special justification outweighs the constitutionally protected interest in avoiding physical restraint. The panel also concluded that the district court did not abuse its discretion in finding that other processes—seeking parole from detention or filing habeas petitions—were insufficient to satisfy due process. The panel further rejected the government's suggestion that noncitizens lack any rights under the Due Process Clause, observing the general rule that once a person is standing on U.S. soil—regardless of the legality of entry—he or she is entitled to due process.

The panel next concluded that the district court did not abuse its discretion in its irreparable harm analysis, noting substandard physical conditions and medical care in detention, lack of access to attorneys and evidence, separation from family, and re-traumatization. The panel also concluded that the district court did not abuse its discretion in finding that the balance of the equities and public interest favors plaintiffs, explaining that the district court weighed: 1) plaintiffs' deprivation of a fundamental constitutional right and its attendant harms; 2) the fact that it is always in the public interest to prevent constitutional violations; and 3) the

government's interest in the efficient administration of immigration law.

As to Part A of the injunction, the panel concluded that the record was insufficient to support the requirement of hearings within seven days, and that the district court made insufficient findings as to the burdens that Part A may impose on immigration courts. The panel also noted that the number of individuals in expedited removal proceedings may have dramatically increased since the entry of the injunction. Thus, the panel remanded to the district court for further factual development of the preliminary injunction factors as to Part A.

The panel also rejected the government's argument that the district court lacked authority to grant injunction relief under 8 U.S.C. § 1252(f)(1), which provides: "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Examining the relevant precedent, statutory scheme, and legislative history, the panel concluded that here, where the class is composed of individual noncitizens, each of whom is in removal proceedings and facing an immediate violation of their rights, and where the district court has jurisdiction over each individual member of that class, classwide injunctive relief is consistent with congressional intent.

Finally, the panel concluded that the district court did not abuse its discretion in granting the injunction as to the nationwide class. However, the panel directed that, on

remand, the district court must also revisit the nationwide scope.

Dissenting, Judge Bade wrote that 8 U.S.C. § 1252(f)(1) barred injunctive relief in this case, concluding that the majority's opinion does not square with the plain text of § 1252(f)(1), is inconsistent with multiple Supreme Court cases, and needlessly creates a circuit split with the Sixth Circuit. Judge Bade further wrote that, even if the district court had jurisdiction to issue injunctive relief, the preliminary injunction is overbroad and exceeds what the constitution demands. Judge Bade would vacate the preliminary injunction and remand for further proceedings with instructions to dismiss the claims for classwide injunctive relief.

---

## COUNSEL

Lauren C. Bingham (argued), Senior Litigation Counsel; Archith Ramkumar, Trial Attorney; Sarah S. Wilson, Assistant United States Attorney; Erez Reuveni, Assistant Director; William C. Peachey, Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Matt Adams (argued), Leila Kang, and Aaron Korthuis, Northwest Immigrant Rights Project, Seattle, Washington; Trina A. Realmuto and Kristin Macleod-Ball, American Immigration Council, Brookline, Massachusetts; Judy Rabinovitz, Michael Tan, and Anand Balakrishnan, ACLU Immigrants' Rights Project New York, New York; for Plaintiffs-Appellees.

Alan Schoenfeld and Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Rebecca Arriaga Herche, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Jamil Aslam, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; for Amici Curiae Retired Immigration Judges and Board of Immigration Appeals Members.

Erin K. Earl, Julie Wilson-McNerney, and Anna Mouw Thompson, Perkins Coie LLP, Seattle, Washington, for Amici Curiae National Association of Criminal Defense Lawyers, Pretrial Justice Institute, and Center for Legal and Evidence-Based Practices.

Robert W. Ferguson, Attorney General; Andrew R. W. Hughes, Kristin Beneski, and Brendan Selby, Assistant Attorneys General; Office of the Attorney General, Seattle, Washington; Xavier Becerra, Attorney General, Sacramento, California; Phil Weiser, Attorney General, Denver, Colorado; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Karl A. Racine, Attorney General, Washington, D.C.; Clare E. Connors, Attorney General, Honolulu, Hawaii; Kwame Raoul, Attorney General, Chicago, Illinois; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, St. Paul, Minnesota; Aaron D. Ford, Attorney General, Carson City, Nevada; Gurbir S. Grewal, Attorney General; Glenn J. Moramarco, Assistant Attorney General; Marie Soueid, Deputy Attorney General; Office of the Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Santa Fe, New Mexico; Peter F. Neronha, Attorney General, Providence, Rhode Island; Ellen F.

PADILLA V. ICE

Rosenblum, Attorney General, Salem, Oregon; Thomas J.
Donovan Jr., Attorney General, Montpelier, Vermont; Mark
R. Herring, Attorney General, Richmond, Virginia; for Amici
Curiae Washington, California, Colorado, Connecticut,
Delaware, District of Columbia, Hawaii, Illinois, Maryland,
Massachusetts, Michigan, Minnesota, Nevada, New Jersey,
New Mexico, Oregon, Rhode Island, Vermont, and Virginia.

---

## OPINION

THOMAS, Chief Judge:

In this interlocutory appeal, we consider whether the
district court abused its discretion in granting a preliminary
injunction ordering the United States to provide bond
hearings to a class of noncitizens who were detained after
entering the United States and were found by an asylum
officer to have a credible fear of persecution. We conclude
that it did not, and we affirm the order of the district court, in
part, and direct the district court to reconsider some of the
technical aspects of its order.

### I

Plaintiffs are a class of noncitizens detained pursuant to
8 U.S.C. § 1225(b). Section 1225(b) provides for "expedited
removal" of "arriving" noncitizens at ports-of-entry and
inadmissible noncitizens apprehended within the United
States who cannot prove that they have been in the United
States for more than two years. *See* Designating Aliens for
Expedited Removal, 84 Fed. Reg. 35,409-01, 35,413–14

(July 23, 2019);[1] *see also* 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Plaintiffs are in this latter category.

DHS removes noncitizens eligible for expedited removal "without further hearing or review," subject to only one exception. 8 U.S.C. § 1225(b)(1)(A)(i). If the noncitizen indicates an intent to apply for asylum or a fear of persecution, DHS must refer the noncitizen for an interview with an asylum officer. *Id.* § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30. If the asylum officer determines that the noncitizen's fear of persecution is credible, the noncitizen is referred to full removal proceedings, in which the noncitizen may apply for asylum or other forms of relief from removal. *See* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 208.30(f), 1003.42(f). Subject to review, if the asylum officer finds no credible fear of persecution, the noncitizen will be removed. 8 U.S.C. § 1225(b)(1)(B)(iii). A supervisor reviews the asylum officer's credible fear determination, 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7), and a noncitizen may also request de novo review by an immigration judge, 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42.

If the asylum officer determines at the time of the credible fear interview that the noncitizen has a credible fear of

---

[1] At the time the district court certified the class and the injunction was issued below, the government applied expedited removal to inadmissable noncitizens arriving at a port-of-entry and any inadmissible noncitizen apprehended within 100 miles of the border and present in the country for fewer than 14 days. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48879–80 (Aug. 11, 2004). In July 2019, however, the Department of Homeland Security ("DHS") announced that it would expand expedited removal to the statutory limit. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409-01, 35,413–14 (July 23, 2019); *see also* 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

PADILLA V. ICE

persecution, the noncitizen must "be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). If the asylum officer determines that the noncitizen does not have a credible fear of persecution, the statute requires that the noncitizen be detained during the review process "pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV).

Until July 2019, noncitizens like plaintiffs, who were apprehended within the United States and initially subject to expedited removal, but who established credible fear and were transferred to full removal proceedings, were considered to be entitled to bond hearings before an immigration judge, as noncitizens in full removal proceedings usually are. *See Matter of X-K-*, 23 I. & N. Dec. 731, 731 (BIA 2005).

