**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

YOLANY PADILLA; IBIS GUZMAN; BLANCA ORANTES; BALTAZAR VASQUEZ,

*Plaintiffs - Appellees*,

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; DAVID J. VENTURELLA; RODNEY S. SCOTT; JOSEPH B. EDLOW; TODD BLANCHE, Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; MARKWAYNE MULLIN; CAMMILLA WAMSLEY; BRUCE SCOTT; JAMES JANECKA,

*Defendants-Appellants*.

No. 24-2801

D.C. No. 2:18-cv-00928-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted May 21, 2025
San Francisco, California

Filed September 21, 2026

Before: Marsha S. Berzon, Michelle T. Friedland, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Friedland.

## SUMMARY[*]


### Immigration

Affirming, on interlocutory appeal, the district court's denial of the government's motion to dismiss in a case in which Plaintiffs challenged their mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii), the panel held that the district court correctly concluded that (1) it had jurisdiction over this dispute and (2) *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), did not bar Plaintiffs' due process claim.


[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Plaintiffs are a certified class of asylum seekers who entered the United States without admission or parole, were screened for expedited removal, and found to have a credible fear of persecution or torture (the "class"). They were placed in regular removal proceedings. However, because they were initially screened for expedited removal, they are subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii), which, as interpreted in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), provides no opportunity for bond hearings. The class asserted that the lack of hearings violates the Fifth Amendment's Due Process Clause. The district court denied the government's motion to dismiss and certified two questions for appeal.

The first certified question was whether the district court lacked jurisdiction under 8 U.S.C. § 1252(a)(2)(A). The panel held that none of the four provisions of § 1252(a)(2)(A) precluded jurisdiction over the class's due process claim. The panel concluded that subsections (i) and (iii) were plainly inapplicable: subsection (i) because the class did not challenge "any individual determination" or "cause or claim" concerning "the implementation or operation of an order of removal," and subsection (iii) because the class did not challenge the application of the expedited removal statute to "individual aliens." Subsection (ii) did not apply because the due process claim did not challenge the government's decision to detain in any individual, "given case." Rather, it challenged the constitutionality of § 1225(b)(1)(B)(ii). Subsection (iv) also did not apply because the class challenged the statute itself, not "procedures and policies" adopted "to implement the provisions" of the expedited removal statute. Further, the panel concluded that § 1252(e)(3) did not preclude jurisdiction because it is an exception to the bars of 8

§ 1252(a)(2)(A), not an independent jurisdiction-limiting provision.

The second certified question was whether the class's due process claim was barred by *Thuraissigiam*, in which the Supreme Court held that a noncitizen apprehended 25 yards within the United States border was "an alien at the threshold of initial entry" and therefore had no due process rights apart from those provided by statute. The government argued that, after *Thuraissigiam*, all noncitizens who entered unlawfully have no procedural due process rights beyond those conferred by statute. And, as a result of the January 2025 expansion of the expedited removal authority and of *Jennings*, inadmissible noncitizens apprehended anywhere in the United States within two years of entry and transferred from expedited to regular removal proceedings after showing a credible fear must be detained for as long as those proceedings are pending. Thus, the government argued that the class's due process claim necessarily failed because class members have no due process rights regarding their detention other than those provided by statute, and the statute does not provide for bond hearings.

The panel rejected this reading of *Thuraissigiam*. *Thuraissigiam* did not trample decades of precedent establishing that noncitizens within the territory of United States, legally or not, generally are within the protections of the Due Process Clause. There is a narrow exception to that territoriality rule: the "entry fiction," under which noncitizens seeking admission at a point of entry may be physically allowed into the country for a determination on admissibility, but are treated as if stopped at the border with respect to certain legal rights. Because such individuals remain "on the threshold of initial entry," their due process rights regarding admission are limited to their statutory

rights. The entry fiction traditionally applied only to individuals at a point of entry but, in *Thuraissigiam*, the Court extended it a tiny bit—to an individual apprehended immediately after entry within 25 yards of the border. Since *Thuraissigiam*, this court has applied the entry fiction to other individuals apprehended immediately after entry.

The panel concluded that the class is fundamentally differently situated from the individuals in *Thuraissigiam* and its progeny. Because the class is limited to those who entered without inspection, it excludes individuals encountered at a point of entry. Moreover, the panel reasoned that *Thuraissigiam*'s careful limitation of its due process holding to those apprehended on the "threshold of initial entry" was not an invitation to remove constitutional due process protections from everyone who meets the current statutory criteria for expedited removal—or as it may be expanded. *Thuraissigiam* does not suggest that the entry fiction has swallowed up the bedrock principle that the Due Process Clause applies to all persons, including those illegally present in this country. Thus, the panel concluded that, because the class here includes noncitizens apprehended far beyond the threshold of entry, it is made up largely of individuals who, before and after *Thuraissigiam*, have full procedural due process rights under the Fifth Amendment.

In Section II.B.2, the panel wrote that its conclusion was reinforced by the consideration that the class's due process claim concerns detention—not, as in *Thuraissigiam*, admission to the country. Unlike the political branches' plenary power over admission, the principle that the government cannot arbitrarily detain people, including noncitizens, has been a central tenet of British and American legal traditions since the thirteenth century. *Thuraissigiam*

was an admission, not a detention, case. For that reason, as well as because it was specifically limited to noncitizens at the threshold of initial entry, it had no application here. Noncitizens who arrive illegally and are found away from the border well after arrival are protected from arbitrary detention in violation of the Due Process Clause.

Concurring, Judge Friedland joined all of the majority's opinion except for Section II.B.2. She agreed that *Thuraissigiam*'s holding covers only those applicants at the threshold of initial entry and, given the broad class definition, that conclusion was sufficient to resolve the certified questions in this appeal. Judge Friedland therefore refrain from deciding anything further.

---

## COUNSEL

Matt Adams (argued), Leila Kang, Glenda M. Aldana Madrid, and Aaron Korthuis, Northwest Immigrant Rights Project, Seattle, Washington; Judy Rabinovitz and Anand Balakrishnan, American Civil Liberties Union Foundation, New York, New York; Michael K.T. Tan and Stephen B. Kang, American Civil Liberties Union Foundation, San Francisco, California; Emma C. Winger, American Immigration Council, Washington D.C.; Kristin Macleod-Ball and Trina A. Realmuto, National Immigration Litigation Alliance, Brookline, Massachusetts; for Plaintiff-Appellees.

David Kim (argued) and Lauren C. Bingham, Senior Litigation Counsel; Bichngoc T. Do and Alanna T. Duong, Trial Attorneys; Erez R. Reuveni and Sarah S. Wilson, Assistant Directors; William C. Peachey and David M.

McConnell, Directors; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Defendants-Appellants.

---

## OPINION

BERZON, Circuit Judge:

Plaintiffs are a certified class of asylum seekers who entered the United States without being admitted or paroled, were screened for expedited removal, and were found to have a credible fear of persecution or torture. They were then placed in regular removal proceedings to adjudicate their asylum claims. Because they were initially screened for expedited removal, they are subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii), as interpreted in *Jennings v. Rodriguez*, 583 U.S. 281, 297–99 (2018). That section, *Jennings* held, provides no opportunity for a bond hearing or any comparable individualized procedure (hereafter "bond hearing") requiring the government to justify the necessity of their detention. Plaintiffs ("the bond hearing class" or "the class") assert that the lack of individualized bond hearings to assess the necessity of their continued detention violates the Fifth Amendment's Due Process Clause.