In June 2018, Yolany Padilla, Ibis Guzman, and Blanca Orantes filed a class action complaint challenging the government's alleged policy and practice of separating families seeking asylum and delaying credible fear interviews and bond hearings for detained asylum seekers. Plaintiffs moved for class certification and for a preliminary injunction requiring "timely bond hearings that comport with due process."

The district court first certified a nationwide Bond Hearing Class consisting of:

> All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of

persecution, but are not provided a bond
hearing with a verbatim transcript or
recording of the hearing within seven days of
requesting a bond hearing.

*Padilla v. U.S. Immigr. & Customs Enf't*, No. C18-928 MJP,
2019 WL 1056466, at *1 (W.D. Wash. Mar. 6, 2019).[2]

The district court also granted the motion for a
preliminary injunction, implementing certain procedural
requirements for class members' bond hearings. Specifically,
the preliminary injunction required the Executive Office for
Immigration Review ("EOIR") to conduct bond hearings
within seven days of a class member's request and release
any member whose detention without a hearing exceeds that
limit. *Padilla v. U.S. Immigr. & Customs Enf't*, 379 F. Supp.
3d 1170, 1172 (W.D. Wash. 2019). The injunction also
provided that in those hearings, the burden of proof must be
placed on DHS to demonstrate why the class member should
not be released on bond, parole, or other conditions. *Id.* It
required the government to record the bond hearings and
produce the recordings or verbatim transcripts upon appeal.
Finally, the injunction required the government to produce a
written decision with particularized findings at the conclusion
of each bond hearing. *Id.*

Shortly after this order, the Attorney General ("AG")
overruled *Matter of X-K-*, which established that noncitizens
similarly situated to the members of the bond hearing class

---

[2] The parties later stipulated that "the Bond Hearing Class includes
individuals who otherwise satisfy the requirements for class membership
but were determined to have a credible fear of torture, rather than only
individuals determined to have a credible fear of persecution."

are entitled to bond hearings, as "wrongly decided." *Matter of M-S-*, 27 I. & N. Dec. 509, 510 (A.G. 2019). The AG interpreted 8 U.S.C. § 1225(b)(1)(B)(ii) to require mandatory detention without bond hearings for asylum seekers who were initially subject to expedited removal but later transferred to full removal proceedings after establishing a credible fear. *See Matter of M-S-*, 27 I. & N. Dec. at 515–17. Under *Matter of M-S-*, the only possibility for release available to noncitizens in this category is a discretionary grant of parole by DHS for "urgent humanitarian reasons or significant public benefit" pursuant to 8 U.S.C. § 1182(d)(5). *Id.* at 516–17. The AG delayed implementation of *Matter of M-S-* for 90 days in light of its "significant impact . . . on detention operations." *See id.* at 519 n.8.

Plaintiffs then filed a third amended complaint challenging *Matter of M-S-* on due process grounds and moved to modify the injunction.[3] Defendants moved to vacate the injunction.

The district court modified the previously issued preliminary injunction, dividing it into two parts "to facilitate appellate review." *Padilla v. U.S. Immigr. & Customs Enf't*, 387 F. Supp. 3d 1219, 1222 (W.D. Wash. 2019). In Part A, the court reaffirmed its previously entered injunctive relief. *Id.* In Part B, the court essentially maintained the status quo before *Matter of M-S-*. *Id.* The court:

> [m]odif[ied] the injunction to find that the
> statutory prohibition at [§ 1225(b)(1)(B)(ii)]

---

[3] Plaintiffs also challenged, *inter alia*, the AG's interpretation of 8 U.S.C. § 1225(b)(1)(B)(ii), but did not seek preliminary relief on that basis.

> against releasing on bond persons found to
> have a credible fear and awaiting a
> determination of their asylum application
> violates the U.S. Constitution; the Bond
> Hearing Class is constitutionally entitled to a
> bond hearing before a neutral decisionmaker
> (under the conditions enumerated [in Part A])
> pending resolution of their asylum
> applications.

*Id.*

The government timely appealed both orders, moved for an administrative stay of the injunction, and a stay pending appeal. A motions panel of this court denied the government's request to stay Part B of the injunction, in which the district court held that class members are constitutionally entitled to bond hearings, but granted the request to stay Part A, which imposed procedural requirements on those bond hearings.[4]

## II

We have jurisdiction of this interlocutory appeal under 28 U.S.C. § 1292(a)(1). "We review the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam) (citation omitted). "Our review is limited and

---

[4] Plaintiffs have moved to stay further appellate proceedings pending the Supreme Court's decision in *Thuraissigiam v. DHS*, 917 F.3d 1097, 1100 (9th Cir. 2019), *cert. granted sub nom. DHS v. Thuraissigiam*, No. 19-161, 2019 WL 5281289 (U.S. Oct. 18, 2019). The motion is DENIED.

deferential." *Id.* The district court abuses its discretion when
it makes an error of law. *Id.* "We review the district court's
legal conclusions de novo, [and] the factual findings
underlying its decision for clear error." *K.W. ex rel. D.W. v.
Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015) (citation
omitted). "We do not 'determine the ultimate merits,' but
rather 'determine only whether the district court correctly
distilled the applicable rules of law and exercised permissible
discretion in applying those rules to the facts at hand.'"
*Saravia v. Sessions*, 905 F.3d 1137, 1141–42 (9th Cir. 2018)
(quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir.
2015)).

We also review the scope of the preliminary injunction,
such as its nationwide effect, for abuse of discretion.
*California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018), *cert.
denied sub nom. Little Sisters of the Poor Jeanne Jugan
Residence v. California*, 139 S. Ct. 2716 (2019). "We review
de novo the existence of the district court's jurisdiction."
*Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 790 (9th Cir.
2018).

III

"A plaintiff seeking a preliminary injunction must
establish that he is likely to succeed on the merits, that he is
likely to suffer irreparable harm in the absence of preliminary
relief, that the balance of equities tips in his favor, and that an
injunction is in the public interest." *Winter v. Natural Res.
Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the
government is a party to a case in which a preliminary
injunction is sought, the balance of the equities and public
interest factors merge. *Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073, 1092 (9th Cir. 2014). After consideration of

the arguments presented by both parties and several *amici curiae* and thorough review of the record, we conclude that the district court did not abuse its discretion in issuing Part B of the preliminary injunction and ordering that plaintiffs receive bond hearings; however, because the record is insufficient to support Part A of the preliminary injunction, we remand for further findings and reconsideration with respect to the particular process due to plaintiffs. On remand, the district court must further develop the factual record and revisit the scope of injunctive relief.

## A

### 1

The Due Process Clause of the Fifth Amendment forbids the government from "depriv[ing]" any "person . . . of . . . liberty . . . without due process of law." The Supreme Court has made clear that all persons in the United States—regardless of their citizenship status, means or legality of entry, or length of stay—are entitled to the protections of the Due Process Clause. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (although "certain constitutional protections . . . are unavailable to aliens outside of our geographic borders . . . once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"); *see also United States v. Raya-Vaca*, 771 F.3d 1195, 1202–03 (9th Cir. 2014) (observing that the "Supreme Court has categorically declared that once an individual has entered the United States, he is entitled to the protection of the Due Process Clause" and that "[e]ven an alien who has run some fifty yards into the United States has entered the

country"); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1108 (9th Cir. 2001) ("[O]nce an alien has 'entered' U.S. territory, legally or illegally, he or she has constitutional rights, including Fifth Amendment rights.").

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Under the Due Process Clause, a person must be afforded adequate notice and hearing before being deprived of liberty. *See Mathews*, 424 U.S. at 333. "In the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)).