Defendants ("the government") moved to dismiss on the grounds that (1) the district court lacked subject matter jurisdiction under 8 U.S.C. § 1252(a)(2)(A), which deprives courts of jurisdiction over certain issues related to expedited removal, and (2) the bond hearing class's due process claim

is precluded by the Supreme Court's recent decision in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 107 (2020). The district court denied the motion to dismiss on each ground but certified two issues for interlocutory appeal.

This interlocutory appeal presents two questions: (1) whether the district court lacked jurisdiction under 8 U.S.C. § 1252(a)(2)(A) and (2) whether the bond hearing class's due process challenge is barred by *Thuraissigiam*. Because we conclude that the district court had jurisdiction and *Thuraissigiam* does not decide the outcome in this case, we affirm on the certified issues.

## I. Background

### A. Expedited Removal Background

Removal of noncitizens usually occurs through the procedures set forth in 8 U.S.C. § 1229a. That provision includes various procedural safeguards—preeminently, an opportunity for an evidentiary hearing before an immigration judge ("IJ") and a right to appeal to the Board of Immigration Appeals ("BIA"). *See* 8 U.S.C. § 1229a. Under certain circumstances though, the government may pursue removal through a different, markedly less procedurally robust pathway known as "expedited removal."

Expedited removal applies to two classes of inadmissible noncitizens. *See* 8 C.F.R. § 235.3(b)(1). First, it applies to "arriving" noncitizens. 8 U.S.C. § 1225(b)(1)(A)(i). Arriving noncitizens are those "applicant[s] for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. Second, expedited removal applies to "certain other" noncitizens. 8 U.S.C. § 1225(b)(1)(A)(iii). The statute authorizes the Secretary of

the Department of Homeland Security ("DHS") to designate as "certain other" noncitizens any inadmissible noncitizens in the United States who have not been admitted or paroled and cannot show that they have been continuously present for the past two years.[1] *Id.*

Previously, DHS limited the "certain other" noncitizen designation to individuals apprehended within 100 miles of the border who could not show they had been continuously physically present in the United States for the 14 days prior to their apprehension. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004). In January 2025, DHS significantly expanded the "certain other" category. Now, any inadmissible noncitizen apprehended anywhere in the United States within two years of entry is eligible for expedited removal.[2] *See* Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025).

If an immigration officer determines that an individual meets the criteria for expedited removal, the officer may place them in either expedited or full removal proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (B.I.A. 2011). In expedited proceedings, "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an

---

[1] Although the statute refers to the Attorney General, this power has since been delegated to the DHS Secretary. *See* 6 U.S.C. § 202(3); 8 C.F.R. § 235.3(b)(1)(ii).

[2] In 2019, the DHS Secretary issued a notice with a similarly expansive expedited removal designation. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019). That notice was rescinded several years later, and the prior, more limited expedited removal designation restored. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).

intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). If a noncitizen placed in expedited removal proceedings indicates an intention to apply for asylum or a fear of persecution, "the officer shall refer the alien for an interview by an asylum officer" to determine whether they have a credible fear of persecution. *Id.* § 1225(b)(1)(A)(ii). The same procedures apply to individuals who assert a fear of torture or return to their country rather than persecution. *See* 8 C.F.R. §§ 235.3(b)(4), 208.30(b). "If the asylum officer finds an applicant's asserted fear to be credible, the applicant will receive 'full consideration' of his . . . claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110 (footnote omitted) (quoting 8 C.F.R. § 208.30(f)); *see also Matter of M-S-*, 27 I. & N. Dec. 509, 509 (A.G. 2019).

Generally, a noncitizen in regular removal proceedings may be arrested and detained pending a decision on their removal from the United States.[3] 8 U.S.C. § 1226(a). Individuals detained under § 1226(a) may request a hearing to determine whether they are eligible to be released on bond. *See* 8 U.S.C. § 1226(a)(2); *Avilez*, 69 F.4th at 530. A different detention provision applies to individuals screened for expedited removal but transferred to regular removal proceedings after a positive credible fear determination. *See* 8 U.S.C. § 1225(b)(1)(B)(ii). That section states that, following the positive credible fear determination, "the alien shall be detained for further consideration of the application for asylum." *Id.*

[3] For those who meet the "criminal aliens" criteria, detention is governed by 8 U.S.C. § 1226(c), not § 1226(a), and is mandatory. *See Avilez v. Garland*, 69 F.4th 525, 529–35 (9th Cir. 2023).

The BIA previously took the view that, like other noncitizens in full removal proceedings, noncitizens in the "certain other" expedited removal category who had been transferred to full removal proceedings after a positive credible fear finding were entitled to bond hearings. *See Matter of X-K-*, 23 I. & N. Dec. 731 (BIA 2005). Although "arriving" noncitizens were ineligible for release on bond under 8 C.F.R. § 1003.19(h)(2)(i)(B), the BIA reasoned that there was no comparable provision precluding bond hearings for "certain other" noncitizens. *Id.* at 734–35.

In *Jennings v. Rodriguez*, the Supreme Court reached the opposite conclusion. 583 U.S. at 299. The Court interpreted § 1225(b)(1)(B)(ii) to mandate detention without a bond hearing "until immigration officers have finished 'consider[ing]' the application for asylum." *Id.* (quoting § 1225(b)(1)(B)(ii)). *Jennings* explained that the statutorily authorized parole "for urgent humanitarian reasons or significant public benefit" was the sole exception to the mandatory detention provision. *Id.* at 300 (quoting 8 U.S.C. § 1182(d)(5)(A)). The Attorney General accordingly overruled *Matter of X-K-*, recognizing that the Court had held in *Jennings* that the statute requires detention without a bond hearing until the asylum claim is adjudicated. *See Matter of M-S-*, 27 I. & N. Dec. at 510.

The upshot: As a result of the January 2025 expansion of the expedited removal authority and of *Jennings*, as applied by *Matter of M-S-*, inadmissible noncitizens apprehended anywhere in the United States within two years of entry and transferred from expedited to regular removal proceedings after showing a credible fear of persecution or torture must be detained for as long as those proceedings are pending.

### B. Procedural Background

This litigation has been through several iterations. When this suit was filed in 2018, *Matter of X-K-* was still in effect, so the plaintiffs were entitled to bond hearings. At that stage, they contested the timeframe for obtaining a bond hearing after requesting one, as well as the procedures applicable to the hearing. After filing their second amended complaint, the plaintiffs sought class certification. In March 2019, the district court certified a nationwide bond hearing class, defined as follows:

> All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing.[4]

Shortly thereafter, the district court entered a preliminary injunction requiring the government to provide members of the bond hearing class with a bond hearing within seven days of a request for one.

Less than two weeks later, the Attorney General issued *Matter of M-S-*, applying the Supreme Court's interpretation of § 1225(b)(1)(B)(ii) in *Jennings* and overruling *Matter of X-K-*. As the bond hearing class was no longer entitled under the statute to a bond hearing, the plaintiffs filed a third

[4] This definition was later amended to include those found to have a credible fear of torture, as well as of persecution.

amended complaint, alleging that the denial of bond hearings to those individuals transferred to full removal proceedings after a credible fear finding violates the Due Process Clause. The class also moved for a preliminary injunction, arguing that class members were constitutionally entitled to a bond hearing pending resolution of their applications for asylum or relief under the Convention Against Torture ("CAT"), and that § 1225(b)(1)(B)(ii), as interpreted in *Jennings* and *Matter of M-S-*, likely violates the Constitution. The district court granted the preliminary injunction requested, replacing the earlier one.