The Supreme Court has held repeatedly that non-punitive detention violates the Constitution unless it is strictly limited, which typically means that the detention must be accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750–51 (1987) (pretrial detention of arrestees constitutional where statute provides for "extensive safeguards," including a "full-blown adversary hearing," in which the government must "provide[] by clear and

convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community"); *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992) (individual entitled to "constitutionally adequate procedures to establish the grounds for his confinement"); *Kansas v. Hendricks*, 521 U.S. 346, 360, 364 (1997) (civil commitment statute that provided for confinement of "only a narrow class of particularly dangerous individuals, and then only after meeting the strictest procedural standards," did not violate due process).  Indeed, the Supreme Court has required individualized hearings for far lesser interests. *See Zadvydas*, 533 U.S. at 692 (criticizing administrative custody reviews and noting "[t]he Constitution demands greater procedural protection even for property"); *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970).

Immigration detention, like all non-punitive detention, violates the Due Process Clause unless "a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. at 356). Although "[t]he government has legitimate interests in protecting the public and in ensuring that non-citizens in removal proceedings appear for hearings, any detention incidental to removal must 'bear[ ] [a] reasonable relation to [its] purpose.'" *Hernandez*, 872 F.3d at 990 (quoting *Zadvydas*, 533 U.S. at 690).

"[G]iven the substantial liberty interests at stake," *Singh*, 638 F.3d at 1200, courts have repeatedly affirmed the importance of providing detained noncitizens individualized hearings before neutral decisionmakers. *See Hernandez*, 872 F.3d at 990 (requiring "adequate procedural protections to ensure that the government's asserted justification for

physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint" (quoting *Singh*, 638 F.3d at 1203)); *Casas-Castrillon v. DHS*, 535 F.3d 942, 950 (9th Cir. 2008) (individuals subjected to prolonged detention pending judicial review of their removal orders are entitled to a bond hearing and an "individualized determination as to the necessity of [their] detention"); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 862, 869 (2018) (Breyer, J., dissenting) (reviewing Supreme Court caselaw, which "almost always has suggested" that bail proceedings for noncitizens are necessary and that "[t]he Due Process Clause foresees bail eligibility as part of 'due process'"); *Salerno*, 481 U.S. at 746 ("When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner.").

Thus, we conclude that the district court did not abuse its discretion in applying *Mathews* and concluding that the plaintiffs were likely to succeed on their claim that they are constitutionally entitled to individualized bond hearings before a neutral decisionmaker.

2

The Supreme Court's decisions in *Zadvydas* and *Demore v. Kim*, 538 U.S. 510 (2003), are not to the contrary. In *Zadvydas*, the two petitioners were in a unique situation: they had been adjudicated removable and were being detained ostensibly to enable their deportation; however, their detention lasted longer than the usual 90-day removal period because no country would accept them. *Zadvydas*, 533 U.S. at 683–87. The Court avoided the constitutional question presented by potentially indefinite detention by construing the

statute, under which detention was mandatory for the 90-day removal period and then discretionary, as limiting detention to a period "reasonably necessary" to effectuate removal. *See id.* at 689. In other words, the Court construed the statute in such a way as to ensure that detention pursuant to it was reasonably limited to its narrow purpose. *See id.*

In *Demore*, the Supreme Court held constitutional the detention of a noncitizen, who had conceded that he was deportable, pursuant to a statute that imposed detention without bond on a subset of noncitizens deportable for having committed enumerated crimes. *See* 538 U.S. at 526–28, 531; *see also* 8 U.S.C. § 1226(c). The Court held that this "narrow" detention policy "during the limited period" necessary to arrange for removal was reasonably related to the government's purpose of effectuating removal and protecting public safety for reasons that do not apply here. *Demore*, 538 U.S. at 526–28; *see also Jennings*, 138 S. Ct. at 869 (Breyer, J., dissenting) (describing *Demore* as "a deviation from the history and tradition of bail and alien detention"). In particular, the Court in *Demore* placed great weight on congressional findings that the particular individuals subject to this detention policy presented a heightened risk of flight and danger to the community. *Demore*, 538 U.S. at 518–20. The Court also emphasized that the periods of detention at issue were typically very short—an average of 47 days and a median of 30 days in approximately 85 percent of cases, and an average of four months and a slightly shorter median time in the remaining 15 percent of cases. *See id.* at 529–30.[5] Further, the Court observed, these

---

[5] We acknowledge, however, that the government recently informed the Supreme Court that, with respect to duration of detention, "the

PADILLA V. ICE

statistics did not include the "many" cases where a noncitizen was never subject to mandatory detention under the statute because his or her removal proceedings were completed while he or she served time for the underlying conviction. *Id.* at 529.

Here, in contrast, the government presented no evidence that Congress considered plaintiffs to present a particular risk of flight or danger—indeed, individuals in the same position as class members have been receiving bond hearings under *Matter of X-K-* for years as well as for many years before *Matter of X-K-* was decided. *See* 23 I. & N. Dec. at 731. Moreover, every plaintiff here will necessarily be subject to mandatory detention, and the duration of that detention is not similarly "limited." *See Demore*, 538 U.S. at 531. Indeed, the record here suggests that, based on statistics from the years 2010 through early 2019, plaintiffs may expect to be detained for anywhere from six months to over-a-year while their applications for asylum or protection are fully adjudicated. This is far longer than the periods at issue in *Demore* or *Zadvydas*.

3

The government argues that such prolonged detention without a bond hearing is nonetheless constitutional because the government may release certain noncitizens on parole pursuant to 8 U.S.C. § 1182(d)(5)(A). *See Matter of M-S-*, 27 I. & N. Dec. at 519. By statute, however, DHS may parole noncitizens "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C.

---

statistics it gave to the Court in *Demore* were wrong." *Jennings*, 138 S. Ct. at 869 (Breyer, J., dissenting).

§ 1182(d)(5)(A); 8 C.F.R. § 212.5 (parole is "generally []
justified only on a case-by-case basis for 'urgent
humanitarian reasons' or 'significant public benefit,'
provided the aliens present neither a security risk nor a risk of
absconding").  Moreover, parole decisions are solely in the
discretion of the Secretary of DHS and are not judicially
reviewable, 8 U.S.C. § 1252(a)(2)(B)(ii),[6] although
individuals may seek a reconsideration based on changed
circumstances, 8 C.F.R. § 212.5.  The "term of parole expires
'when the purposes of such parole . . . have been served.'"
*Matter of M-S-*, 27 I. & N. Dec. at 516 (noting limited
circumstances under which parole may be granted by statute
(quoting 8 U.S.C. § 1182(d)(5)(A))).  By its terms, therefore,
the parole process does not test the necessity of detention; it
contains no mechanisms for ensuring that a noncitizen will be
released from detention if his or her detention does not
"bear[] [a] reasonable relation," *Zadvydas*, 533 U.S. at 690,
to the government's "legitimate interests in protecting the
public [or] in ensuring that non-citizens in removal
proceedings appear for hearings," *Hernandez*, 872 F.3d at
990.

The government urges us to consider, in the first instance,
interim parole guidance issued in the wake of the preliminary
injunction; however, this guidance is consistent with the
statute and regulations and provides no additional procedural
protections.  To be considered for parole under the interim
guidance, a noncitizen must first "satisfy" an officer that he
or she is not a security or flight risk, at which point the officer
may order release on parole for "urgent humanitarian

---

[6] These sections refer to the AG, but those functions have been
transferred to the Secretary of DHS.  *See* 6 U.S.C. §§ 251, 552(d); *Clark
v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

reasons" or if detention is not in the public interest.
Detention "may not be in the public interest . . . where, in
light of available detention resources, detention of the subject
alien would limit the ability of ICE to detain another alien
whose release may pose a greater risk of flight or danger to
the community." Under this guidance, ICE officers make
parole determinations by checking one of five boxes on a
form that requires no factual findings, no specific
explanation, and no evidence of deliberation. Indeed, one of
the checkboxes corresponds to five possible reasons for
denying parole, without space to indicate which applies in a
particular case.