The government appealed the preliminary injunction ruling. This court concluded that the bond hearing class had shown that it was likely to succeed on the merits and determined that the district court had not abused its discretion in issuing a preliminary injunction. *See Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141–48 (9th Cir. 2020). The court simultaneously vacated the portion of the preliminary injunction requiring a hearing after only seven days and remanded to the district court to consider the appropriate timing and procedures for the bond hearings. *Id.* at 1148, 1152.

The government filed a writ of certiorari, which the Supreme Court granted. The Court then vacated our opinion and remanded for further consideration in light of *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). *See Immigr. & Customs Enf't v. Padilla*, 141 S. Ct. 1041 (2021). This court, in turn, remanded to the district court to consider the effect of *Thuraissigiam* on the class's claims. *See Padilla v. Immigr. & Customs Enf't*, 41 F.4th 1194, 1195 (9th Cir. 2022). Additionally, we instructed the district court to vacate the preliminary injunction, because another intervening Supreme Court case, *Garland*

*v. Aleman Gonzalez*, 596 U.S. 543 (2022), interpreted 8 U.S.C. § 1252(f) to deprive courts of jurisdiction to issue class-wide injunctions affecting the "operation" of certain immigration provisions. *Padilla*, 41 F.4th at 1195.

On remand, the district court vacated the injunction. The bond hearing class filed a fourth amended complaint, this time seeking declaratory rather than injunctive relief. The most recent complaint alleges that "class members continue to face lengthy detention without independent review or timely procedures to guarantee that their deprivation of liberty serves a valid purpose" and that "Defendants violate the Fifth Amendment's Due Process Clause by failing to provide prompt individualized custody hearings with adequate safeguards."

The government moved to dismiss, arguing that the court did not have subject matter jurisdiction under 8 U.S.C. §§ 1252(a)(2)(A) and (e)(3); the bond hearing class's due process claim was barred by *Thuraissigiam*; and the class had not adequately alleged the existence of a due process violation. The district court denied the motion, concluding that the jurisdictional provisions did not apply, *Thuraissigiam* did not apply to the class's due process claim, and the class continued to allege a viable due process claim.

The district court subsequently granted the government's motion to certify for interlocutory appeal the order denying dismissal, and a Ninth Circuit motions panel approved the petition for permission to appeal.

## II. Analysis

Two questions have been certified for interlocutory appeal: (1) whether "the Court has subject matter jurisdiction over Plaintiffs' claims" and (2) whether

"Plaintiffs may pursue constitutional due process claims regarding bond hearings."

The government raises additional arguments concerning the merits of the bond hearing class's due process claim. Those arguments are outside the scope of the questions certified for interlocutory appeal. Although an "appellate court may address any issue fairly included within the certified order," even one not contained in the certified questions, *see Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996), there is no obligation to do so, *see, e.g.*, *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 684 (9th Cir. 2011); *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1175 n.2 (9th Cir. 2016), *overruled on other grounds by Ratha v. Rubicon Res. LLC*, 168 F.4th 541 (9th Cir. 2026).

In its interlocutory appeal order, the district court explained that "[t]he jurisdictional issues presented appear to be novel and unaddressed by the Ninth Circuit or the Supreme Court." It likewise concluded that the second question presented a "novel legal issue[]" and that "fair-minded jurists might disagree with the Court's determination that the decision in *Department of Homeland Security v. Thuraissigiam* does not bar Plaintiffs' due process claims." There was no determination that any of the other issues addressed in the district court's order presented legal questions meriting interlocutory review. Nor do we see any reason why those issues should be addressed in this interlocutory posture. As a result, we decline the government's invitation to go beyond the questions certified by the district court and so address only those two issues.

### A. Subject Matter Jurisdiction

The government first asserts that the court lacks subject matter jurisdiction under 8 U.S.C. § 1252(a)(2)(A). That

provision states that "no court shall have jurisdiction to review" the following:

> (i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,
>
> (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,
>
> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>
> (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A).

These provisions cross reference § 1225(b)(1), which contains various rules governing expedited removal. Among other matters, § 1225(b)(1) describes which individuals may be subject to expedited removal, procedures applicable to asylum claims and credible fear interviews, and rules for when an order of expedited removal may be issued. It also contains the detention provision applicable to the bond hearing class, which states, "If the officer determines at the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further

consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii).

Three of the four jurisdiction-stripping provisions in § 1252(a)(2)(A) provide for an exception for cases described in subsection (e). As relevant here, subsection (e) states:

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of–
>
> (i) whether such section, or any regulation issued to implement such section, is constitutional; or
>
> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

*Id.* § 1252(e)(3)(A). Any action brought under this provision "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." *Id.* § 1252(e)(3)(B).

The government argues that the bond hearing class's due process claim is functionally a challenge to *Matter of M-S-*, the post-*Jennings* decision recognizing that, under the Supreme Court's interpretation in *Jennings*, § 1225(b)(1)(B)(ii) requires detention without a bond

hearing for individuals transferred from expedited removal to full removal proceedings after a positive credible fear determination. *See Matter of M-S-*, 27 I. & N. Dec. at 510. *Matter of M-S-*, the government contends, is a "polic[y] adopted by the Attorney General to implement the provisions of section 1225(b)(1)," so the class's due process claim is barred by § 1252(a)(2)(A)(iv).[5]

Alternatively, the government asserts that § 1252(e)(3) precludes the bond hearing class from bringing its claim outside of the United States District Court for the District of Columbia. It maintains that *Matter of M-S-* "implements" 1225(b)(1)(B)(ii), so the class's due process claim involves "[j]udicial review of . . . [§ 1225(b)'s] implementation." 8 U.S.C. § 1252(e)(3).

We address each argument in turn.

**1. Section 1252(a)(2)(A)**

None of the four provisions in § 1252(a)(2)(A) is implicated by the bond hearing class's due process challenge to its members' detention.

Romanettes (i) and (iii) are plainly inapplicable here. The class does not challenge any "individual determination" or assert a "cause or claim" concerning "the implementation or operation of an order of removal." 8 U.S.C. § 1252(a)(2)(A)(i). By definition, there has been no order of removal for any class member; each has an asylum or CAT claim that remains undecided. The class also does not challenge "the application of [§ 1225(b)(1)] to individual aliens," as it does not ask the court to determine whether the

[5] The government also suggests that the other subsections of § 1252(a)(2)(A) potentially bar the bond hearing class's claim. *See infra*, pp. [18–19].

government properly applied § 1225(b)(1)(B)(ii) to any particular individual. 8 U.S.C. § 1252(a)(2)(A)(iii).

Nor is the class's claim precluded by subsection (ii), which "bars judicial review of 'a decision by the Attorney General to invoke the provisions of [§ 1225(b)(1)]' in a given case." *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1154 (9th Cir. 2022) (emphasis omitted) (quoting 8 U.S.C. § 1252(a)(2)(A)(ii)). Again, the class's due process claim does not challenge the government's decision to detain in any individual, "given case." Rather, class members challenge the constitutionality of § 1225(b)(1)(B)(ii), which *Jennings* held requires mandatory detention. Because *Jennings* interpreted § 1225(b)(1)(B)(ii) as making detention mandatory, the class's challenge is not to any decision or determination in "a given case," but rather to the constitutionality of a statute. Subsection (ii) does not apply.