In short, parole review is nothing like the "full-blown
adversary hearing" that the Supreme Court has found
adequate to justify civil confinement, *see, e.g.*, *Salerno*,
481 U.S. at 750–51, and it is "not sufficient to overcome the
constitutional concerns raised by prolonged mandatory
detention," *Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th
Cir. 2013); *see also Zadvydas*, 533 U.S. at 692 (suggesting
that "the Constitution may well preclude granting an
administrative body the unreviewable authority to make
determinations implicating fundamental rights" (citation and
quotation marks omitted)); *St. John v. McElroy*, 917 F. Supp.
243, 251 (S.D.N.Y. 1996) (due process not satisfied by parole
review; instead, it requires an "impartial adjudicator" to
review detention since, "[d]ue to political and community
pressure, the INS . . . has every incentive to continue to
detain"). The district court thus did not abuse its discretion
in concluding that the parole process is inadequate to ensure
that class members are only detained where a valid
governmental purpose outweighs their fundamental liberty
interest.

4

The government also insists that plaintiffs' detention without bond does not present due process concerns because each individual alien can file a habeas petition to challenge the legality of his or her detention. In essence, the government argues for transferring the work of bond hearings in the first instance from the immigration courts to the district courts. Judicial economy would not be well-served by such a system.

Moreover, the obligation to provide due process exists regardless of whether a detainee files a habeas petition. *See Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199, 1217 n.8 (11th Cir. 2016) ("The constitutional principles at play here, of course, apply to the government's conduct—detaining criminal aliens—whether a § 2241 petition is filed or only potentially forthcoming."), *vacated as moot*, 890 F.3d 952 (11th Cir. 2018). Plaintiffs should not be required to endure further delays while they contest the constitutionality of their detention.

The district court also properly reviewed the evidence before it and underscored the barriers that may prevent many detained noncitizens in the plaintiff class from successfully filing and litigating habeas petitions. The district court had before it declarations testifying to the fact that noncitizens such as plaintiffs are frequently pro se, have limited English skills, and lack familiarity with the legal system, and that immigration detention centers have inadequate law libraries.

Thus, on this record, we cannot say that the district court abused its discretion by determining the theoretical

availability of the habeas process did not alone satisfy due process.

### 5

The government also suggests that non-citizens lack any rights under the Due Process Clause. As we have discussed, this position is precluded by *Zadvydas* and its progeny. The government relies on inapposite cases that address the peculiar constitutional status of noncitizens apprehended at a port-of-entry, but permitted to temporarily enter the United States under specific conditions. *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei* ("*Mezei*"), 345 U.S. 206, 208–09, 213–15 (1953) (noncitizen excluded while still aboard his ship, but then detained at Ellis Island pending final exclusion proceedings gained no additional procedural rights with respect to removal by virtue of his "temporary transfer from ship to shore" pursuant to a statute that "meticulously specified that such shelter ashore 'shall not be considered a landing'"); *Leng May Ma v. Barber*, 357 U.S. 185 (1958) (noncitizen paroled into the United States while waiting for a determination of her admissibility was not "within the United States" "by virtue of her physical presence as a parolee"); *Kaplan v. Tod*, 267 U.S. 228 (1925) (noncitizen excluded at Ellis Island but detained instead of being deported immediately due to suspension of deportations during World War I "was to be regarded as stopped at the boundary line").

Indeed, these cases, by carving out exceptions not applicable here, confirm the general rule that once a person is standing on U.S. soil—regardless of the legality of his or her entry—he or she is entitled to due process. *See, e.g.*, *Mezei*, 345 U.S. at 212 ("[A]liens who have once passed

through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); *Leng May Ma*, 357 U.S. at 187 (explaining that "immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality," and recognizing, "[i]n the latter instance . . . additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry'" (quoting *Mezei*, 345 U.S. at 212)); *Kwai Fun Wong v. United States*, 373 F.3d 952, 973 (9th Cir. 2004) (explaining that "the entry fiction is best seen . . . as a fairly narrow doctrine that primarily determines the *procedures* that the executive branch must follow before turning an immigrant away" because "[o]therwise, the doctrine would allow any number of abuses to be deemed constitutionally permissible merely by labelling certain 'persons' as non-persons"). We thus conclude that the district court did not err in holding that plaintiffs are "persons" protected by the Due Process Clause.

6

For all these reasons, we conclude that the district court did not abuse its discretion in concluding that the plaintiffs were likely to prevail on the merits of their due process claim regarding the availability of bond hearings.

B

Nor did the district court abuse its discretion in concluding that the plaintiffs would suffer irreparable harm absent the grant of a preliminary injunction. The district court found that, in the absence of preliminary relief,

plaintiffs would suffer irreparable harm in the form of "substandard physical conditions, low standards of medical care, lack of access to attorneys and evidence as Plaintiffs prepare their cases, separation from their families, and re-traumatization of a population already found to have legitimate circumstances of victimization." *Padilla*, 387 F. Supp. 3d at 1231. Contrary to the government's unsubstantiated arguments, the record supports the district court's conclusion, and we see no abuse of discretion.

## C

The district court also did not abuse its discretion in determining that the balance of the equities and public interest favors plaintiffs with respect to Part B of the preliminary injunction.

The district court found that the equities on Plaintiffs' side consist of the deprivation of a fundamental constitutional right and its attendant harms, which range from physical, emotional, and psychological damages to unnecessarily prolonged family separation. *Padilla*, 387 F. Supp. 3d at 1231; *see also Padilla*, 379 F. Supp. 3d at 1181. The court also observed that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Padilla*, 387 F. Supp. 3d at 1232 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). On the other side, the district court weighed defendants' expressed interests in the administration of immigration law, in controlling their dockets, and in allocating their limited resources as they see fit—*i.e.*, "the efficient administration of the immigration laws." *Padilla*, 387 F. Supp. 3d at 1231; *see also Padilla*, 379 F. Supp. 3d at 1181. The court concluded that the balance of hardships "tips decidedly in plaintiffs'

favor." *Padilla*, 387 F. Supp. 3d at 1232 (quoting *Hernandez*, 872 F.3d at 996).

Defendants argue that the district court erred in balancing the equities because the government suffers irreparable injury anytime a statute is enjoined. This court has recognized that there is "some authority" for the idea that "a state may suffer an abstract form of harm whenever one of its acts is enjoined," but, "to the extent that is true . . . it is not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (quoting *Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009) (alterations omitted), *vacated and remanded on other grounds*, 132 S. Ct. 1204 (2012)); *see also id.* at 500 n.1 (noting that "[i]ndividual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined, [but] [n]o opinion for the Court adopts this view" (citations omitted)). The district court thus did not commit legal error in this respect. *See also Robbins*, 715 F.3d at 1145 (finding that balance of equities favored detained noncitizens and noting that the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

In sum, we conclude that the district court did not abuse its discretion in determining that the balance of the equities and public interest favors plaintiffs.

## D

Because the district court did not abuse its discretion in applying the *Winter* factors to determine whether plaintiffs were entitled to a preliminary injunction requiring that they

receive bond hearings, we affirm Part B of the preliminary injunction.

## IV

We now consider the specific procedural requirements the district court imposed in its preliminary injunction order for the required bond hearings.

As we have noted, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (citation and quotation marks omitted). Accordingly, bond hearings must be held promptly and must involve adequate procedural protections to ensure that detention is reasonably related to preventing flight or danger to the community. *See Hernandez*, 872 F.3d at 990. The current record is, however, insufficient to support the district court's findings with respect to likelihood of success, the harms facing plaintiffs, and the balance of the equities implicated by Part A of the preliminary injunction—and particularly with respect to the requirement that the class members receive a bond hearing within seven days of making such a request or be released.

The record contains evidence describing wait times faced by detained noncitizens generally and class members prior to *Matter of M-S-*, but does not contain sufficient specific evidence justifying a seven-day timeline, as opposed to a 14-day, 21-day, or some other timeline. The district court also made insufficient findings regarding the extent to which the procedural requirements in Part A—and their nationwide scope—may burden the immigration courts. Critically, since the entry of the preliminary injunction, the number of individuals currently in expedited removal proceedings—and

thus the number of class members—may have increased dramatically. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. at 35,413–14 (expanding expedited removal to the statutory limit). The government submitted on appeal declarations explaining the operational difficulties that the procedural requirements in Part A will cause. Such evidence is properly considered in the first instance by the district court.