The final subsection, romanette (iv), addresses review of "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A)(iv). The government contends that this provision governs because the class's due process claim implicates *Matter of M-S-*. That opinion, the government asserts, is a policy implementing § 1225(b)(1)(B)(ii)'s detention mandate. But the class's due process claim is, after *Jennings*, necessarily a challenge to § 1225(b)(1)(B)(ii) itself.

In *Jennings*, the Court assessed whether § 1225(b)(1)(B)(ii), read in conjunction with § 1226(a), requires the government to provide a bond hearing to individuals detained under that provision. 583 U.S. at 296–98. The Court determined that it does not. It held that § 1225(b)(1)(B)(ii) "mandate[s] detention" until asylum

proceedings "have concluded." *Id.* at 297. The Court explained that the statute's provision authorizing temporary parole "for urgent humanitarian reasons or significant public benefit" is the sole exception to the mandatory detention required by the statute. *Id.* at 300 (quoting 8 U.S.C. § 1182(d)(5)(A)). Because "[t]hat express exception to detention implies that there are no other circumstances under which aliens detained under § 1225(b) may be released," the Court determined that § 1225(b)(1)(B)(ii) does not allow for release and so no bond hearings need be held. *Id.* (emphasis omitted).

The Attorney General subsequently referred *Matter of M-S-* to himself to address "[w]hether *Matter of X-K-* . . . should be overruled in light of *Jennings v. Rodriguez*." *Matter of M-S-*, 27 I. & N. Dec. 476, 476 (A.G. 2018). *Matter of M-S-*, 27 I. & N. Dec. 509, 510 (A.G. 2019) concluded that "unless paroled, an alien must be detained until his asylum claim is adjudicated" pursuant to § 1225(b)(1)(B)(ii), precisely what *Jennings* had already interpreted the detention statute to require. *Matter of M-S-* thus simply recognized, as required by *Jennings*, that the statute did not permit noncitizens detained under § 1225(b)(1)(B)(ii) to access bond hearings. *Matter of M-S-* then went on to overrule *Matter of X-K-*. *Matter of M-S-*, 27 I. & N. Dec. at 510.

The bond hearing class asserts that "Defendants violate the Fifth Amendment's Due Process Clause by failing to provide prompt individualized custody hearings with adequate safeguards." As interpreted by *Jennings*, § 1225(b)(1)(B)(ii) does not allow for such hearings. Plaintiffs' due process claim is thus a constitutional challenge to the statutory detention requirement in

§ 1225(b)(1)(B)(ii).[6] Section 1252(a)(2)(A)(iv) does not bar judicial review of the validity of section 1225(b)(1). It bars review only of "procedures and policies adopted . . . to implement" that section. *Id.* § 1252(a)(2)(A)(iv). So subsection (iv), like the other subsections of § 1252(a)(2)(A), does not preclude the bond hearing class's claim. *Id.*

Any remaining doubt that § 1252(a)(2)(A) does not apply to the class's claim is dispelled by the principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). "This rule of statutory construction is necessary to avoid 'the serious constitutional question that would arise if we construed [a statute] to deny a judicial forum for constitutional claims.'" *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986)). Section 1252(a)(2)(A) provides no indication that Congress intended to limit judicial review of the constitutional claim at issue here.

Our conclusion that § 1252(a)(2)(A) does not bar the bond hearing class's challenge is consistent with that

[6] Even if Plaintiffs' due process claim were conceived of as *both* a challenge to the constitutionality of § 1225(b)(1)(B)(ii) and to *Matter of M-S-*, and we accepted the government's assumption that an Attorney General's decisions in precedential BIA cases can constitute "procedures" or "policies" to implement § 1225(b)(1)—an issue we need not reach—the result would be the same: the constitutional challenge to the statute would proceed in the district court. *See e.g.*, *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (Barrett, J., concurring) (requiring splitting of claim between two forums, each of which had jurisdiction over an aspect of the claim).

section's purpose. As explained in the House Judiciary Committee Report on the legislation creating expedited removal, Congress was concerned with making "[e]xpedited removal . . . subject to strictly limited judicial review." H.R. Rep. No. 104-469, at 12 (1996). The statute "limits administrative and judicial review of expedited removal proceedings" "[i]n order to streamline the removal process." *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081 (9th Cir. 2011); *see also I.M. v. U.S. Customs & Border Prot.*, 67 F.4th 436, 437–38 (D.C. Cir. 2023). If courts could review all determinations made during expedited removal proceedings, then "the process would no longer be expedited." *Thuraissigiam*, 591 U.S. at 113. Accordingly, § 1252(a)(2)(A)'s goal is to ensure that expedited removal proceedings remain expedited.

Limiting judicial review of the constitutionality of mandatory detention under § 1225(b)(1)(B)(ii) would in no way advance that goal. If a noncitizen screened for expedited removal obtains a positive credible fear finding, then they are no longer subject to the expedited removal process. Instead "the applicant will receive 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110 (quoting 8 C.F.R. § 208.30(f)).[7] As a result, judicial review of the provision governing detention *after* a finding of credible fear cannot possibly be said to delay—or impact in any way—expedited removal, as the detained individual is no longer in expedited

[7] *See* 8 U.S.C. § 1225(b)(1)(B)(ii) (mandating that a noncitizen with a positive credible fear finding obtain "further consideration of the application for asylum"); H.R. Rep. No. 104-469, at 158 (1996) ("If the alien meets this [credible fear] threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim—the same as any other alien in the U.S.").

removal. And, in any event, the length of detention and the length of the removal proceedings are entirely discrete matters; whether an individual in removal proceedings is detained or not, the proceedings will end when they end, not earlier or later.

In short, § 1252(a)(2)(A) does not preclude review of the bond hearing class's due process claim.

**2. Section 1252(e)(3)**

Nor does § 1252(e)(3) preclude jurisdiction here. As discussed, § 1252(a)(2)(A)(i), (ii), and (iv) strip the court of jurisdiction over various issues related to expedited removal "except as provided in subsection (e)." Section 1252(e)(3), in turn, states that "[j]udicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia" but that such review is limited to only certain issues and must be brought within 60 days after "the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." 8 U.S.C. § 1252(e)(3)(A)–(B).

As the statutory scheme indicates, § 1252(e)(3) is "*an exception* to the jurisdictional bars in § [1252](a)(2)(A)," *Mendoza-Linares*, 51 F.4th at 1155–56 (emphasis added), not an independent jurisdiction-limiting provision. Section 1252(e)(3) preserves the D.C. District Court's jurisdiction over a subset of claims otherwise barred by § 1252(a)(2)(A). It does not preclude other courts from asserting available jurisdiction over challenges where § 1252(a)(2)(A) does not

apply.[8] Nothing in the text of § 1252(e)(3) indicates that it is meant to operate as an independent jurisdiction-limiting provision. Rather, the statutory scheme confirms that § 1252(e)(3) *grants* jurisdiction where otherwise § 1252(a)(2)(A), standing alone, would preclude it. Consistent with this understanding, the D.C. Circuit has described § 1252(e)(3) as "preserv[ing] the district court's jurisdiction under 28 U.S.C. § 1331" where jurisdiction would otherwise have been stripped by § 1252(a)(2)(A). *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 624–25 (D.C. Cir. 2020); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19 (D.D.C. 2020).[9] As we have explained, § 1252(a)(2)(A) does not strip jurisdiction over the class's constitutional challenge to the detention mandate imposed by § 1225(b)(1)(B)(ii), as interpreted in *Jennings*, so § 1252(e)(3) has no applicability here.