The threat of irreparable harm to plaintiffs, the balancing of the equities, and the public interest implicated by Part A of the preliminary injunction present intensely factual questions. The factual landscape has shifted as this case has developed, including the time between the district court's first preliminary injunction order and modified preliminary injunction order, and the district court did not consider these developments when entering the modified preliminary injunction order. Accordingly, although we affirm Part B of the preliminary injunction, we remand this case to the district court for further factual development on the *Winter* factors with respect to Part A of the preliminary injunction. As set forth below, we also direct the district court on remand to revisit the injunction's scope.

V

The defendants argue that, under 8 U.S.C. § 1252(f)(1), the district court lacked authority to grant injunctive relief in this case. We disagree.

Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–1232], other than with respect to the application of

PADILLA V. ICE

such provisions to an individual alien against whom proceedings under such part have been initiated." All of the individuals in the plaintiff class here are "individual[s] against whom proceedings under such part have been initiated." *See id.*

Although the Supreme Court has analyzed the impact of § 1252(f)(1) on classwide relief in suits filed by organizations, it has never had an opportunity to consider the meaning of the statute's exception clause and its effect on the availability of classwide relief where every member of a class is "an individual alien against whom proceedings under such part have been initiated." *See id.* The Supreme Court observed in *Reno v. American-Arab Anti-Discrimination Committee* ("*AADC*") that § 1252(f)(1) is "nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases." 525 U.S. 471, 481–82 (1999). The Court made this observation in the course of rejecting an argument that the subsection provided an affirmative grant of jurisdiction. *See id.*

Because *AADC* was not a class action, "[t]he Court in *AADC* did not consider, and had no reason to consider, the application of § 1252(f)(1) to [] a class" in which "[e]very member . . . falls within the provision's exception." *Jennings*, 138 S. Ct. at 875 (2018) (Breyer, J., dissenting). In *Jennings*, the Supreme Court made clear that the question is unresolved, quoting *AADC*, but remanding to this court to consider in the first instance whether classwide injunctive relief is available under § 1252(f)(1)). *See id.* at 851.

As we noted in *Rodriguez v. Marin*, § 1252(f)(1) does not on its face bar class actions or classwide relief. 909 F.3d 252, 256 (9th Cir. 2018) (remanding in turn to the district court to consider in the first instance whether § 1252(f)(1) precluded the injunctive relief sought there). We decline the government's invitation to read into the text, or in *AADC*, a broad but silent limitation on the district court's powers under Federal Rule of Civil Procedure 23. "In the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' under the Rules established for that purpose, class relief is appropriate in civil actions brought in federal court." *Califano v. Yamasaki*, 442 U.S. 682, 700 (1979).

Section 1252(f)(1)'s silence as to class actions is especially significant because its neighboring subsection, § 1252(e)(1)(B), adopted at the same time by the same Congress, expressly prohibits class actions. *See* 8 U.S.C. § 1252(e)(1)(B) (barring courts from "certify[ing] a class under Rule 23 . . . in any action for which judicial review is authorized under a subsequent paragraph of this subsection"); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018). Congress knows how to speak unequivocally when it wants to alter the availability of class actions in immigration cases. It did not do so here. *See Hayes*, 591 F.3d at 1119 (construing § 1252(f)(1) narrowly as not banning classwide declaratory relief in light of § 1252(e)'s breadth); *Am. Immigration Lawyers Ass'n v. Reno* ("*AILA*"), 199 F.3d 1352, 1359 (D.C. Cir. 2000) (noting that § 1252(e) contains a "ban on class actions" while § 1252(f)(1) contains a different limitation); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

PADILLA V. ICE

Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and citation omitted)).

The government contends that our interpretation of § 1252(f)(1) as applied to this case renders superfluous the word "individual" in the phrase "individual alien." However, the word "individual" is not superfluous if Congress intended it to prohibit injunctive relief with respect to organizational plaintiffs. *Cf. Califano*, 442 U.S. at 701 (explaining that a statute authorizing a suit by "any individual" and "contemplat[ing] case-by-case adjudication" does not foreclose classwide relief because "[w]here the district court has jurisdiction over the claim of each individual member of the class, [FRCP] 23 provides a procedure by which the court may exercise that jurisdiction over the various individual claims in a single proceeding"); *Brown v. Plata*, 563 U.S. 493, 531 (2011) (provision stating that a remedy shall extend no further than necessary to remedy the violation of the rights of a "particular plaintiff or plaintiffs" was not a limitation on classwide injunctive relief, but instead meant that the "scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court").

The statute's legislative history supports our reading. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 937 F.3d 1191, 1196 (9th Cir. 2019) (explaining that courts "may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent"). Congress adopted § 1252(f)(1) after a period in which organizations and classes of persons, many of whom were not themselves in proceedings, brought preemptive challenges to the enforcement of certain immigration statutes. *See, e.g.*, *Reno*

*v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 47–51 (1993) (appeal from orders invalidating INS regulations in class actions brought by immigration rights groups); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 487–88 (1991) (appeal from order holding certain INS practices unconstitutional and requiring INS to modify its practices in action brought by immigrant rights group on behalf of a class of farmworkers); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1026 (5th Cir. Unit B 1982) (affirming finding that new asylum procedures violated due process in case brought by an organization on behalf of a class of Haitians who had petitioned for political asylum); *see also AILA*, 199 F.3d at 1359–60 ("Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied").

The statute's legislative history also reveals that Congress was concerned that § 1252(f)(1) not hamper a district court's ability to address imminent rights violations. *See* H.R. Rep. No. 104-469(I), at 161 (1996) (explaining that § 1252(f)(1) limited courts' "authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S.," but preserved their ability to "issue injunctive relief pertaining to the case of an individual alien, and thus protect against any immediate violation of rights"). This history supports the view that Congress intended § 1252(f)(1) to restrict courts' power to impede the new congressional removal scheme on the basis of suits brought by organizational plaintiffs and noncitizens not yet facing proceedings under 8 U.S.C. §§ 1221–1232. Here, where the class is composed of individual noncitizens, each of whom is in removal proceedings and facing an immediate violation of their rights, and where the district court has jurisdiction over

each individual member of that class, classwide injunctive relief is consistent with that congressional intent.

Thus, upon interlocutory review, we conclude that § 1252(f)(1) did not bar the district court from granting preliminary injunctive relief for this class of noncitizens, each of whom is an individual noncitizen against whom removal proceedings have been initiated.

## VI

Although defendants dispute the district court's authority to issue classwide injunctive relief under § 1252(f)(1), defendants do not challenge the scope of the preliminary injunction. We conclude that the district court did not abuse its discretion in granting a preliminary injunction with respect to the nationwide class.

Where, as here, a district court has already certified a nationwide class, the concerns associated with broad injunctions are minimized. "If a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties." *Califano*, 442 U.S. at 702. *Cf. Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification."). "[T]he scope of [a] remedy is determined by the nature and extent of the . . . violation," *Milliken v. Bradley*, 433 U.S. 267, 270 (1977), and "not by the geographical extent of the plaintiff," *Califano*, 442 U.S. at 702.