To summarize: § 1252(a)(2)(A) does not deprive the court of jurisdiction over the class's due process claim. Section 1252(e)(3)'s limited jurisdictional grant therefore does not come into play. As neither § 1252(a)(2)(A) nor § 1252(e)(3) bars the class's due process claim, the district court, and we, have subject matter jurisdiction over that claim.

---

[8] Under 28 U.S.C. § 1331, the court has jurisdiction to decide federal questions, which include questions concerning the constitutionality of statutes.

[9] Under this provision, the District Court for the District of Columbia retains jurisdiction to hear cases challenging the agency's processes for carrying out expedited removal. *See, e.g.*, *Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 25 (D.C. Cir. 2026).

### B. Merits

We now turn to the second certified question: whether the class "may pursue constitutional due process claims regarding bond hearings" in light of *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020).

The government's sweeping core position is that after *Thuraissigiam*, noncitizens who have entered the United States unlawfully have no procedural due process rights beyond those conferred by statute. As a result, the government maintains, noncitizens, such as those in the bond hearing class, who are covered by the recently expanded expedited removal designation, may be detained for as long as it takes to complete full removal proceedings, including court of appeals review of the agency decision. Because the government's argument turns on its understanding of *Thuraissigiam*, we begin by carefully examining that opinion.

Vijayakumar Thuraissigiam crossed the border into the United States without inspection. *Thuraissigiam*, 591 U.S. at 114. He was then apprehended 25 yards from the border and placed in expedited removal proceedings. *Id.* At that point, Thuraissigiam asserted that he feared persecution if returned to his home country, Sri Lanka. *Id.* An asylum officer and an immigration judge found that he lacked a credible fear of persecution. *Id.* Thuraissigiam then filed a habeas petition contesting the negative credible fear finding. *Id.* at 114–15. The Court determined that 8 U.S.C. § 1252(e)(2)

"unequivocally bars habeas review of [Thuraissigiam's] claims."[10] *Id.* at 133.

In doing so, the Court rejected the proposition that § 1252(e)(2)'s jurisdiction limitation "violate[d] [Thuraissigiam's] right to due process by precluding judicial review of his allegedly flawed credible-fear proceeding." *Id.* at 138. It explained that, "[w]hile aliens who have established connections in this country have due process rights in deportation proceedings, the Court long ago held that Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien *at the threshold of initial entry* cannot claim any greater rights under the Due Process Clause." *Id.* at 107 (emphasis added). Consequently, "an alien in [Thuraissigiam's] position has

---

[10] Section 1252(e)(2) states:

> Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—
>
> (A) whether the petitioner is an alien,
> (B) whether the petitioner was ordered removed under such section, and
> (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

only those *rights regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added).

The government argues that, under *Thuraissigiam*, the bond hearing class members have no procedural due process rights regarding their detention other than what is provided by statute. Because the statute does not provide for bond hearings, *see Jennings*, 583 U.S. at 302–03, the government contends, the class's due process claim necessarily fails.

We cannot agree with this extreme reading of *Thuraissigiam*. *Thuraissigiam* did not—contrary to the government's contention—trample decades of precedent establishing that noncitizens within the United States, legally or not, generally are within the protections of the Fifth Amendment's Due Process Clause. The limits on noncitizens' due process rights that *Thuraissigiam* recognized apply only to individuals on the threshold of initial entry, not individuals well within the country's borders and present for days, weeks, months, or years.

### 1. Threshold of Initial Entry

First and most important, *Thuraissigiam*'s due process holding turned on its conclusion, emphasized repeatedly, that Thuraissigiam was apprehended "at the threshold of initial entry" or "on the threshold." 591 U.S. at 107, 140. As expedited removal now applies to unlawful entrants who arrived up to two years before their apprehension and are encountered anywhere in the country, the bond hearing class is comprised largely of individuals who have passed that "threshold" both temporally and geographically.[11] Such

[11] The definition of the class is not included with the certified questions, nor did the government argue in this appeal that the definition is flawed.

individuals, under *Thuraissigiam* as before, are entitled to the constitutional due process rights available to every person present in the United States. *Thuraissigiam*, narrowly focused on noncitizens right near the border, did not unsettle this longstanding principle.

#### i. Due Process and the Territoriality Rule

"No *person* shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V (emphasis added). As its language proclaims, the Fifth Amendment's due process guarantee is accorded *any* person. It is not contingent on citizenship status. The Supreme Court confirmed well over a century ago that "even aliens shall not be . . . deprived of life, liberty, or property without due process of law." *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). The application of the Fifth Amendment to noncitizens has been repeatedly and resoundingly reaffirmed over the many years since *Wong Wing*. *See, e.g.*, *Downes v. Bidwell*, 182 U.S. 244, 283 (1901); *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *Galvan v. Press*, 347 U.S. 522, 530 (1954); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). There is just no room for doubt that "since he is a 'person,' an alien has the same protection for his life, liberty and property under the Due Process Clause as is afforded to a citizen." *Galvan*, 347 U.S. at 530.

---

The class definition potentially could, in the district court, be amended to leave out the narrow category of noncitizens covered by *Thuraissigiam*.

The application of the Due Process Clause to a noncitizen generally turns on whether that individual is "within the territory of the United States." *Wong Wing*, 163 U.S. at 238. Noncitizens "outside the sovereign territory of the United States" are generally not "entitled to Fifth Amendment rights." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990); *see also Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950). "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens." *Zadvydas*, 533 U.S. at 693. As a result, physical entry is, by and large, the pivotal factor on which the scope of a noncitizen's due process rights turns.

Importantly, the applicability of the Due Process Clause is not contingent on the *legality* of an individual's entry. Ergo, "[a]liens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler*, 457 U.S. at 210.[12] The Due Process Clause applies to all "aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

### ii. The Entry Fiction

There is a narrow exception to the territoriality rule: the "entry fiction." Where the entry fiction applies, "aliens seeking admission into the United States may *physically* be

[12] *See also Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1109 (9th Cir. 2001) ("[A]liens who have entered the United States, legally or illegally, are entitled to the protections of the Fifth Amendment."); *Mezei*, 345 U.S. at 212 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

allowed within its borders pending a determination of admissibility, [but] such aliens are *legally* considered to be detained at the border and hence as never having effected entry into this country." *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir. 1995) (en banc) (emphasis added) (citation omitted); *see Mezei*, 345 U.S. at 215 (explaining that "such temporary harborage . . . [does] not affect[] an alien's status").