The nationwide class in this case is defined by a shared alleged constitutional violation. *See Padilla*, No. C18-928 MJP, 2019 WL 1056466, at *6 (W.D. Wash. Mar. 6, 2019). The injunction seeks to remedy that constitutional violation. In certifying the class, the court observed that, in addition to establishing numerosity, commonality, typicality and adequacy, plaintiffs had demonstrated "that the challenged conduct is 'such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)). The court further concluded that certification of a nationwide class was "manifestly" appropriate, and it rejected defendants' request to limit the scope of class certification. *See id.*[7] Defendants did not seek to appeal class certification on any grounds, nor have they suggested at any point during this appeal that the nationwide scope of the certified class is improper. We have already concluded that the district court did not abuse its discretion in holding that members of the certified class are constitutionally entitled to bond hearings. Therefore, we cannot conclude that the

---

[7] The district court rejected defendants' request to limit the class to individuals located in the Western District of Washington. *Id.* The court noted that class representatives were transferred all over the country before landing in Washington and that detained immigrants are routinely transferred throughout the country prior to adjudicating their cases. *Id.* The court also found that defendants apply a uniform "indefinite detention" policy across the country and that class members face the same allegedly improper circumstances of detention regardless of their location. *Id.* The court could not identify—and defendants did not cite—any ongoing litigation of the same issue in other districts. *Id.* Finally, noting that the overwhelming majority of class members are not sufficiently resourced to pursue individual litigation, the court rejected defendants' argument that class members should be afforded the opportunity to seek "speedier individual recovery." *Id.* Defendants have not raised any similar arguments on appeal.

36                    PADILLA V. ICE

district court abused its discretion in issuing classwide
preliminary injunctive relief. Nonetheless, on remand, in
considering the appropriate procedures that must be followed
with respect to the required bond hearings, the district court
must revisit the nationwide scope of the injunction to ensure
that it is not "more burdensome than necessary to redress the
complaining parties." *See Califano*, 442 U.S. at 702.

                          VII

    In sum, the district court did not abuse its discretion in
concluding that plaintiffs are likely to succeed on their
challenge under the Due Process Clause to the detention of
class members without any opportunity for a bond hearing.
The district court likewise did not abuse its discretion in
finding plaintiffs would suffer irreparable harm absent
preliminary relief and that the balance of the equities and
public interest favored plaintiffs. Part B of the district court's
preliminary injunction is thus **AFFIRMED**, except to the
extent that it requires that bond hearings be administered
under the conditions enumerated in Part A.

    We **VACATE** and **REMAND** Part A of the preliminary
injunction to the district court for further factual development
and consideration of the procedures that must be followed
with respect to the required bond hearings. The district court
must further develop the relevant factual record and revisit
the scope of the injunction.

    **AFFIRMED IN PART; VACATED AND
REMANDED IN PART.**

BADE, Circuit Judge, dissenting:

In keeping with the current trend in constitutional challenges to the enforcement of immigration statutes, the district court issued a classwide, nationwide preliminary injunction against the operation of 8 U.S.C. § 1225(b)(1)(B)(ii). But Congress plainly barred lower courts from issuing such injunctions except as to "an individual alien," 8 U.S.C. § 1252(f)(1), and the Supreme Court has construed § 1252(f)(1) as a jurisdictional bar on a lower court's ability to issue classwide injunctive relief. Despite this authority (and the plain language of the statute, general statutory construction principles, and the holdings of two of our sister circuits), the majority opinion finds jurisdiction in this case.

I respectfully dissent.

## I.

Section 1252(f)(1) is straightforward. It provides that:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).  Recognizing the simplicity of this language, the Supreme Court has repeatedly interpreted this statute as a bar on classwide injunctive relief against the operation of 8 U.S.C. §§ 1221–1232.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018)  (confirming that § 1252(f)(1) bars federal courts from issuing classwide injunctive relief against the operation of §§ 1221–1232); *Nken v. Holder*, 556 U.S. 418, 431 (2009) (describing § 1252(f)(1) as "a provision prohibiting class wide injunctions against the operation of removal provisions"); *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 481–82 (1999) ("By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief.  It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–123[2], but specifies that this ban does not extend to individual cases.").

The majority opinion brushes these cases aside because the Supreme Court has yet to construe § 1252(f)(1) in a case brought by a class of aliens all of whom were in removal proceedings. Maj. Op. 30–31. Although the majority opinion is correct that *AADC* and *Nken* were not class actions brought by aliens in removal proceedings, *Jennings* was such a class proceeding.  And in that case, the Court was dubious that a lower court would have jurisdiction to issue a classwide injunction in the context of a constitutional challenge to §§ 1221–1232.  *See Jennings*, 138 S. Ct. at 851 (explaining that the Ninth Circuit's reasoning for exercising jurisdiction over a class action statutory claim seeking injunctive relief

against the operation of §§ 1225–1226 "does not seem to apply to an order granting relief on constitutional grounds").[1]

Nothing in the Supreme Court's precedent suggests that the Court has changed its mind since deciding *Jennings*. And, even if we characterize the Court's repeated statements about § 1252(f)(1) as dicta, we are "advised to follow" them. *Lemoge v. United States*, 587 F.3d 1188, 1193 (9th Cir. 2009) (quoting *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1129 (9th Cir. 2006) (en banc)); *see, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) (noting that "Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold" (internal quotation marks and citation omitted)).  The majority opinion does not follow the Court's interpretation of § 1252(f)(1), but then fails to persuasively explain why the Court would—despite its skepticism in *Jennings*—rule differently in the circumstances of this case.

Even if we could (or should) sidestep *Jennings*, *Nken*, and *AADC*, a proper statutory analysis leads to the same result. The majority opinion's conclusion that jurisdiction exists is based on a faulty reading of § 1252(f)(1)'s plain language and misapplication of statutory construction principles.

---

[1] In *Jennings*, the Ninth Circuit exercised jurisdiction over a statutory challenge brought by a class of aliens in removal proceedings because the claim was premised on conduct allegedly "not authorized by the statutes" and therefore the claim did not go to the "operation of" the removal provisions.  138 S. Ct. at 851.  Here, in contrast, Plaintiffs do not argue that their constitutional challenge seeks to prevent conduct not authorized by § 1225(b)(1)(B)(ii); they directly challenge the "operation of" that statute.

II.

When construing a statute, "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted). The majority opinion's reading of § 1252(f)(1)—specifically its interpretation of "an individual alien"—departs from this long-established rule. As the majority opinion construes the statute, the word "individual" stands as a mere superfluity. *See Hamama v. Adducci* ("*Hamama I*"), 912 F.3d 869, 877 (6th Cir. 2018) ("There is no way to square the concept of a class action lawsuit with the wording 'individual' in [§ 1252(f)(1)].").

The majority opinion defines "individual" as the opposite of "organization," apparently concluding that Congress added "individual" to § 1252(f)(1) to ensure that "alien" refers to a person, not an artificial entity. Maj. Op. 32. But this definition renders "individual" superfluous because an organizational or artificial entity "alien" does not exist for purposes of the immigration statutes. *See* 8 U.S.C. § 1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States"). To be given effect, "individual" can only be read as an *adjective* providing a separate, numerical limitation on the clause's noun, "alien." *See Individual*, Black's Law Dictionary (11th ed. 2019) (defining "individual" when used as an adjective as "[e]xisting as an indivisible entity" or "[o]f, relating to, or involving a *single* person or thing, as opposed to a group" (emphasis added)).[2]

---

[2] The Dictionary Act instructs that when a statute includes a word "importing the singular," that word applies to "several persons, parties, or things" "unless the context indicates otherwise." 1 U.S.C. § 1. Here,

The majority opinion's construction would be palatable only if Congress had replaced the phrase "an individual alien" with "any alien" or "an alien"—as it did in over a dozen other subsections of the statute. *See, e.g.*, 8 U.S.C. §§ 1252(a)(2)(C), 1252(b)(3)(B), 1252(b)(4)(C), 1252(b)(9), 1252(e)(1)(A), 1252(e)(4)(B), 1252(f)(2), 1252(g).[3]  Had Congress used either of these alternatives, there would be no separate numerical limitation on "alien," there would be no reason for us to define "individual," and the majority opinion's perceived legislative goal of preventing organization-led preemptive challenges to immigration statutes would be achieved.  But we cannot rewrite the statute, *see Dodd v. United States*, 545 U.S. 353, 359 (2005) ("[W]e are not free to rewrite the statute that Congress has enacted."), nor can we overlook Congress's use of different language in separate provisions of the same statute, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).  Congress specifically precluded lower courts from issuing injunctive relief except as to "an individual alien," and that is the language we must enforce. *See Dodd*, 545 U.S. at 359.  And because Congress "use[d] certain language in one part of the statute and different language in another, [we] assume[] different meanings were intended." *Sosa*, 542 U.S. at 711 n.9 (citation omitted).