The entry fiction was devised as a response to the humanitarian crisis created by a massive increase in immigration at the end of the nineteenth century. Most immigrants arrived by ship, where they waited to be inspected before disembarking. *See* Eunice Lee, *The End of Entry Fiction*, 99 N.C. L. Rev. 565, 584 (2021). The immigration system was overwhelmed, so the wait was often lengthy, and the conditions on the ships were notoriously squalid and unsanitary. *Id.* at 585–88; Charles D. Weisselberg, *The Exclusion and Detention of Aliens: Lessons from the Lives of Ellen Knauff and Ignatz Mezei*, 143 U. Pa. L. Rev. 933, 952 (1995). So Congress passed legislation allowing immigration officers to order uninspected individuals removed from the vessels they arrived on and then examined later at a designated time and place. Act of Mar. 3, 1891, ch. 551, § 8, 26 Stat. 1084, 1085; *Mezei*, 345 U.S. at 215. The immigrants were granted "temporary harborage" in the United States pending a conclusive determination on whether to admit them. *Mezei*, 345 U.S. at 215. "But such temporary harborage, an act of legislative grace, bestow[ed] no additional rights." *Id.* The entry fiction allowed noncitizens temporarily to enter the United States without any impact on their immigration status or ultimate right to be admitted; they remained "in the same position, so far as regarded [their] right to land in the United

States, as if [they] never had been removed from the steamship." *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892).

Today, the entry fiction encompasses those apprehended at or very near a point of entry and then either paroled into the United States or detained in the United States pending a determination of their admissibility. Such individuals are "treated as if stopped at the border" with respect to certain legal rights. *Mezei*, 345 U.S. at 215; *see also Nishimura Ekiu*, 142 U.S. at 661–62; *United States v. Ju Toy*, 198 U.S. 253, 263 (1905); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). Because such individuals remain "on the threshold of initial entry" despite their physical presence in the United States, their due process rights regarding admission are limited to "[w]hatever the procedure authorized by Congress is." *Mezei*, 345 U.S. at 212 (citation omitted).

The entry fiction traditionally applied only to individuals encountered by immigration officials at a point of entry. *See, e.g.*, *Nishimura Ekiu*, 142 U.S. at 661; *Mezei*, 345 U.S. at 208; *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 539 (1950). In *Thuraissigiam*, the Supreme Court extended the entry fiction a tiny bit—to an individual apprehended immediately after entry within 25 yards of the border. 591 U.S. at 107. Although Thuraissigiam had his feet on United States soil for long enough to traverse those 25 yards, the Court determined that his legal status was that of one on the "threshold of initial entry." *Id.* As a consequence of that status, he did not have due process rights "regarding admission" beyond those "that Congress has provided by statute." *Id.* at 140.

This court has, since *Thuraissigiam*, applied the entry fiction to other individuals apprehended immediately after entering the United States. *Guerrier v. Garland*, 18 F.4th 304 (9th Cir. 2021), applied the entry fiction to an individual apprehended "'shortly []after' entering the United States" who challenged his lack of counsel during his credible fear interview. *Id.* at 307 n.1, 312–13. Likewise, *Mendoza-Linares*, 51 F.4th at 1149, applied the entry fiction to an individual "immediately apprehended and detained" after "jumping over the international border fence" with regard to a challenge to a negative credible fear determination.

**iii. The Threshold of Initial Entry**

The bond hearing class is fundamentally differently situated from Thuraissigiam and the individuals in *Guerrier* and *Mendoza-Linares*. The class is specifically limited to those who "who entered the United States without inspection." So, it excludes individuals encountered at a point of entry. And, as we have explained, as DHS now uses "expedited removal to the fullest extent authorized by statute," any inadmissible noncitizen "encountered anywhere in the United States" who has "been continuously present in the United States for less than two years" is currently subject to expedited removal. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025). The bond hearing class includes all noncitizens originally in expedited removal who are subject to detention during full removal proceedings following a positive credible fear determination. That group now includes noncitizens apprehended tens, hundreds, or over a thousand miles from the border, weeks, months, or up to two years after entry.

*Thuraissigiam* was not an abandonment of the longstanding principle that noncitizens, like the class members, who are well within the country's borders are protected by the Due Process Clause. If it were, the Court would not have taken pains repeatedly to emphasize that Thuraissigiam was "at the threshold of initial entry," or "on the threshold," 591 U.S. at 107, 140, and "just 25 yards from the border," *id.* at 107. And, if it were adopting the groundbreaking principle the government posits, the Court in *Thuraissigiam* would have grappled with the serious stare decisis concerns any broader holding would have raised. To the contrary, *Thuraissigiam* affirmed that "aliens who have established connections in this country have due process rights in deportation proceedings." *Id.* at 107.

The government insists otherwise, asserting that, under *Thuraissigiam*, every individual subject to the new expedited removal directive is "on the threshold of initial entry" and so has no due process rights beyond those in the expedited removal statute. *Mezei*, 345 U.S. at 212. And, when asked, the government explained that its position does not stop there. Should Congress choose to apply the expedited removal procedures to *all* noncitizens who entered illegally, the government maintained, there would be no constitutional barrier to doing so and "it doesn't really matter if it's two weeks or two years or five years or nine years for that matter."[13]

[13] The government has taken a similarly extreme position elsewhere. *See Make the Road N.Y. v. Noem*, 805 F. Supp. 3d. 139, 147 (D.D.C. 2025) ("[T]he Government makes a truly startling argument: that those who entered the country illegally are entitled to no process under the Fifth Amendment, but instead must accept whatever grace Congress affords

The government's interpretation of *Thuraissigiam* proposes that the *constitutional* question whether an undocumented individual is entitled to due process protections is determined solely by whether Congress decided to apply § 1225's expedited removal criteria—or the criteria of some future, broader expedited removal statute—to that individual. In other words, in the government's view, there is no independent constitutional due process protection for undocumented individuals at all. If a statute provides that they may be ousted from the country without *any* procedural protections, then they can be.

The government's boundless proposition is nowhere to be found in *Thuraissigiam*. *Thuraissigiam* does not anywhere suggest that the entry fiction has swallowed up the *Wong Wing* principle that the Due Process clause applies to all "persons," including those illegally present in this country. Nor could it have so held. "The right to due process is conferred, not by legislative grace, but by constitutional guarantee." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (citation modified).

Contrary to the government's asserted understanding of the opinion, *Thuraissigiam*'s due process holding—and its underlying interpretation of the entry fiction—was explicitly premised on the fact that Thuraissigiam was detained within yards of the border immediately after his unauthorized entry. The Court explained that Thuraissigiam "attempted to enter the country illegally and was apprehended just 25 yards from the border. He *therefore* has no entitlement to procedural

---

them."), *vacated*, 179 F.4th 16 (D.C. Cir. 2026); *Rodriguez v. Ortega*, 180 F.4th 702, 714-15 (5th Cir. 2026), *reh'g en banc granted, opinion vacated*, 2026 WL 2014647 (5th Cir. July 10, 2026).

rights other than those afforded by statute." *Thuraissigiam*, 591 U.S. at 107 (emphasis added).

The government's extravagant reading of *Thuraissigiam* is at odds with the key concept, emphasized in *Thuraissigiam*, that the entry fiction applies to those noncitizens stopped "at the threshold of initial entry," *id.*, as well as to those allowed to enter only conditionally. "Threshold" means "the place or point of entering or beginning: outset." *Threshold*, Merriam-Webster Coll. Dictionary 1639 (12 ed. 2026). "Threshold" thus connotes a limited geographic space closely proximate to the point of entry and a temporal period closely proximate to the moment of entry. As *Thuraissigiam* explained, the entry fiction applies to "an alien who is detained *shortly after unlawful entry*." 591 U.S. at 140 (emphasis added).