---

"alien" is a singular term and thus should generally be construed as applying to multiple aliens.  The context of § 1252(f)(1), however, indicates otherwise:  by adding the adjective "individual," Congress placed a specific, standalone numerical limitation on the term "alien."  If the Dictionary Act required both "individual" and "alien" to be read as applying to multiple persons, "individual" becomes superfluous.

[3] In § 1252, the phrase "an individual alien" is found only in subsection (f)(1), while "an alien" and "any alien" are used fifteen times in subsections (a), (b), (e), (f)(2), and (g).

PADILLA V. ICE

### III.

The majority opinion also posits that if Congress intended to bar classwide injunctive relief, it would have explicitly barred class actions like it did in a neighboring statute, 8 U.S.C. § 1252(e)(1)(B).  Maj. Op. 31–32.  But barring class certification altogether (the function of § 1252(e)(1)(B)) fundamentally differs from barring a type of relief that a court can issue (the function of § 1252(f)(1)).  The two statutes serve different purposes, and § 1252(f)(1) does not preclude class actions wholesale; it narrowly limits the available relief.

The majority opinion relies, in part, on *Califano v. Yamasaki*, 442 U.S. 682 (1979), to argue that Congress did not intend to prohibit classwide injunctive relief in § 1252(f)(1).  This reliance on *Califano*, a case analyzing a provision in the Social Security Act, 42 U.S.C. § 405(g), is misplaced.  In *Califano*, the Court found that a statute affirmatively authorizing a suit by "[a]ny individual" did not foreclose class actions because Federal Rule of Civil Procedure 23 "provides a procedure by which [a] court may exercise . . . jurisdiction over the various individual claims in a single proceeding."  442 U.S. at 701.  But 42 U.S.C. § 405(g) and 8 U.S.C. § 1252(f)(1) differ materially in form and in substance.  The former explicitly authorizes "[a]ny individual" to file a lawsuit and thus is a jurisdictional *conferring* statute.  *See* 42 U.S.C. § 405(g).  It does not prohibit a court from issuing a specific form of relief, nor does it carve out an exception to a general statutory bar.  In contrast, the latter is a jurisdictional *stripping* statute that categorically bars a type of relief but carves out a narrow exception for "an individual alien."  *See* 8 U.S.C. § 1252(f)(1).  It does not fully foreclose a class or multi-party lawsuit, *see Rodriguez v. Marin*, 909 F.3d 252, 259 (9th Cir.

2018), nor does it grant jurisdiction, *see AADC*, 525 U.S. at 481–82. And in contrast to § 405(g)'s use of "individual" as a standalone noun, § 1252(f)(1) uses "individual" as an adjective to numerically limit "alien." In short, *Califano* "does not stop the [c]ourt from looking at a particular statute that uses the word 'individual' and determining that, even if the use of 'individual' does not always bar class actions, it does bar them in the particular statute at issue." *Hamama I*, 912 F.3d at 878.

Section 1252(f)(1)'s title ("Limit on *injunctive* relief") and its first clause ("*Regardless* of the nature of the action or claim or of the identity of the party *or parties* bringing the action") further demonstrate its functional difference from 8 U.S.C. § 1252(e)(1)(B) and 42 U.S.C. § 405(g). As recognized by the Supreme Court, § 1252(f)(1)'s title portends what the language of the statute makes plain: the statute generally prohibits injunctive relief. *See AADC*, 525 U.S. at 481–82. And its opening clause recognizes that a lower court has jurisdiction over cases filed by multiple "parties," but states that "[r]egardless" of whether the action is brought by one "party" or multiple "parties," lower courts cannot issue injunctive relief except as to "an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Thus, by its explicit terms, § 1252(f)(1) bars *both* classwide injunctions and injunctive relief for aliens who are not in removal proceedings.

IV.

Perhaps seeking a foothold for its shaky analysis, the majority opinion also resorts to the statute's legislative history. Maj. Op. 32–34. But "where, as here, the words of the statute are unambiguous, the judicial inquiry is complete."

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (internal quotation marks and citation omitted); *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (internal quotation marks and citation omitted)). The majority opinion fails to identify any ambiguity in § 1252(f)(1), nor have I discovered any such language.

In any event, the scant discussion in the statute's legislative history specifically addressing § 1252(f)(1) does not salvage the majority opinion's interpretation. Without explaining the relevance, the majority opinion first notes that Congress enacted § 1252(f)(1) after a "period" when organizational plaintiffs filed "preemptive challenges" against "the enforcement of certain immigration statutes." Maj. Op. 32. This statement may be true as far as it goes, but we should not bootstrap our interpretation of a statute on a hypothesis that Congress silently intended the legislation to prevent organization-led preemptive lawsuits of which it may have been unaware.[4]

The majority opinion also relies on a House Committee report to support its reading of § 1252(f)(1) as allowing classwide injunctive relief when each class member "is in removal proceedings and facing an immediate violation of

---

[4] We, of course, can assume that Congress was "aware of relevant judicial precedent" when it enacted § 1252(f)(1), *see Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010), but for what "relevant judicial precedent" would we assume such Congressional awareness? The majority opinion does not identify any pre-§ 1252(f)(1) case addressing the threshold jurisdictional question at issue here—nor can it: the statutory bar on classwide injunctive relief did not exist until the enactment of § 1252(f)(1) in 1996.

rights." Maj. Op. 33–34. The relevant portion of this report provides, in full, as follows:

> Section 306 also limits the authority of Federal courts other than the Supreme Court to enjoin the operation of the new removal procedures established in this legislation. These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending. In addition, courts may issue injunctive relief pertaining to the case of an individual alien, and thus protect against any immediate violation of rights. However, single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S.

H.R. Rep. No. 104-469(I), at 161 (1996).

Although this report holds "no binding legal effect," *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 684 (9th Cir. 2007), the majority opinion emphasizes the phrase "immediate violation of rights." In so doing, it overlooks the preceding clause: "courts may issue injunctive relief pertaining to *the case* of *an individual alien*." H.R. Rep. No. 104-469(I), at 161 (emphasis added). Like the statute itself, this language specifically describes the scope of the carve out using singular phrasing. And the next sentence firmly states that lower courts cannot "enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S." *Id.* Contrary to the majority opinion's view, this report shows that Congress wanted to

Case: 2:18-cv-00928-MJP, Document 360, Filed 03/27/20, Page 46 of 52

prevent lower courts from issuing sweeping injunctions—
such as the classwide, nationwide injunction at issue here—
against its enacted removal procedures.

In sum, the legislative history does not support the
majority opinion's reading of § 1252(f)(1). It is ambiguous
at best and cannot override the clear statutory language. *See
Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019)
("[E]ven those of us who believe that clear legislative history
can illuminate ambiguous text won't allow ambiguous
legislative history to muddy clear statutory language."
(internal quotation marks and citation omitted)).

## V.

I am not the first to conclude that § 1252(f)(1) bars
classwide injunctive relief under the circumstances of this
case. In a constitutional challenge to continued detention
under the immigration statutes brought by a class of aliens in
removal proceedings, the Sixth Circuit applied the Supreme
Court's reading of § 1252(f)(1) to hold that the statute bars
classwide injunctive relief. *See Hamama I*, 912 F.3d at 877
("In our view, [*AADC*] unambiguously strips federal courts
of jurisdiction to enter class-wide injunctive relief[.]"); *see
also Hamama v. Adducci* ("*Hamama II*"), 946 F.3d 875, 877
(6th Cir. 2020) ("Congress stripped all courts, save for the
Supreme Court, of jurisdiction to enjoin or restrain the
operation of 8 U.S.C. §§ 1221–1232 on a class-wide basis."
(citing 8 U.S.C. § 1252(f)(1))). The Tenth Circuit reached the
same result. *See Van Dinh v. Reno*, 197 F.3d 427, 433 (10th
Cir. 1999) (holding that "§ 1252(f) forecloses jurisdiction to
grant class-wide injunctive relief to restrain operation of
§§ 1221–[12]3[2] by any court other than the Supreme
Court").