Once again, the expedited removal process now applies to undocumented individuals apprehended *anywhere in the United States* within *two years* of their initial entry. That group is not congruent with the category of noncitizens covered by *Thuraissigiam*. A person who, for example, has been in the United States for over a year and lives in Nebraska is no more on the "threshold" of entry than a person sleeping in their bedroom is on the "threshold" of their house or a student graduating from college is on the "threshold" of matriculating. *Thuraissigiam*'s careful limitation of its due process holding to those apprehended on the "threshold of initial entry" was not an invitation to the government to remove constitutional due process protections from everyone who meets the statutory criteria for expedited removal as it now exists—or as it may be expanded by statute to cover all noncitizens who enter illegally. *Id.* at 107.

#### iv. Entry Versus Admission

As a counterpoint, the government puts forth a novel interpretation of "entry." It contends that "entry" requires legal admission; *all* those not legally admitted, according to the government, remain on the "threshold of initial entry" and have only those due process rights provided by statute. This assertion runs squarely into over a century of Supreme Court precedent holding that those who have physically entered the United States, no matter the legality of their entry, are entitled to due process under the Fifth Amendment.

In *Yick Wo v. Hopkins*, the Court recognized that "[t]he fourteenth amendment to the constitution is not confined to the protection of citizens"; its provisions are "universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." 118 U.S. 356, 369 (1886). *Wong Wing* then applied *Yick Wo*'s interpretation to the Fifth Amendment, proclaiming that "*all* persons within the territory of the United States," even those accused of "being and remaining unlawfully within the limits of the United States" are entitled to due process rights under the Fifth Amendment. 163 U.S. at 234, 238 (emphasis added). *Yamataya* reaffirmed this principle, declaring that a person "who has entered the country, . . . although alleged to be illegally here" must be given due process. 189 U.S. at 101. *Mezei* likewise held that "aliens who have once passed through our gates, *even illegally*, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." 345 U.S. at 212 (emphasis added).

The Court has not wavered from this position in the intervening years. In *Mathews*, it again explained:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.

426 U.S. at 77 (citations omitted). *Plyler* made this point yet again: "'all persons within the territory of the United States,' *including aliens unlawfully present*, may invoke the Fifth and Sixth Amendments to challenge actions of the Federal Government." 457 U.S. at 212 (emphasis added) (quoting *Wong Wing*, 163 U.S. at 238). And, in *Zadvydas*, the Court was emphatic once more that "the Due Process Clause applies to all 'persons' within the United States, including aliens, *whether their presence here is lawful, unlawful, temporary, or permanent.*" 533 U.S. at 693 (emphasis added).

The government insists that *Thuraissigiam* undid—without so acknowledging—this extensive authority. It so contends even though *Thuraissigiam* nowhere suggested that it was overruling any Supreme Court precedents, and never made any broad statements affecting the due process rights of all illegal entrants generally, as opposed to those encountered "at the threshold of initial entry." 591 U.S. at 107. So that there is no uncertainty, we will say it once more: except for the extremely narrow category of people covered

by the entry fiction, *every* person in the United States is entitled the Fifth Amendment's guarantee of due process, regardless of their citizenship or legal status. We cannot, as the government urges, circumvent this bedrock principle by completely reinventing the entry fiction such that every person who has not been legally admitted is stripped of their due process rights. The bond hearing class includes noncitizens apprehended far beyond the threshold of entry covered by *Thuraissigiam*. It is therefore made up largely of individuals who, before and after *Thuraissigiam*, have full procedural due process rights under the Fifth Amendment.

### 2. Admission Versus Detention

This conclusion is reinforced by the consideration that the class's due process claim concerns *detention*—not, as in *Thuraissigiam*, admission to the country.

*Thuraissigiam* specifically addressed whether a petitioner had a due process right independent of statutory protections to judicial review of his negative credible fear finding. 591 U.S. at 140. A credible fear determination affects whether an individual may be removed or denied admission without access to full asylum proceedings. Thuraissigiam's due process claim thus concerned *admission*. As the Court noted, Thuraissigiam "made no mention of release from custody," nor did he assert a due process claim regarding judicial review of any aspect of his detention. *Id.* at 115, 117–18. And the Court in *Thuraissigiam* emphasized that it was specifically addressing Thuraissigiam's admission-related rights, concluding that "an alien in respondent's position has only those *rights regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added).

Unlike the political branches' plenary power over admission, [14] the principle that the government cannot arbitrarily detain people, including noncitizens, has been a central tenet of British and American legal traditions since the thirteenth century. Admission and detention occupy fundamentally different positions in our legal order. From the Declaration of Independence through the original Constitution and the Fourteenth Amendment, protection against restrictions on "liberty" has been central to our national identity.

Our tradition of due process protections predates the nation itself, deriving from the "settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1855). So our examination of the long tradition of restraints on the government's authority to detain people, including noncitizens, begins in thirteenth-century England.

The right to be free from detention without adequate process was recognized at least as early as 1215, when the Magna Carta, "the foundation of American as well as British liberty," was adopted. *Martin v. Waddell's Lessee*, 41 U.S. 367, 382 (1842). That seminal document pronounced that "[n]o free man shall be taken [or] imprisoned, . . . except by the lawful judgment of his peers and by the law of the land." Magna Carta, ch. 39, *reprinted in* A.E. Dick Howard, *Magna Carta: Text and Commentary* 43 (1964).

In the centuries that followed, freedom from detention was understood as the foundation of all other rights. "[T]he liberty of a mans person" provided for in the Magna Carta,

[14] *Thuraissigiam*, 591 U.S. at 139 (citation omitted).

"is more precious to him, th[a]n all the [rights] that follow." Edward Coke, *The Second Part of the Institutes of the Laws of England* 45 (1797). A century after the Magna Carta, a 1354 statute declared that "no Man of what Estate or Condition that he be, shall be . . . taken, nor imprisoned . . . without being brought in Answer by due Process of the Law." 28 Edw. 3, ch. 3 (1354). So was born the "due process" terminology to encompass the protections against arbitrary detention fundamental to our liberty.

The right to be free from temporary detention before adjudication, absent adequate justification, is at least as old as the Magna Carta. By the 1100s, an individual imprisoned pretrial could seek release from confinement through the writ *de homine replegiando*, unless accused of a particularly severe offense. *See* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 43–45 (1977). By 1275, the right to be released pretrial if eligible for bail, and the procedures for establishing such eligibility, were codified. *See* Statute of Westminster the First of 1275, 3 Edw. 1, ch. 15. These early provisions rested on the fundamental principle that the government cannot deprive an individual of liberty, even temporarily, without providing an individualized justification.

After the Magna Carta's broad declaration of the right to be free from arbitrary detention and the codification of mechanisms for securing release, additional interventions further limited the government's detention authority. In *Darnell's Case* (1627) 3 How. St. Tr. 1, five knights were imprisoned without being charged with any specific offense. When the Court of the King's Bench upheld their detention and denied them bail, Parliament responded by adopting the Petition of Right. *See* Petition of Right, 3 Car. 1 c. 1 (1627); *see* Kellen R. Funk & Sandra G. Mayson, *Bail at the*

*Founding*, 137 Harv. L. Rev. 1816, 1827–28 (2024). The Petition of Right protested the practice of "imprison[ment] without any cause showed" and provided that "no freeman in any such manner as is before mentioned be imprisoned or detained." Petition of Right §§ 5, 8 (spelling modified).