We should "decline to create a circuit split unless there is a compelling reason to do so." *Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003). The majority opinion fails to identify such a "compelling reason." As a result, even though we trail two other circuits in addressing this issue, the majority opinion makes us the first and only circuit to conclude that § 1252(f)(1) does not bar classwide injunctive relief.

## VI.

Even if the district court had jurisdiction to issue classwide injunctive relief, the preliminary injunction is overbroad and extends far beyond the demands of due process.

The district court certified the Bond Hearing Class as:

> All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing.

*Padilla v. U.S. Immigration & Customs Enf't*, No. C18-928 MJP, 2019 WL 1056466, at *1 (W.D. Wash. Mar. 6, 2019). The district court then issued the two-part preliminary injunction that is the subject of this appeal. In Part A of the injunction, the district court ordered the government to provide bond hearings with various procedures that

supposedly are required by the Constitution, including that the hearings be conducted within seven days of a request. *Padilla v. U.S. Immigration & Customs Enf't*, 387 F. Supp. 3d 1219, 1232 (W.D. Wash. 2019). In Part B, the district court "f[ound] that the statutory prohibition at [§ 1225(b)(1)(B)(ii)] against releasing on bond persons found to have a credible fear and awaiting a determination of their asylum application violates the U.S. Constitution." *Id.* In Part B, the district court also found that "the Bond Hearing Class is constitutionally entitled to a bond hearing before a neutral decisionmaker (under the conditions enumerated [in Part A]) pending resolution of their asylum applications." *Id.*

The majority opinion concludes that "[t]he current record is . . . insufficient to support the district court's findings with respect to likelihood of success, the harms facing plaintiffs, and the balance of the equities implicated by Part A of the preliminary injunction—and particularly with respect to the requirement that the class members receive a bond hearing within seven days of making such a request or be released." Maj. Op. 28. The majority opinion finds that the record "does not contain sufficient specific evidence justifying a seven-day timeline, as opposed to a 14-day, 21-day, or some other timeline." Maj. Op. 28. Ultimately, the majority opinion affirms Part B "except to the extent that it requires that bond hearings be administered under the conditions enumerated in Part A" and remands Part A for "further factual development and consideration" of the bond hearing procedures. Maj. Op. 36.

This holding raises multiple concerns, and Part B's breadth is the most troublesome. Plaintiffs concede that they do not assert a facial challenge to § 1225(b)(1)(B)(ii). Nonetheless, in Part B the district court deems the statute

unconstitutional in its entirety, rather than as applied to the Bond Hearing Class. *See Padilla*, 387 F. Supp. 3d at 1232 ("[F]ind[ing] that the statutory prohibition at [§ 1225(b)(1)(B)(ii)] against releasing on bond persons found to have a credible fear and awaiting a determination of their asylum application violates the U.S. Constitution[.]"). Section 1225(b)(1)(B)(ii) requires the government to detain multiple categories of aliens, not only those aliens who meet the definition of the Bond Hearing Class.[5] But the district court did not exclude from its sweeping finding of unconstitutionality the application of the statute to detain other aliens who are not members of the Bond Hearing Class, such as "arriving" aliens under § 1225(b)(1)(A)(ii). By rendering § 1225(b)(1)(B)(ii) wholly unconstitutional, Part B is overbroad.[6]

---

[5] Section 1225(b)(1)(B)(ii) mandates detention of any alien referred to in § 1225(b)(1)(A)(ii) who an asylum officer determines has a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(i)–(ii). Section 1225(b)(1)(A)(ii) refers to two types of aliens: (1) those "arriving in the United States"; and (2) those "described" in § 1225(b)(1)(A)(iii), including an alien "who has not been admitted or paroled into the United States, and who has not affirmatively shown . . . that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(ii)–(iii). Members of the Bond Hearing Class are in the latter group, and do not include arriving aliens.

[6] The law has long recognized a distinction between the process due to aliens arriving at our borders and to those who have already entered the country. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."). And unlike members of the Bond Hearing Class, arriving aliens have not entered the country. *See, e.g.*, *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1097 (9th Cir. 2004) ("[A]lthough aliens seeking admission into the United States may physically be allowed within its

Furthermore, the majority opinion suggests that although the record does not support a seven-day deadline for bond hearings, it may support a 14-day, 21-day, or other unspecified but presumably similarly limited deadline. *See* Maj. Op. 28. But decisions made in similar contexts by the Supreme Court and this court establish that due process is not so demanding. Rather, these cases hold that, as a constitutional matter, the government need only provide bond hearings to detained aliens once the detention becomes "prolonged" or fails to serve its immigration purpose, a period generally understood to be six months. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (applying a "6-month presumptive detention period"); *Demore v. Kim*, 538 U.S. 510, 527–31 (2003) (upholding as constitutional the detention of aliens for the entire duration of removal proceedings under 8 U.S.C. § 1226(c)); *Zadvydas*, 533 U.S. at 699, 701–02 (holding that six months is a "presumptively reasonable period of detention" under 8 U.S.C. § 1231(a)(6)); *Marin*, 909 F.3d at 256–57 (expressing doubt "that any statute that allows for arbitrary prolonged detention without any process is constitutional"); *Diouf v. Napolitano*, 634 F.3d 1081, 1092 n.13 (9th Cir. 2011) (defining detention under 8 U.S.C. § 1231(a)(6) as "prolonged when it has lasted six months and is expected to continue more than minimally beyond six months").[7]

---

borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country."). The detention of arriving aliens under § 1225(b)(1)(B)(ii) was not an issue before the district court (or this court) in this as-applied challenge.

[7] The impact of a longer detention period runs deeper than the preliminary injunction; it creates an Article III standing dilemma for the Bond Hearing Class. Standing requires, among other things, an actual or

Although "detention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process," *Demore*, 538 U.S. at 523, the majority opinion cites no decision from the Supreme Court or this court suggesting that two or three weeks constitutes "prolonged" detention.[8]

## VII.

The majority opinion does not square with the plain text of § 1252(f)(1), is inconsistent with multiple Supreme Court cases, and needlessly creates a circuit split. Despite Congress unequivocally barring lower courts from issuing classwide injunctions against the operation of certain immigration statutes, the majority opinion gives a green light for the district courts in this circuit (as well as this court) to issue (and uphold) such relief. And, even if the district court had jurisdiction to issue injunctive relief, the preliminary

---

imminent injury in fact, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and "at least one named plaintiff" in a class action must establish standing, *see Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc). As the district court found, the longest period a named plaintiff for the Bond Hearing Class waited to obtain a bond hearing after securing a positive credible fear determination was about three weeks, *see Padilla*, 2019 WL 1056466, at *1–2, a period far shorter than the presumptively reasonable six months.

[8] As to the other procedural requirements imposed by the district court in Part A of the preliminary injunction (*e.g.*, placing the burden of proof on the government, requiring the government to record the bond hearing and produce the recording or a verbatim transcript on appeal, and requiring the government to provide a written decision with particularized determinations of individualized findings on the same day as the hearing), I agree with the majority opinion that the record does not support those procedures, and I find it exceedingly unlikely that the Constitution mandates them.

injunction is overbroad and exceeds what the Constitution demands.

I would vacate the preliminary injunction and remand for further proceedings with instructions to dismiss the claims for classwide injunctive relief.  I respectfully dissent.