Subsequent enactments created additional procedures designed to prevent arbitrary detention. The Habeas Corpus Act of 1679, 31 Car. 2 c. 2, characterized by Blackstone as a "second *magna carta*, and stable bulwark of our liberties," established various detention-related procedures, including an assurance against undue delays in holding bond hearings for pretrial detainees. 1 William Blackstone, *Commentaries* *133; *see also* Habeas Corpus Act, 16 Car. 1 c. 10, § 6 (1640) (providing for use of the writ of habeas corpus to contest the legality of detention).[15] A decade later, the English Bill of Rights prohibited the practice of setting "excessive bail[]" to "elude the Benefit[] of the Lawes made for the Liberty of the Subjects." Bill of Rights, 1 W. & M. 2 c. 2 (1689).

Critically for present purposes, the ability to contest the legality of one's detention during this period was not limited to citizens. *See* Matthew Hale, *The Prerogatives of the King* 56 (1976); *see also* 11 *Halsbury's Laws of England* 25 (3d ed. 1955). Noncitizens could and did challenge their detention. In one case, for example, an African slave purchased in Virginia and transported to England obtained habeas relief on the ground that English law did not recognize his enslavement. *Somerset v. Stewart* (1772) 98

[15] At that time, the writ of habeas corpus was the primary mechanism by which individuals could enforce the Magna Carta's protections against detention without due process. *See* Coke, *supra*, at 52; 9 W.S. Holdsworth, *A History of English Law* 111–12 (1926); 3 William Blackstone, *Commentaries* *137.

Eng. Rep. 499, 510. In another, a court considered the habeas petition of a Swedish man, holding that he was lawfully detained. *R v. Schiever* (1759) 97 Eng. Rep. 551, 551–52. "[I]n the many cases of foreigners using habeas corpus the issue of their foreignness was almost never discussed, much less used to bar review of detention orders." Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 Va. L. Rev. 575, 605 (2008). In one of the rare instances in which it was argued that a noncitizen should not be able to access habeas relief to challenge his detention because he was a foreigner, that assertion was rejected and the prisoner discharged. *See Du Castro's Case* (1697) 92 Eng. Rep. 816.

The right to challenge unlawful detention also extended to non-criminal detentions and confinements. English courts reviewed the allegedly unlawful confinement of a woman to a "mad-house," *R v. Turlington* (1761) 97 Eng. Rep. 741; the impressment of sailors, *see Goldswain's Case* (1778) 96 Eng. Rep. 711; and detention during bankruptcy proceedings, *see R v. Nathan* (1730) 93 Eng. Rep. 914. By the seventeenth century, it had become increasingly common to use the writ of habeas corpus "to get relief from imprisonment by private persons, or from imprisonment on other than a charge of crime." 9 Holdsworth, *supra*, at 119; *see also* Jonathan L. Hafetz, *The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts*, 107 Yale L.J. 2509, 2522–24. Bail was likewise available for individuals detained in connection with a civil case. *See* 4 William Blackstone, *Commentaries* *294.

The deep concern over arbitrary deprivations of liberty, and the sustained project of limiting the government's detention authority, carried through to the founding of our nation. "The Framers viewed freedom from unlawful

restraint as a fundamental precept of liberty." *Boumediene v. Bush*, 553 U.S. 723, 739 (2008). Early on, Alexander Hamilton proclaimed that "the practice of arbitrary imprisonments, [has] been, in all ages, the favorite and most formidable instrument[] of tyranny." The Federalist No. 84 (Alexander Hamilton). Hamilton saw preventing arbitrary imprisonment as a critical reason for creating the federal judiciary, to prevent Congress from imprisoning individuals without adequate judicial process. *See* The Federalist No. 78 (Alexander Hamilton). In debates over the ratification of the Constitution, there was much discussion of whether the proposed provisions sufficiently prevented "arbitrary imprisonment, which has been the principal source of tyranny in all ages." 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 145 (Jonathan Elliot ed., 2d ed. 1836) (quoting James Iredell); *see also* 2 *id.*, at 79 (characterizing the ability to force the government to justify an individual's detention as "essential to freedom").

The Framers, committed to guarding against arbitrary detention, included numerous provisions in our Constitution to protect against unlawful restraint—the Fifth Amendment's due process guarantee, the Eighth Amendment's prohibition on excessive bail, and the Suspension Clause's assurance of access to the writ of habeas corpus. U.S. Const. amends. V, VIII; *id.* art. I, § 9 cl. 2. Carrying forward the English tradition, the authority to challenge the legality of detention was ordinarily accorded during the founding era to citizens and noncitizens alike. *See, e.g.*, *United States v. Villato*, 2 U.S. (2 Dall.) 370, 373 (1797); *Ex parte D'Olivera*, 7 F. Cas. 853, 854 (C.C.D. Mass. 1813).

This historical account illustrates three features of our legal tradition regarding detention. *First*, freedom from arbitrary imprisonment has occupied a central place in both the English constitutional order and our own. As Blackstone proclaimed, detention ungoverned by adequate procedures is a "dangerous engine of arbitrary government." 1 William Blackstone, *Commentaries* *131–32. "Of great importance to the public is the preservation of this personal liberty: for if once it were left in the power of any, the highest, magistrate to imprison arbitrarily whomever he or his officers thought proper, . . . there would soon be an end of all other rights and immunities." *Id.* at *131. *Second*, there is a long history of imposing limits on the government's ability to detain or imprison people. Such constraints include the widespread availability of bail as well as judicial review of the legality of confinement. And, *finally*, noncitizens and citizens alike have been able to use these mechanisms to obtain release from detention.

Concern about arbitrary detention is not a vestige of a bygone era. Since the founding, constitutional protections limiting the government's authority over physical confinement have expanded, not diminished. In the immigration context specifically, rights against arbitrary detention have been frequently vindicated through the Due Process Clause, in recognition that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. *Zadvydas* so confirmed when it recognized that there are constitutional limitations on the government's ability to detain noncitizens who have final orders of removal. *See id.* at 696. Although such individuals have no right to remain in

the United States, they retain their constitutional rights regarding confinement.

In sum, the government's strictly circumscribed detention authority, a pillar of our common law tradition for almost a millennium, stands in contrast to the political branch's "plenary authority to decide which aliens to admit." *Thuraissigiam*, 591 U.S. at 139. *Thuraissigiam* was an admission, not a detention, case. For that reason, as well as because it was specifically limited to noncitizens at the "threshold of initial entry," it has no application here, the government's fervent pleas for its vast expansion notwithstanding. *Id.* at 107. Noncitizens who arrive illegally and are found away from the border well after arrival are protected from arbitrary detention in violation of the Due Process Clause.**[16]**

## III. Conclusion

The district court correctly concluded that (1) it has jurisdiction over this dispute and (2) *Thuraissigiam* does not bar the bond hearing class's due process claim. The district court's order denying the government's motion to dismiss is **AFFIRMED.**

[16] What those protections entail is an issue not before us now, as it is not within the certified issues in this interlocutory appeal.

FRIEDLAND, Circuit Judge, concurring:

I join all of the majority's opinion except for Section II.B.2. I agree that *Thuraissigiam*'s holding covers only those applicants at the threshold of initial entry. Given the broad class definition, *see* Maj. Op. at 25 n.11, that conclusion is sufficient to resolve the certified questions in this appeal. I therefore refrain from deciding anything further. *See PDK Laboratories Inc. v. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").